D.C. No. 1:22-cv-00434-JAO-KJM

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

———————

In Re:  PANIOLO CABLE COMPANY, LLC,

Debtor.

WAIMANA ENTERPRISES INC.,

Appellant,

v.

HAWAIIAN TELCOM, INC., et al.,

Appellees.

———————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

NO. HI-22-01178

HON. ROBERT J. FARIS

**APPENDIX**

WILLIAM MEHEULA          2277
MEHEULA LAW, LLLC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaii 96813
Telephone No.: (808) 599-9554
Email:  bill@meheulalaw.com

Attorney for Appellant
WAIMANA ENTERPRISES INC.;
PA MAKANA LLC; and
CLEARCOM, INC

i

# TABLE OF CONTENTS

2022/08/18 (Dkt. 67) Order Granting Motion By Hawaiian Telcom, Inc. To Dismiss The First Amended Complaint In Its Entirety .......................................1-4

2022/08/23 (Dkt. 71) Judgment on Adversary Proceeding (Adversary Proceeding No. 22-90008) ...............................................5-8

2022/08/30 (Dkt. 75) Notice of Appeal and Statement of Election .................9-15

2022/03/29 (Dkt. 637, at 8-9) Motion By Hawaiian Telcom, Inc. For Interim And Final Relief Enforcing The Court's Sale Order ...........................16-166

2022/05/17 (Dkt. 729) Order Granting Final Relief in Connection With Motion by Hawaiian Telcom, Inc. Enforcing the Court's Sale Order .................167-174

**Date Signed:**
**August 18, 2022**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>   Debtor. | CASE NO. 18-01319<br>(Chapter 11) |

| | |
|---|---|
| WAIMANA ENTERPRISES INC.,<br>PA MAKANI LLC, CLEARCOM,<br>INC.<br><br>   Plaintiffs,<br><br>  v.<br><br>HAWAIIAN TELCOM INC.,<br><br>   Defendant. | Adversary Proceeding No. 22-90008<br><br><br>**ORDER GRANTING MOTION BY HAWAIIAN TELCOM, INC. TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY**<br><br><br>Hearing:<br>Date: August 1, 2022<br>Time: 9:30 a.m.<br>Judge: Honorable Robert J. Faris |

## ORDER GRANTING MOTION BY HAWAIIAN TELCOM, INC.
## <u>TO DISMISS THE FIRST AMENDED COMPLAINT IN ITS ENTIRETY</u>

The *Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety,* which motion was filed on June 10, 2022 at Docket No. 35 in the above-captioned adversary proceeding (the "<u>Motion to Dismiss</u>") came on for hearing before the Honorable Robert J. Faris, on August 1, 2022 at 9:30 a.m. (the "<u>Hearing</u>").

The Court, having duly considered the Motion to Dismiss, all of the written memoranda and exhibits filed in connection with the Motion to Dismiss, the First Amended Complaint filed at Docket No. 28, the argument of all counsel at the Hearing, the record of the case, and good cause appearing therefor, it is HEREBY ORDERED that for the reasons set forth by the Court at the Hearing, the Motion to Dismiss is GRANTED.  The *First Amended Complaint*, filed at Docket No. 28 by Waimana Enterprises Incorporated, Pa Makani LLC, and Clearcom, Inc., and all claims asserted therein, are hereby DISMISSED in their entirety, WITH PREJUDICE.

**END OF ORDER**

APPROVED AS TO FORM:

_____ /s/ William K. Meheula, III _____
William K. Meheula, III
D. Kaena Horowitz
MEHEULA LAW LLLC
Counsel for Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc.

Submitted by:

CASE LOMBARDI & PETTIT
A LAW CORPORATION
TED N. PETTIT                                         4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                                   8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street | Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

H9022a (12/15)

| **Information to identify the case:** | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | **United States Bankruptcy Court**<br>**District of Hawaii** |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number:  **18–01319**<br>Chapter:  **11**<br>Adversary Proceeding No:  **22–90008** |
| | Defendant(s) | |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Granting Motion By Hawaiian Telcom, Inc. To Dismiss the First Amended Complaint In Its Entirety. (Related Doc # 35) Date of Entry: 8/18/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:   August 18, 2022

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

Michael B. Dowling
Clerk

**Date Signed:**
**August 23, 2022**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

In re:

PANIOLO CABLE COMPANY, LLC,

　　　　　　Debtor.

CASE NO. 18-01319
(Chapter 11)

WAIMANA ENTERPRISES INC., PA MAKANI LLC, CLEARCOM, INC.

　　　　　　　　Plaintiffs,

　　v.

HAWAIIAN TELCOM INC.,

　　　　　　Defendant.

Adversary Proceeding No. 22-90008

**JUDGMENT ON
ADVERSARY PROCEEDING**

## JUDGMENT ON ADVERSARY PROCEEDING

In accordance with the Court's issued *Order Granting Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety,* it is hereby ORDERED, ADJUDGED, and DECREED that the above-captioned adversary proceeding is DISMISSED, WITH PREJUDICE on the merits, and that judgment is hereby entered in favor of the defendant, Hawaiian Telcom, Inc., on all claims asserted therein.  The proceeding shall be closed.

### END OF JUDGMENT

Submitted by:

CASE LOMBARDI & PETTIT
A LAW CORPORATION
TED N. PETTIT                                    4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                                 8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street | Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

H9022a (12/15)

| **Information to identify the case:** | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | **United States Bankruptcy Court**<br>**District of Hawaii** |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number:  **18–01319**<br>Chapter:  **11**<br>Adversary Proceeding No:  **22–90008** |
| | Defendant(s) | |

## NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Judgment on Adversary Proceeding (related document nos. 35 and 67) Date of Entry: 8/23/2022.**
**(LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  August 23, 2022

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

Michael B. Dowling
Clerk

*Filer's Name, Address, Phone, Fax, Email:*

WILLIAM MEHEULA  (2277)
Meheula Law, LLLC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawai'i  96813
Telephone No.:  (808) 599-9554
Facsimile No.:  (808) 599-9610
Email: meheula@smlhawaii.com

Attorneys for Plaintiffs WAIMANA ENTERPRISES INC., PA
MAKANI LLC, and CLEARCOM, INC.

Form 417A (12/15)



**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF HAWAII**
**1132 BISHOP STREET, SUITE 250**
**HONOLULU, HI 96813**

| Debtor(s): | Chapter: | Case No.: |
|---|---|---|
| Paniolo Cable Company, LLC | **11** | 18-01319 |

| *(If Adversary Proceeding)* Plaintiff(s): | A.P. No.: |
|---|---|
| Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc. | 22-90008 |

| *(If Adversary Proceeding)* Defendant(s): | Related Docket No.: |
|---|---|
| Hawaiian Telcom, Inc. | 71 |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

### Part 1: Identify the appellant(s)

1. Name(s) of appellant(s):

   Waimana Enterprises Inc., Pa Makani LLC, and Clearcom, Inc.

2. Position of appellant(s) in adversary proceeding or bankruptcy case that is subject of this appeal:

For appeals in an adversary proceeding.

For appeals in a bankruptcy case and not in an adversary proceeding.

☒ Plaintiff
☐ Defendant
☐ Other (describe):

☐ Debtor
☐ Creditor
☐ Trustee
☐ Other (describe):

### Part 2: Identify the subject of this appeal

1. Describe the judgment, order, or decree appealed from:

   Judgment on Adversary Proceeding entered on August 23, 2022 [Dkt. 71], attached hereto as Exhibit A.

2. State the date on which the judgment, order, or decree was entered: August 23, 2022

**Part 3: Identify the other parties to the appeal**

List the names of all the parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:                                                        Attorney:

   SEE ATTACHED PAGE

2. Party:                                                        Attorney:

**Part 4: Optional election to have appeal heard by District Court**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court.  If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below.  Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐  Appellant(s) elect(s) to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

**Part 5: Sign below**

/s/ William Meheula                                      Date: August 30, 2022
_____                                  _____
Signature of attorney for appellant(s) (or
appellant(s) if not represented by an attorney)

Name, address, and telephone number of attorney
(or appellant(s) if not represented by an attorney):

WILLIAM MEHEULA  (2277)
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawaiʻi  96813
Telephone No.:  (808) 599-9554
Email: meheula@smlhawaii.com

Fee waiver notice: If appellant is a child support creditor or its representative and appellant has filed the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.

## Part 3: Identify the other parties to the appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

1. Party:   Hawaiian Telcom, Inc.   Attorney:   Ted N. Pettit, Esq.
David G. Brittin, Esq.
Case Lombardi & Pettit, A
Law Corporation
Pacific Guardian Center,
   Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, HI 96813
Tel No.: (808) 547-5400

Attorney:   Andrew J. Gallo, Esq.
(*Pro Hac Vice*)
Morgan, Lewis & Bockius
LLP
One Federal Street
Boston, MA 02110-1726
Tel No.: +1 (617) 951-8117

Attorney:   Melissa Y. Boey, Esq.
(*Pro Hac Vice*)
Morgan, Lewis & Bockius
LLP
1400 Page Mill Road
Palo Alto, CA 94304
Tel No.: +1 (650) 843-4000

**Date Signed:**
**August 23, 2022**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re: | CASE NO. 18-01319 (Chapter 11) |
| PANIOLO CABLE COMPANY, LLC, | |
| Debtor. | |
| | |
| WAIMANA ENTERPRISES INC., PA MAKANI LLC, CLEARCOM, INC. | Adversary Proceeding No. 22-90008 |
| Plaintiffs, | |
| v. | **JUDGMENT ON ADVERSARY PROCEEDING** |
| HAWAIIAN TELCOM INC., | |
| Defendant. | |

EXHIBIT A

## JUDGMENT ON ADVERSARY PROCEEDING

In accordance with the Court's issued *Order Granting Motion by Hawaiian Telcom, Inc. to Dismiss the First Amended Complaint in its Entirety,* it is hereby ORDERED, ADJUDGED, and DECREED that the above-captioned adversary proceeding is DISMISSED, WITH PREJUDICE on the merits, and that judgment is hereby entered in favor of the defendant, Hawaiian Telcom, Inc., on all claims asserted therein.  The proceeding shall be closed.

### END OF JUDGMENT

Submitted by:

CASE LOMBARDI & PETTIT
A LAW CORPORATION
TED N. PETTIT                                    4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                                 8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Pro Hac Vice)*
One Federal Street | Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:  andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Pro Hac Vice)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:  melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

H9022a (12/15)

| **Information to identify the case:** | | |
|---|---|---|
| Debtor(s) | **Paniolo Cable Company, LLC** | **United States Bankruptcy Court**<br>**District of Hawaii** |
| Parties | Waimana Enterprises Inc, et al. | |
| | Plaintiff(s) | |
| | v. | |
| | Hawaiian Telcom Inc., | Bankruptcy Case number: **18–01319**<br>Chapter: **11**<br>Adversary Proceeding No: **22–90008** |
| | Defendant(s) | |

# NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Judgment on Adversary Proceeding (related document nos. 35 and 67) Date of Entry: 8/23/2022. (LL)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:   August 23, 2022

Michael B. Dowling
Clerk

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

CASE LOMBARDI & PETTIT
A LAW CORPORATION

TED N. PETTIT                                          4287-0
Email: tnp@caselombardi.com
DAVID G. BRITTIN                                      8686-0
Email: dbrittin@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Telephone: (808) 547-5400 | Fax: (808) 523-1888

MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO *(Order Granting Pro Hac Vice Admittance Pending)*
One Federal Street
Boston, MA 02110-1726
Phone: +1 (617) 951-8117
Email:    andrew.gallo@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
MELISSA Y. BOEY *(Order Granting Pro Hac Vice Admittance Pending)*
1400 Page Mill Road | Palo Alto, CA 94304
Phone: 1 (650) 843-4000
Email:    melissa.boey@morganlewis.com

Attorneys for HAWAIIAN TELCOM, INC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>Chapter 11<br><br>**MOTION BY HAWAIIAN TELCOM, INC. FOR INTERIM AND FINAL RELIEF ENFORCING THE COURT'S SALE ORDER**<br><br><u>Final Hearing</u>:<br>Date:    May 2, 2022<br>Time:    2:00 p.m.<br>Judge:   Honorable Robert J. Faris |

**MOTION BY HAWAIIAN TELCOM, INC. FOR
INTERIM AND FINAL RELIEF
ENFORCING THE COURT'S SALE ORDER**

Since the Court granted in part Hawaiian Telcom, Inc.'s ("HTI" or the "Buyer") prior motion seeking to enforce the Court's sale order, Sandwich Isles Communications, Inc. ("SIC") and its affiliates (collectively, the "SIC Parties") have repeatedly misrepresented, and acted in direct contravention of, that order and the Court's prior orders. As detailed in the supporting memorandum hereto, SIC has wrongly claimed that this Court "confirm[ed HTI's] purchase of the Paniolo assets did not include the access rights across [SIC's] property surrounding and under the Paniolo assets." *See Declaration of Lynette Yoshida* filed simultaneously herewith (the "Yoshida Decl."), Ex. Y-33 (letter from SIC counsel suggesting that the real property belonged to SIC). SIC's counsel has also sent letters to the four police chiefs stating that this Court "has confirmed that no real estate was transferred to Hawaiian Telcom" and that the assets purchased by HTI "are located on real estate granted to Waimana/SIC." *Id.*, Ex. Y-34 to Y-37. The SIC Parties have even claimed that the terms "central offices" and "terminal buildings," as used by the Court in its prior order to describe the physical structures transferred to HTI through the court-approved sale, do not refer to the whole structure, but only portions of the buildings, and thus other portions (as determined by SIC) can still be occupied by SIC. Most recently, in clear violation of the exclusive jurisdiction retained by this

2

Court in its order approving the sale, the SIC Parties have gone so far as to initiate a civil lawsuit against HTI in the State of Hawaii Circuit Court of the First Circuit (the "State Court Action"), seeking to forcibly evict HTI from the Paniolo buildings and premises HTI purchased through the sale.

A summary of SIC's recent, extensive misconduct includes:

(a) removing, destroying, or otherwise tampering with HTI locks on the perimeter fences surrounding the buildings purchased by HTI;

(b) installing SIC locks or devices on these perimeter fences, and barring and physically blocking HTI personnel from accessing its buildings and the surrounding premises;

(c) barricading the interior doors and otherwise rendering inaccessible areas of the buildings purchased by HTI in Anahola and Hilo;

(d) drilling out locks on doors to the buildings in Anahola and Hilo;

(e) welding access gates shut, and installing concrete fixtures in the access roadway, in an attempt to permanently render the premises surrounding the buildings inaccessible to all, including but not limited to HTI, its contractors and suppliers (such as electric utility personnel), and any fire and safety first responders;

(f) making false police reports that HTI is trespassing on SIC land; and

(g) calling the police on HTI personnel attempting to enter the premises surrounding the buildings purchased by HTI.

Such misconduct should not be taken lightly. Not only have the SIC Parties either violated or misrepresented the terms of the Court's orders, and not only have the SIC Parties prevented HTI from rightfully enjoying the benefit of its arms-length purchase, but the SIC Parties' ongoing actions have also impaired HTI's ability to provide for its customers, and have posed a severe threat to the security and safety of HTI's personnel and the Paniolo telecommunications cable network. *See* Yoshida Decl. ¶ 44. The SIC Parties' calls and correspondence to the four police chiefs reflect their desire to use intimidation and *in terrorem* tactics against HTI's employees and contractors. The SIC Parties' conduct is not only wrongful, but has become progressively harmful and alarming.

This motion therefore seeks the entry of an interim order, substantially in the form attached hereto as **Exhibit 1** (the "Interim Order") which, subject to the entry of the Final Order (defined below), compels the SIC Parties, their principals, affiliates, employees and contractors (including for avoidance of doubt but without limitation Waimana Enterprises, Inc., Pa Makani LLC, Clearcom, Inc., and members of the Hee family) to:

1.      Immediately cease removing, destroying, altering, or otherwise tampering with any of HTI's locks on and within, including on the perimeter fences of, the following buildings and appurtenant fixtures that HTI purchased from the Paniolo estate (the structures, together with the associated systems, infrastructure,

4

and appurtenances supporting a particular structure including, without limitation the conduits, manholes, hand holes, cross connects, meet-me cabinets, and the fences installed by SIC and/or Paniolo surrounding such buildings, the "Paniolo Buildings") and on the easement areas surrounding the Paniolo Buildings (the "Paniolo Premises"):

| | |
|---|---|
| 1. | Anahola [Kauai] Central Office |
| 2. | Kekaha [Kauai] Terminal Building |
| 3. | Nanakuli [Oahu] Terminal Building |
| 4. | Waimanalo [Oahu] Terminal Building |
| 5. | Kalamaula [Molokai] Terminal Building |
| 6. | Puunene [Maui] Terminal Building |
| 7. | Waiehu [Maui] Central Office |
| 8. | Puukapu [Hawaii] Terminal Building |
| 9. | Laiopua [Hawaii] Central Office |
| 10. | Hilo [Hawaii] Central Office |

2.      Immediately cease barricading the internal doors, drilling or tampering with locks and doors for any portion of the Paniolo Buildings, including but not limited to the Paniolo Buildings at Anahola and Hilo;

3.      Immediately cease preventing or impeding HTI's access to the Paniolo Buildings and Paniolo Premises in any way, including without limitation, by physically blocking entrances to or within the Paniolo Premises, disabling or replacing locks or hardware, installing any locks or devices on the perimeter fences of or within the Paniolo Buildings and Paniolo Premises, welding shut any access

5

gates, installing any bollards or barriers, or any other action that prevents or impedes access to or within the buildings and premises by HTI or any first responders;

4.     Immediate cease making false police reports alleging that HTI has been trespassing on the Paniolo Buildings and Paniolo Premises, or otherwise contacting the police with respect to HTI personnel accessing the Paniolo Buildings and Paniolo Premises.

5.     Fully adhere to, and refrain from interfering with, HTI's security protocols to which all parties accessing the Paniolo Buildings and Paniolo Premises are subject.

The Motion further seeks entry of a final order, substantially in the form attached hereto as **Exhibit 2** (the "Final Order"), which includes:

(a)     the same relief sought in the Interim Order, on a final basis;

(b)     a confirmation from the Court that HTI holds control and ownership over the entirety of the Paniolo Buildings;

(c)     a confirmation from the Court that the SIC Parties are not permitted to obstruct HTI's access to the Paniolo Buildings and Paniolo Premises in any way, or impose any fees on HTI for access to, or use of, the Paniolo Buildings and Paniolo Premises;

(d)     a confirmation from the Court that, through the Court's order approving the sale of assets to HTI (the "363 Sale"), HTI assumed the obligation to control and

6

maintain security for the Paniolo Premises, subject to the requirements of the Federal Communications Commission (the "FCC") and the LOA (defined below), and enjoining the SIC Parties from interfering with HTI's efforts to provide such security;

(e)     a finding that the SIC Parties, through the filing and prosecution of the State Court Action, have violated the exclusive jurisdiction provisions of the 363 Sale Order and that the Court retains exclusive jurisdiction to adjudicate the issues raised by the SIC Parties in the State Court Action with respect to the Transferred Assets; and

(f)     compelling the SIC Parties to remove their property from the "warehouse" rooms within the Paniolo Buildings in Anahola and Hilo.

This Motion is brought pursuant to 11 U.S.C. §§ 105 and 363(f), Rule 9013 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Local Bankruptcy Rules for the District of Hawaii, and is supported by the memorandum in support of the Motion, attached declarations and exhibits, and the records and files herein.

DATED:      Honolulu, Hawaii, <u>March 29, 2022</u>.

                              CASE LOMBARDI & PETTIT


                              _____/s/ Ted N. Pettit_____
                              TED N. PETTIT
                              DAVID G. BRITTIN
                              And
                              MORGAN, LEWIS & BOCKIUS LLP
                              ANDREW J. GALLO
                              MELISSA Y. BOEY

                              Attorneys for HAWAIIAN TELCOM, INC.

8

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

In re:

PANIOLO CABLE COMPANY, LLC,

Debtor.

Case No. 18-01319 (RJF)
Chapter 11

**MEMORANDUM IN SUPPORT OF MOTION BY HAWAIIAN TELCOM, INC. FOR INTERIM AND FINAL RELIEF ENFORCING THE COURT'S SALE ORDER**

**MEMORANDUM IN SUPPORT OF MOTION BY
HAWAIIAN TELCOM, INC. FOR
INTERIM AND FINAL RELIEF
ENFORCING THE COURT'S SALE ORDER**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

JURISDICTION....................................................................................................8

RELEVANT FACTUAL BACKGROUND............................................................8

    A.    Through the Marshal Sale, the Trustee obtained the
Paniolo Buildings and the Access and Easement Rights
that it did not already own.................................................................9

    B.    In the 363 Sale, the Trustee then sold to HTI all of the
Transferred Assets, including all of the Paniolo Buildings,
all of the Access and Easement Rights, and all other
Marshal Sale Assets .......................................................................13

    C.    The Trustee terminated contractual arrangements with SIC
prior to the 363 Sale .......................................................................18

    D.    The SIC Parties have no right to use and occupy the
Paniolo Buildings............................................................................19

    E.    The obligation to control and maintain security for the
Paniolo Premises was assumed by HTI through
the 363 Sale ....................................................................................20

    F.    The DHHL has issued a Right of Entry Agreement to HTI .........23

    G.    HTI's First Enforcement Motion ....................................................24

    H.    The SIC Parties impede HTI's access to and within the
Paniolo Buildings and the Paniolo Premises ................................26

    I.    SIC and Waimana have initiated the State Court Action
seeking, *inter alia*, to permanently evict HTI from the
Paniolo Buildings and the Paniolo Premises ................................29

ARGUMENT .......................................................................................................31

    A.    HTI acquired, and now possesses control and ownership
over, the entirety of the Paniolo Buildings, including the
perimeter fences .............................................................................32

        1.    HTI acquired the Paniolo Buildings..................................32

        2.    HTI also acquired the perimeter fences
surrounding the Paniolo Buildings....................................36

B.    HTI acquired Access and Easement Rights associated with the Paniolo Premises, and the SIC Parties should be prohibited from interfering with HTI's Access and Easement Rights in any manner .................................................................38

    1.    Waimana obtained the 372 License, and partially assigned different portions of the 372 License to SIC, Pa Makani, and Clearcom....................................................39

    2.    DHHL separately granted to SIC certain access and easement rights for the construction and operation of Paniolo Buildings ..............................................40

    3.    HTI purchased, along with the Paniolo Buildings, the necessary Access and Easement Rights on each corresponding Paniolo Premise .........................................42

    4.    In violation of the 363 Sale Order, the SIC Parties have blocked and impeded HTI's access to the Paniolo Premises ..............................................46

C.    HTI assumed the obligation of maintaining security over the Paniolo Premises ..........................................................50

D.    Through the filing of the State Court Action, SIC and Waimana have breached the 363 Sale Order and the Marshal Sale Order....................................................................54

CONCLUSION.........................................................................56

## I.    **INTRODUCTION**

Hawaiian Telcom, Inc. ("HTI" or the "Buyer") purchased substantially all of the assets of Paniolo Cable Company, LLC ("Paniolo") from the Trustee in an arms'-length, good-faith sale approved by this Court pursuant to section 363 of the Bankruptcy Code (the "363 Sale").  The "Transferred Assets", as defined in the Court's order approving the 363 Sale[1] [Dkt. 366] (the "363 Sale Order"), comprised assets that had traditionally been owned by Paniolo directly, as well as assets formerly owned by SIC that the Trustee obtained and brought into the bankruptcy estate via a marshal sale (the "Marshal Sale") confirmed by an order of this Court (the "Marshal Sale Order").  The Trustee has previously informed the Court regarding certain difficulties it faced in working with SIC and its affiliates (including Waimana Enterprises Inc., Pa Makani LLC, Clearcom, Inc., and members of the Hee family, collectively, the "SIC Parties") on the turnover of assets to the Trustee.  *See Michael Katzenstein, Chapter 11 Trustee's, Status Report and Request for Status Conference* [Dkt. 425] (the "Trustee's Status Report").  HTI has similarly approached this Court on a prior occasion, requesting enforcement of the 363 Sale Order and SIC's attendant requirements to turn over Transferred Assets, shortly after

---

[1] *Order (A) Authorizing and Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Approving the Asset Purchase Agreement, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in connection with the Sale, (D) Approving the Operational Support and Sales Services Agreement, (E) Approving a Break-Up Fee, and (F) Granting Related Relief* [Dkt. 366].

the sale closed in August 2021.  Since the Court's decision in connection with HTI's first *Motion to Enforce Sale Order* [Dkt. 459] (the "<u>First Enforcement Motion</u>"), the misconduct that occasioned the Trustee's Status Report and HTI's First Enforcement Motion has not only continued, but has intensified.

Pursuant to the 363 Sale Order, the Transferred Assets that HTI acquired included certain central offices and terminal buildings (the structures, together with the associated systems, infrastructure, and appurtenances supporting a particular structure including, without limitation the conduits, manholes, hand holes, cross connects, meet-me cabinets and the fences installed by SIC and/or Paniolo surrounding such buildings, the "<u>Paniolo Buildings</u>").  The SIC Parties are now attempting to interfere with HTI's ownership and enjoyment of the Paniolo Buildings by taking the indefensible position that the acquisition by HTI of the Paniolo Buildings did not include all of the rooms contained within such buildings or the fences erected to surround the Paniolo Buildings.  SIC has wrongfully asserted ownership and control over certain rooms within the Paniolo Buildings – which they have misleadingly characterized as "warehouses" in an attempt to assert that rooms within the buildings are separate and distinct from the buildings themselves.  *See Declaration of Lynette Yoshida* filed simultaneously herewith (the "<u>Yoshida Decl.</u>"), Ex. Y-31 ("I also understand the Court's order did not list the warehouses located at many of our sites where your central offices are located as part of the purchase.

2

Please put back SIC's lock on the Hilo warehouse which was removed."). SIC has also repeatedly interfered with locks on the fences around the Paniolo Buildings in an effort to deny HTI access.

Similarly, each Paniolo Building is located on, and surrounded by, an easement granted or permitted by the Department of Hawaiian Home Lands ("DHHL")[2] for the purpose of locating a central office building and obtaining access thereto (each such easement area, a "Paniolo Premise").[3] These access easements, necessary for HTI to access its operations within the Paniolo Buildings, were also transferred to the Trustee through the Marshal Sale, and then sold to HTI as Transferred Assets in the 363 Sale. In its ruling on the First Enforcement Motion, the Court noted that due to "gaps in the existing record," it could not, at that time, determine whether the Trustee (and HTI) had acquired **exclusive** rights of occupancy. *See Order Granting in Part and Denying in Part Hawaiian Telcom's Motion to Enforce Sale Order* [Dkt. 537] (the "First Enforcement Order") at 10.

Notwithstanding the Court's rulings, the SIC Parties have doubled down on their position that they hold an exclusive right to occupy and control the Paniolo Premises – and not HTI. The SIC Parties have declared, in its letters to the four

---

[2] As further detailed in this pleading, this easement is an express written easement for the Paniolo Premises at Anahola, Nanakuli, Waimanalo, Kalamau, Waiehu, Puukapu, Laiopua, and Hilo, and is an implied easement for the Paniolo Premises at Kekaha and Puunene. *See infra* III.(B)(2).

[3] A summary of Paniolo Premises has been attached hereto as **Exhibit A.**

3

police departments, that this Court "confirm[ed HTI's] purchase of the Paniolo assets did not include the access rights across [SIC's] property surrounding and under the Paniolo assets." Yoshida Decl., Ex. Y-34 to Y-37. The SIC Parties have also claimed that this Court "confirmed that no real estate was transferred to Hawaiian Telcom" through the 363 Sale, and that the assets purchased by HTI "are located on the real estate granted to Waimana/SIC". *Id.* These statements by the SIC Parties are clear misstatements of the First Enforcement Order. Most recently, in clear violation of this Court's retention of "exclusive jurisdiction" over disputes related to the Marshal Sale and 363 Sale, SIC and its affiliate Waimana Enterprises Inc. ("Waimana") have also filed a lawsuit against HTI in the State of Hawaii Circuit Court of the First Circuit (the "State Court Action"), which takes the position that the Marshal Sale and 363 Sale did not include "any rights to occupy" the Paniolo Buildings and Paniolo Premises and thus seeks to, among other things, evict HTI for trespass and remove HTI from the Paniolo Buildings and Paniolo Premises. *See* Complaint, filed on March 18, 2022, at Case No. 1CCV-22-0000321 (the "Complaint").[4] This legal position held by SIC and Waimana directly conflicts with this Court's rulings in the Marshal Sale Order and the 363 Sale Order.

---

[4] A copy of the Complaint has been attached here for the Court's convenience at **Appendix H.**

Accordingly, this motion supplements the record, as requested by the Court in the First Enforcement Order, and requests further relief from the Court to enforce its 363 Sale Order, on an interim and final basis.

The Interim Order, attached hereto as **Exhibit 1**, seeks to compel the SIC Parties, their principals, affiliates, employees and contractors (including for avoidance of doubt but without limitation Waimana, Pa Makani LLC, Clearcom, Inc., and members of the Hee family) to, subject to the entry of the Final Order:

1.      Immediately cease removing, destroying, altering, or otherwise tampering with any of HTI's locks on and within, including on the perimeter fences of, the following Paniolo Buildings and Paniolo Premises:

| | |
|---|---|
| 1. | Anahola [Kauai] Central Office |
| 2. | Kekaha [Kauai] Terminal Building |
| 3. | Nanakuli [Oahu] Terminal Building |
| 4. | Waimanalo [Oahu] Terminal Building |
| 5. | Kalamaula [Molokai] Terminal Building |
| 6. | Puunene [Maui] Terminal Building |
| 7. | Waiehu [Maui] Central Office |
| 8. | Puukapu [Hawaii] Terminal Building |
| 9. | Laiopua [Hawaii] Central Office |
| 10. | Hilo [Hawaii] Central Office |

2.      Immediately cease barricading the internal doors, drilling or tampering with locks and doors for any portion of the Paniolo Buildings, including but not limited to the Paniolo Buildings at Anahola and Hilo;

5

3.      Immediately cease preventing or impeding HTI's access to the Paniolo Buildings and Paniolo Premises in any way, including without limitation, by physically blocking entrances to or within the Paniolo Premises, disabling or replacing locks or hardware, installing any locks or devices on the perimeter fences of or within the Paniolo Buildings and Paniolo Premises, welding shut any access gates, installing any bollards or barriers, or any other action that prevents or impedes access to or within the buildings and premises by HTI or any first responders;

4.      Immediate cease making false police reports alleging that HTI has been trespassing on the Paniolo Buildings and Paniolo Premises, or otherwise contacting the police with respect to HTI personnel accessing the Paniolo Buildings and Paniolo Premises.

5.      Fully adhere to, and refrain from interfering with, HTI's security protocols to which all parties accessing the Paniolo Buildings and Paniolo Premises are subject.

The Final Order, attached hereto as **Exhibit 2**, seeks:

(a)      the same relief sought in the Interim Order, on a final basis;

(b)      a confirmation from the Court that HTI holds control and ownership over the entirety of the Paniolo Buildings;

(c)      a confirmation from the Court that the SIC Parties are not permitted to obstruct HTI's access to the Paniolo Buildings or Paniolo Premises in any way, or

impose any fees on HTI for access to, or use of, the Paniolo Buildings or Paniolo Premises;

(d)     a confirmation from the Court that through the 363 Sale Order, HTI assumed the obligation to control and maintain security for the Paniolo Premises, in compliance with and subject to the requirements of the Federal Communications Commission (the "FCC"), and enjoining the SIC Parties from interfering with HTI's efforts to provide such security;

(e)     a finding that the SIC Parties, through the filing and prosecution of the State Court Action, have violated the exclusive jurisdiction provision of the 363 Sale Order, and that the Court retains exclusive jurisdiction to adjudicate the issues raised by the SIC Parties in the State Court Action with respect to the Transferred Assets; and

(f)     compelling the SIC Parties to remove their property from the "warehouse" rooms within the Paniolo Buildings in Anahola and Hilo.

In light of the substantial risk to national security, to the ability of first responders to access the Paniolo Premises when needed, to the operations of HTI, and to the safety of HTI personnel, this Motion seeks interim and final orders enforcing the 363 Sale Order and providing the relief requested herein.

## II.   <u>JURISDICTION</u>

The Court has jurisdiction over this matter under 28 U.S.C. § 1334.  This matter is a core proceeding as it relates to the administration of a debtor's bankruptcy estate pursuant to 28 U.S.C. § 157(b)(2)(a), relates to an order approving the sale of property pursuant to 28 U.S.C. § 157(b)(2)(n), and relates to the liquidation of the assets of the estate pursuant to 28 U.S.C § 157(b)(2)(o).  The enforcement and interpretation of orders issued in core proceedings, such as the 363 Sale Order at issue here, are also considered core proceedings within the bankruptcy court's jurisdiction.  *See*, *e.g.*, *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153-55 (2009) (holding that the "bankruptcy court plainly had jurisdiction to interpret and enforce its own prior orders . . . .").  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.   <u>RELEVANT FACTUAL BACKGROUND</u>

Pursuant to this Court's orders in connection with the Marshal Sale (as defined below) and the 363 Sale, HTI acquired the Transferred Assets, which included (a) the Paniolo Buildings; (b) rights of access to the Paniolo Premises necessary to access the Paniolo Buildings and operate the Paniolo network[5] (the "<u>Access and Easement Rights</u>"); (c) all of SIC's rights under that certain License Agreement No.

---

[5] The Paniolo network, which is a submerged marine fiber and terrestrial fiber telecommunications cable network, is hereinafter collectively referred to as the "<u>Paniolo Network</u>."

8

372 issued by the DHHL (the "372 License") with respect to the Paniolo Network, and (d) a certain cable landing license issued by the FCC, under which HTI was required to retain and assume the obligation to establish and maintain specific security requirements over the Paniolo Premises and the operation of the Paniolo Network.

**A.  Through the Marshal Sale, the Trustee obtained the Paniolo Buildings and the Access and Easement Rights that it did not already own.**

To satisfy a judgment in excess of $256 million against SIC and in favor of Michael Katzenstein, Chapter 11 Trustee ("Trustee"), the U.S. Marshal for the District of Hawai'i levied upon certain SIC assets identified on the exhibit to the Trustee's Certificate of Execution ("Marshal Sale Assets"). *See Judgment,* available at Dkt. 28 in the *Katzenstein v. Sandwich Isles Commc'ns, Inc.*; Adv. Pro. No. 19-90022 (Bankr. D. Haw.) (the proceeding, the "SIC AP").  The Marshal Sale Assets included those certain "Schedule A.2 Assets" listed on Schedule A.2 to the Certificate of Execution.  *See Certificate of Execution* (with the exhibits thereto, the "Certificate of Execution"), *available at* Dkt. 37 in the SIC AP, at 6 *et seq*.  Schedule A.2 is organized by location, with each page of the schedule identifying certain Paniolo Buildings and related SIC assets that were levied upon on the corresponding Paniolo Premises.  *Id.*  Each of the following buildings are identified on Schedule A.2:

"Anahola Central Office – Central office located in Anahola, Hawaii, including access rights to the land on which the central office resides."

"Nanakuli Terminal Building – Terminal building locate in Nanakuli, Hawaii including access rights to the land on which the terminal building resides."

"Waimanalo Terminal Building – Terminal building located in Waimanalo, Hawaii including access rights to the land on which the terminal building resides."

"Kalamaula Terminal Building – Terminal building located in Kalamaula, Hawaii including access rights to the land on which the terminal building resides."

"Waiehu Central Office – Central Office located in Waiehu, Hawaii including access rights to the land on which the central office resides."

"Laiopua Central Office – Central Office located in Laiopua, Hawaii including access rights to the land on which the central office resides."

"Hilo Central Office – Central Office located in Hilo, Hawaii including access rights to the land on which the central office resides."[6]

*Id.* at 6-9, 11-13.

Not only does Schedule A.2 list the buildings, but it also lists all systems and appurtenances necessary to operate the buildings, including HVAC Systems and "all

---

[6]As explained further below, only 7 of the 10 Paniolo buildings are included on Schedule A.2. This is because three of the Paniolo Buildings were owned directly by Paniolo prior to the Marshal Sale. Those three buildings (along with the seven acquired through the Marshal Sale) were all transferred by the Trustee to HTI as part of the 363 Sale.

other environmental assets" supporting each building; generators and the infrastructure providing power to the buildings and all "ancillary equipment" necessary to operate these systems and to make the equipment in the building "function within the network." *Id.* Such "ancillary equipment" expressly included "any equipment that is necessary for the performance or monitoring of . . . Security" for the Paniolo Network. *Id.*

Schedule A.2 also includes a schedule of "Other Related Assets" that were acquired by the Trustee in the Marshal Sale. Certificate of Execution at 14-15. These assets included "[a]ll keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings and central offices" (collectively, the "Paniolo Keys"). *Id.* at 15.

Further, "Other Related Assets" on Schedule A.2 that were acquired by the Trustee through the Marshal Sale also expressly lists the following:

> "--[a]ll licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, **including without limitation SIC's interest in License Agreement No. 372 issued by the State of Hawaii Department of Hawaiian Home Lands**.
> --**All existing and pending entitlements** (including without limitation, **SIC's interests** in memoranda of agreement, **easements,** leases, **license agreements**, letters of approval, special area management permits, rights of way or rights of interest, necessary to build, construct, repair, maintain and operate the Schedule A.2 assets."

*Id.* at 15 (emphasis added).

This Court confirmed the sale of the Marshal Sale Assets to the Trustee through the Marshal Sale Order, dated March 16, 2020 [SIC AP, Dkt. 65]. As the provisions of the Marshal Sale Order make clear, the Marshal Sale transferred the Marshal Sale Assets to the Trustee (including the Paniolo Buildings and the Access and Easement Rights listed on Schedule A.2), and it did so by specifically divesting SIC of any further rights in these assets. The Marshal Sale Order provides as follows:

> 6.  [SIC] and all persons claiming any interest in the Property, by or through [SIC's] interest in the Property,[7] are forever barred and foreclosed of and from all right, title and interest, and claims at law or in equity in and to the Property and every part thereof, and to the proceeds therefrom arising up to the date of closing.
>
> 7.  Any and all other encumbrances affecting the Property, or any part thereof (except for any holders of liens or security interest that are senior in priority to the judgment lien of [the Trustee]) are perpetually barred of and from any and all right, title and interest, and claims at law or in equity, in the Property or any part thereof. Any liens or security interests that are junior to the judgment lien of [the Trustee] shall be extinguished by the Execution Sale.

*Id.* ¶¶ 6-7.[8]  The Marshal Sale Order further provides that "[t]his Court maintains

---

[7] "Property" is defined in the Marshal Sale Order as the real property and the A.2. Assets which were both sold to the Trustee as the highest bidder.

[8] The fact that the Trustee acquired SIC's easement rights as part of the Marshal Sale has also been admitted by SIC numerous times. One example can be found in related proceedings pursuant to which the United States Government, acting on behalf of the Rural Utilities Service ("RUS"), applied for a writ of execution to enforce its own lien against SIC's assets. In that dispute, SIC took the position that "Paniolo's judgment was entered and recorded prior to [RUS's] and accordingly constitutes a lien on **all of** SIC's real property assets, which . . . include **the easements, rights of way, and other real estate interests** that allow all of SIC's assets on Hawaiian Home Lands." *SIC's Objection to Application for Writ of Execution,* available at Dkt. 263 in *U.S.A. v.*

12

jurisdiction for of [sic] the purposes of interpretation, implementation and enforcement of this Order."  *Id.* ¶ 8.

**B.   In the 363 Sale, the Trustee then sold to HTI all of the Transferred Assets, including all of the Paniolo Buildings, all of the Access and Easement Rights, and all other Marshal Sale Assets.**

On December 28, 2020, the Court entered the 363 Sale Order, approving the sale of substantially all of Paniolo's assets to HTI pursuant to the terms of the *Asset Purchase Agreement,* dated November 30, 2020, by and between the Trustee, Paniolo, and HTI (the "APA").  *See* Ex. A to the 363 Sale Order [Dkt. 366-1].  In the 363 Sale Order, the Court made explicit findings that HTI constituted a bona-fide, good faith purchaser, that the terms and conditions of the APA constituted the highest and best offer, and that consummation of the 363 Sale was "in the best interests of the Debtor, its creditors, its estate, and all parties in interest."  363 Sale Order ¶¶ O, P.  The assets and rights sold to HTI (the "Transferred Assets") included assets traditionally titled or owned by Paniolo and identified in Schedule 2.1(a)(i) of the APA ("A.1 Assets"), and also formerly SIC-owned assets the Trustee acquired post-petition through the Marshal Sale and identified in Schedule 2.1(a)(ii) to the APA ("A.2 Assets").  *Id.* ¶ 7-12; APA at 2.  The A.1 Assets included the Paniolo

_____

*Sandwich Isles Commc'ns, Inc.*, Case No. 18-145 (D. Haw.) at 7-8 (emphasis added).  Further, SIC continued, RUS could not levy on the full breadth of its writ (the writ was for all of SIC's assets), because some of the easements and real estate interests sought by the RUS had already been sold to the Paniolo Trustee.  *See id.*

13

Buildings at Kekaha, Puunene and Puukapu, along with systems and associated appurtenances such as HVAC, conduits, generators and manholes, and "access rights to the land on which the terminal building[s] reside[]."  APA at 232-237.

The list of A.2 Assets being transferred through the 363 Sale was substantively identical to the list of A.2 Assets transferred to the Trustee pursuant to the Marshal Sale (and therefore included the Paniolo Buildings and the Access and Easement Rights listed therein).  *Compare* APA, Schedule 2.1(a)(ii) (p. 238 *et seq.*) *with* Certificate of Execution at 6 *et seq*.  The APA defined these assets as follows:

> **The following assets and rights obtained by the Trustee from SIC in the Marshal Sale held March 6, 2020, free and clear of the claims and liens of any other person ("Schedule A.2")[:]**
>
> Transferred Equipment and Property Rights (as defined in the Settlement Agreement) transferred by SIC in conjunction with the US Marshal Sale, and generally consisting of **all** assets spanning from and including the points of presence (central offices) to the subsea cable connections (cable stations), which for the avoidance of doubt includes but is not limited to all buildings currently performing as cable landing stations, central offices, real estate **(including easements, rights of way, licenses, the Licenses and Entitlements and the like, as are required for ingress, egress and access)** conduits, manholes, handholes, rights of way, **easements**, fiber optic and telecommunication cables, fiber optic transmission, multiplexing, circuit switching, circuit transport equipment, IP routing & switching equipment, and related supporting assets such as towers, test equipment, power systems, cooling systems, **security systems,** network management systems, cross connects and cross connect panels, vehicles, trailers and tools. . . for a stand-alone commercial operation and use of the Paniolo Cable System.

*Id.* at 238 (emphasis added).  In other words, the Transferred Assets included all of

14

the Marshal Sale Assets on Schedule A.2, including (a) the seven Paniolo Buildings listed on Schedule A.2 at Anahola, Waiehu, Laiopua, Hilo, Nanakuli, Waimanalo, and Kalamaula, along with appurtenances located within the Paniolo Premises such as HVAC, conduits, generators manholes, "access rights to the land on which the [central offices and terminal buildings] reside[]", and the ancillary security equipment necessary for operating the Paniolo Network; (b) SIC's Access and Easement Rights for all ten of the Paniolo Premises, and (c) all of the Paniolo Keys. *Id.* at 238-245.

The Transferred Assets also specifically included Paniolo's Submarine Cable Landing License (FCC File No. SCL-LIC-20070223-00003, the "SCL License") issued by the FCC. The SCL License is expressly identified in Schedule 1.1(b) of the APA as an "Assigned Permit", and thus is included within the "Incidental Rights" purchased by HTI under Section 2.1 of the APA, and within the scope of "Transferred Assets" under the 363 Sale Order. *See* APA at 2, 5, 6 and Schedule 1.1(b) to the APA; 363 Sale Order ¶ v.

With respect to the 363 Sale, the Court made specific findings that all conditions of 363(f) of the Bankruptcy Code have been satisfied, *see* 363 Sale Order ¶ S, and that the Trustee was therefore "authorized to transfer all of the Debtor's right, title and interest to the Transferred Assets free and clear of all Interests and Claims," *id.* ¶ T. This Court also made explicit findings that the "Buyer would not

15

have entered into the APA if the transfer of the Transferred Assets was not free and

clear of all Interests or Claims . . . or if in the future the Buyer would or could be

liable for any such Interests or Claims." *Id.* ¶ S.

> Further, the Court found that:

> "A sale of the Transferred Assets other than one free and clear of all
> Interests or Claims . . . would yield substantially less value for the
> Debtor's estate, with less certainty, than the Sale as contemplated.
> Therefore, the Sale contemplated by the APA and approved herein free
> and clear of all Interests or Claims . . . is in the best interests of the
> Debtor, its estate and creditors, and all other parties-in-interest.

*Id.* ¶ U.

On August 31, 2021, the 363 Sale closed (the "Closing"). *See Notice of (A)*

*Closing and Consummation of Sale of the Debtor's Assets, and (B) Assumption and*

*Assignment of Certain Designated Contracts in Connection with the Sale* [Dkt. 440]

at 1-2.

Pursuant to the terms of the 363 Sale Order, the transfer of the Transferred

Assets and the extinguishment of any interests or claims held by any party in or

against the Transferred Assets, became binding on all parties-in-interest, including

the SIC Parties, upon Closing. *See* 363 Sale Order ¶¶ S, T, 6. Expressly included

within those interests and claims extinguished by the 363 Sale were "licenses",

"restrictive covenants", "rights of use or possession", "restrictions on the use . . . or

other exercise of any attributes of ownership", "consent rights", and all "obligations,

contractual rights and claims . . . of the Debtor, **SIC [and] SIC's Affiliates**". *Id.* ¶

16

S (emphasis added).

The 363 Sale Order also expressly provides for a permanent injunction against third parties asserting any continuing claim or interest in the Transferred Assets. All third parties, including, expressly the SIC Parties, are required to surrender possession of the Transferred Assets to HTI:

> 10.    Except to the extent expressly included in the Assumed Liabilities or Permitted Liens or to enforce the APA, or as provided in this Sale Order, upon the Closing, all entities or persons are permanently and forever prohibited, barred, estopped, and permanently enjoined from asserting against the Buyer, and its permittee successors, designees, and assigns, or property, or the Transferred Assets conveyed in accordance with the APA, any Interests or Claims of any kind or nature whatsoever arising prior to the closing, including, without limitation, under any theory of successor or transferee liability, de facto merger or continuity liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated . . .

> 39.    All persons or entities that are currently in possession of some or all of the Transferred Assets in contravention of the US Marshal Sale, the Settlement Agreement or MRA, including for the avoidance of doubt, SIC and SIC's Affiliates or any person or entity claiming by or through SIC or SIC's Affiliates, are hereby directed to surrender possession of the Transferred Assets except as Debtor and Buyer may otherwise agree.

*Id.* ¶¶ 10 & 39.  The 363 Sale Order also provides that this Court retained "**exclusive jurisdiction** over any matters related to or arising from the Settlement Agreement and the **implementation of the Sale Order**, including without limitation, the **enforcement of the US Marshal Sale**, and Settlement Agreement

Representations and Settlement Agreement Covenants." *Id.* ¶ 52 (emphasis added).

### C.   The Trustee terminated contractual arrangements with SIC prior to the 363 Sale.

Historically, SIC's rights to use certain Paniolo assets, including portions of the Paniolo Buildings, had been granted to SIC via contract – specifically, that certain Paniolo Cable Network Lease, dated July 19, 2007 and that certain Joint Use Agreement dated July 19, 2007. *See Rule 9019 Settlement Agreement (Post-Judgment)* (the "Settlement Agreement"), filed at Dkt. 252, Ex. A. Prior to entering into the APA with HTI, the Trustee and SIC renegotiated the prior occupancy and use arrangement, and replaced it with a lease agreement whereby the Trustee agreed to provide to SIC (but not the other SIC Parties) certain transport services on the Paniolo Network, and further granted to SIC (but not the other SIC Parties) colocation space within the Paniolo Buildings and conduit access to place SIC fiber or copper telecommunications cables within certain of Paniolo's conduits. *See* Schedule I to *Master Relationship Agreement*, dated as of March 6, 2020, by and between SIC and the Debtor (the "SIC Lease"), filed under seal at Ex. 1 to the Settlement Agreement. Prior to the Closing, the Trustee terminated the SIC Lease (and thus all of SIC's contractual rights of occupancy and use) as a result of SIC's payment default and other defaults. *See Declaration of Michael Katzenstein* ¶¶ 11, 18, filed at Dkt. 19-3 in *Sandwich Isles Commc'ns, Inc. v. Michael Katzenstein, et al.,* Adv. Pro. 21-90017 (Bankr. D. Haw.) (the adversary proceeding, the "2021

18

AP"). This Court has affirmed the finding of a default thereunder, as well as the resulting termination of the SIC Lease. *See* 2021 AP at Dkt. 56 (audio file of court hearing), Dkt. 63 (final judgment).

### D. The SIC Parties have no right to use or occupy the Paniolo Buildings.

As a result of the Trustee's termination of the SIC Lease, at the time of Closing the SIC Parties no longer held any contractual or easement rights to occupy the Paniolo Buildings. Furthermore, the DHHL, as grantor of the Access and Easement Rights, has previously informed this Court of its position that SIC's rights in any of the Transferred Assets had been extinguished through the 363 Sale. *See Department of Hawaiian Home Lands' Response Regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status Conference, Filed Herein on August 16, 2021* [Dkt. 432] at 6 ("[I]t is DHHL's understanding that any interest of SIC in the Paniolo assets being acquired by Buyer, including that portion of License 372 which comprises part of the Paniolo assets, has been extinguished by the bankruptcy proceedings . . . .") The Hawaii Public Utilities Commission (the "PUC") has also recently taken the same view. *See* Order No. 38269,[9] at Docket No. 2022-0037 at 7 ("[I]t appears that the bankruptcy court case terminated SIC's rights to occupancy

---

[9] This order was recently issued by the PUC in order to institute an emergency investigative proceeding regarding SIC's "fitness, willingness, and ability to continue providing telecommunications services" on the Hawaiian Home Lands. The order is publicly available at the following link, but a copy has been attached hereto as **Appendix G** for the Court's convenience: https://dms.puc.hawaii.gov/dms/DocumentViewer?pid=A1001001A22C11B63803A00670.

19

and use of the Paniolo Network.")

Immediately upon Closing, HTI contacted the SIC Parties and offered new contractual arrangements for them to remain on the Paniolo Network. *See* Masutomi Decl. ¶¶ 33-34; Exs. M-26, M-27. HTI proposed an industry-standard framework for such commercial agreement,[10] which included nominal rates for transport services and occupancy charges at rates SIC had previously agreed to with the Trustee. Thus far, however, the SIC Parties have been disinclined to negotiate, and thus no occupancy agreement is currently in place between HTI and the SIC Parties for the SIC Parties' occupancy or use of the Paniolo Buildings. Yoshida Decl. ¶ 45.

### E. The obligation to control and maintain security was assumed by HTI through the 363 Sale.

Prior to the 363 Sale, it was the Trustee, not SIC, which held sole responsibility for controlling and managing security for the Paniolo Premises. *See* SIC Lease § 2.8. The Trustee later delegated this responsibility to HTI under that

---

[10] Modern telecommunications require that a call or message initiated by a customer on one network will inevitably need to be routed through other carriers on its way to reaching its intended recipient. In this case, the Paniolo Network is a "middle mile" network, and exists to transport signals originated by customers on a last-mile network (such as the network currently operated by SIC), to another destination, where it is then handed off to the last-mile network of the intended recipient. Carriers routinely enter into such contractual arrangements with each other to route traffic through different networks, to obtain services from each other, and to arrange any needed use of their respective infrastructure by the other. Such intercarrier usage and occupancy arrangements are subject to the guidelines established by federal and state telecommunications law applicable to intercarrier relationships. HTI has publicly stated numerous times that per its obligations under federal telecommunications law applicable to it, HTI will continue to offer all carriers, including any of the SIC Parties and any other carrier offering services to the Hawaiian Home Lands, access to these middle-mile services on the Paniolo Network on a non-discriminatory basis. *See, e.g.,* Dkt. 359 at 2 (HTI filing).

certain *Operational Support and Services Agreement* approved by the Court in the 363 Sale Order. *See* Ex. B to 363 Sale Order, § 3.1. HTI thereafter implemented its own security protocols to fulfill the terms of the *Operational Support and Services Agreement*, and all of third-party security vendor relationships, including those that had previously been managed by SIC, were transferred to HTI as a part of that process. Yoshida Decl. ¶ 4.

When the 363 Sale closed, and the Paniolo security apparatus (keys, fences, equipment, etc.) and security obligations transferred to HTI under the 363 Sale Order, what first began as HTI's **contractual** security obligation (on the Trustee's behalf) became HTI's continuing **regulatory** obligation. This is because the Court's approval of the 363 Sale, and the Closing thereof, had been conditioned on HTI successfully obtaining approval from the FCC for the 363 Sale. 363 Sale Order ¶ 49. Additionally, because the Paniolo Network would be integrated into HTI's other operations and could potentially carry sensitive government information, the 363 Sale had to be reviewed by the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector ("Team Telecom"),[11] as the FCC's rules require referral of applications to assign submarine

---

[11] This Committee was established pursuant to Executive Order 13913, issued April 4, 2020. It is chaired by the Department of Justice, but also includes the Department of Homeland Security and the Department of Defense.

cable landing licenses to Team Telecom.[12]

As a result of Team Telecom's review of the transaction, Team Telecom required HTI to enter into a certain Letter of Agreement (the "LOA") with the Department of Justice ("DOJ"), Department of Homeland Security ("DHS") and the Department of Defense ("DOD") (the DOJ, DHS, and DOD collectively, the "Compliance Monitoring Agencies").   *See Petition to Adopt Conditions to Authorization and License,* FCC File No. SCL-ASG-20210122-0006[13] (Team Telecom "has no objection to the [FCC] approving the above-captioned application, provided that the Commission conditions its approval on the assurances of Hawaiian Telcom, Inc. . . . to abide by the commitments and undertakings set forth in the July 23, 2021, Letter of Agreement.").   Under HTI's LOA with Team Telecom, HTI's Paniolo operations are subject to certain security mandates ("Security Mandates"), which include (i) undertaking specific measures to restrict logical access to the network, (ii) establishing physical security measures for the premises and network

---

[12]  *See* 47 C.F.R. § 1.40001(a)(1); *Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, 35 FCC Rcd 10927, 10935 ¶ 24 (2020) (the "FCC Executive Branch Review Order").   *See also* FCC Public Notice Report No. SCL-00303, dated February 18, 2021 (application requesting FCC consent to the assignment of the SCL License under the 363 Sale was found to be "acceptable for filing" and would be referred to relevant executive branch agencies for their review), *available at* https://licensing.fcc.gov/ibfsweb/ib.page.FetchPN?report_key=3872593.   For the Court's convenience, a copy is attached hereto at **Appendix D.**

[13] This document is publicly available at https://fcc.report/IBFS/SCL-ASG-20210122-00006/12174013.pdf, but for the Court's convenience, a copy is attached hereto at **Appendix E**. The LOA begins at page 3 *et seq.*

22

infrastructure, (iii) performing background screens for any persons entering the premises, (iv) appointing responsible officers, (v) reporting incidents to the Compliance Monitoring Agencies, (vi) submitting annual compliance reports, and (vii) responding to (and notifying the Compliance Monitoring Agencies regarding) breaches or threatened breaches of security. *Id.* at 3 *et seq.* (copy of the LOA). HTI was further required to submit its policies and procedures implementing the Security Mandates for review and approval (or non-objection) by the Compliance Monitoring Agencies. *Id.,* LOA at § 9.

By requiring HTI's adherence to the LOA as a condition to approving the transfer of the SCL License to HTI, the FCC accordingly required that HTI assume responsibility for implementing and maintaining security, in compliance with and subject to the Security Mandates. *Id.* at §§ 8, 9. HTI now holds continuing security obligations under the LOA – and it is these obligations which are now directly impacted by the SIC Parties' recent misconduct.

### F.     The DHHL has issued a Right of Entry Agreement to HTI.

The DHHL, as grantor of the Access and Easement Rights, has previously informed this Court of its position that the SIC Parties' rights in any of the Transferred Assets had been extinguished through the 363 Sale. *See Department of Hawaiian Home Lands' Response Regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status Conference, Filed Herein on August*

23

*16, 2021* [Dkt. 432] at 6 ("[I]t is DHHL's understanding that any interest of SIC in the Paniolo assets being acquired by Buyer, including that portion of License 372 which comprises part of the Paniolo assets, has been extinguished by the bankruptcy proceedings . . . .")  Post-Closing, the DHHL has also issued to HTI a Right of Entry Agreement (as amended, the "ROE").  Masutomi Decl., Exs. M-24, M-25 (ROE and amendment thereto).  This ROE confirmed HTI's Access and Easement Rights for all ten Paniolo Premises now owned by HTI.  *Id.,* Ex. M-24 (ROE) at § 4.  In alignment with the LOA under the SCL License, the ROE similarly places all responsibility for Paniolo Premise security on HTI.  *Id.* at § 5.  Additionally, the ROE further clarifies that HTI remains responsible for all insurance and hazardous materials on the Paniolo Premises.  *Id.* at §§ 12, 14.

The DHHL's counsel has also provided written notice to SIC stating that notwithstanding anything in the 372 License to the contrary, HTI holds the responsibility for securing the Paniolo Premises, and the SIC Parties do not have any rights to limit or restrict HTI's access to and use of the Paniolo Assets on the Hawaiian Homelands.  *See* Yoshida Decl., Ex. Y-29.

## G.    HTI's First Enforcement Motion.

On October 2, 2021, HTI filed the First Enforcement Motion asking the Court to compel the SIC Parties to (1) turn over information related to the Paniolo Network ("Information Requests"); (2) remove trash and other items from the Paniolo

buildings acquired by HTI ("<u>Removal Requests</u>"); and (3) turn over spare tools and equipment ("<u>Spare Parts Requests</u>").  *See* Dkt. 459.

On November 19, 2021, the Court entered the First Enforcement Order, which granted the Spare Parts Requests and denying without prejudice the Information Requests and Removal Requests.  First Enforcement Order at 8-11.  *See also Judgment on the First Enforcement Order* [Dkt. 559].  In connection with the Spare Parts Request, the Court held that spare parts and equipment associated with the submarine system were undoubtedly "Transferred Assets" under the 363 Sale Order, and thus SIC was required to turn over such assets to HTI.  First Enforcement Order at 11.  In contrast, with the Information Requests, SIC was not required to turn over requested information to HTI as the Court could not determine from the record whether such information was within the scope of "Transferred Assets."  *Id.* at 8-9.

In connection with the Removal Requests, the position of the SIC Parties was that they held a license from the DHHL which allowed it to occupy the land and facilities on which its network operates.  *Id.* at 9.  Accordingly, SIC contended that it had the right to store its property, including its rubbish, on facilities shared with HTI.  *Id.*

The Court found that it did not have sufficient factual evidence in the record to issue a determination on this issue:

> First, the license from the Department of Hawaiian Homelands to SIC's affiliates and the sublicenses are not in the record.  Second, although

25

the record is clear that the trustee acquired certain "central offices" and "terminal buildings" by virtue of the execution sale, it is not clear that the Trustee acquired exclusive rights of occupancy. . . . Third, it is not clear what contract or arrangement currently governs the relationship between Hawaiian Telcom and SIC. The Master Relationship Agreement and related agreements clarified the situation, but Hawaiian Telcom chose not to acquire the Master Relationship Agreement or the related agreements . . . . Simply put, I cannot determine on the existing record whether Hawaiian Telcom has the exclusive right to occupy the premises in which SIC's property is located.

*Id.* at 9-10.

Contrary to the SIC Parties' later declarations (detailed below), nowhere in the First Enforcement Order does the Court even implicitly "confirm" that "no real estate was transferred" to HTI through the 363 Sale or that HTI's purchase of the Paniolo assets exclude "access rights across [SIC]'s property."  Yoshida Decl., Ex. Y-34 to Y-37 (SIC's letters mischaracterizing the First Enforcement Order).  In fact, the terms "real estate" and "access rights" do not even appear in the First Enforcement Order.

### H.    The SIC Parties impede HTI's access to and within the Paniolo Buildings and the Paniolo Premises.

Upon the Closing, and now being directly responsible for security over the Paniolo Premises under SCL License and the ROE, HTI provided SIC with the same access and security protocols it had previously implemented on behalf of the Trustee under the *Operational Support and Services Agreement*.  Yoshida Decl. ¶ 4.  These temporary protocols were implemented under the assumption that SIC would

26

expediently and in good faith negotiate (and then execute and abide by) a standard colocation agreement with HTI, as is customary in the industry, and that SIC would at all times continue to adhere to the Security Mandates. *Id.* Under these protocols, HTI allowed unescorted access to the Paniolo Premises for those SIC personnel who had been screened and had notified HTI of their need for access, and implemented a "daisy-chain" perimeter locking system to allow SIC screened personnel to unlock the perimeter access gate without needing HTI assistance. *Id.* SIC personnel would first simply notify HTI of their need for access, and HTI would turn off the alarm system so that access via the daisy-chain locking system would not trigger an alarm or first-responder visit. *Id.* HTI also permitted SIC unescorted access to the Paniolo Buildings, by remotely unlocking the applicable Paniolo Building access doors and turning off the applicable alarms after being notified of SIC's need for access. *Id.* SIC, however, has not entered into any sort of colocation agreement with HTI post-Closing. *Id.* ¶ 45.

Shortly after the Court entered the First Enforcement Order, SIC instead began engaging in blatant misconduct, including (1) bypassing HTI's lock on the perimeter fence of the Paniolo Building in Kekaha by installing its own lock that prevented HTI's access to the same; (2) barricading the interior doors to the warehouse rooms of the Paniolo Buildings in Anahola and Hilo; and (3) threatening to change additional locks on or within the other of the Paniolo Premises. Yoshida

Decl. ¶¶ 3, 5. Consequently, in response to the heightened safety and security risks represented by these actions, on December 22, 2021, HTI discontinued some of the accommodations it had previously extended to SIC, and thereafter required SIC to comply with HTI's standard security protocol applicable to third parties without a valid colocation agreement – in other words, SIC was required to obtain escorted access to enter any of the Paniolo Buildings. *Id.* ¶ 6.

After entry of the Court's First Enforcement Order, the SIC Parties also began asserting that (i) the Court determined that HTI had not acquired the right to use or access the land under or leading up to the Paniolo Premises, *see*, *e.g.*, Yoshida Decl., Ex. Y-33 to Y-37, (ii) SIC and/or Waimana controlled said land, *see id.*, Exs. Y-34 to Y-37, and (iii) the 363 Sale Order did not include the warehouse rooms of the Paniolo Buildings in Anahola and Hilo, *see*, *e.g.*, Yoshida Decl., Ex. Y-31. The SIC Parties also began continually interfering with the fences surrounding, and blocking HTI's access to, the Paniolo Premises, beginning with cutting and bypassing installed locks, and escalating to permanently welding access gates shut, installing concrete barriers at the access gates, drilling out building locks, physically blocking entrances, and calling the police on HTI personnel. *See* Appendix C (summary of the incidents). Despite repeated demands by HTI that the SIC Parties immediately cease such egregious conduct, the SIC Parties have failed to do so (*see* Yoshida Decl. ¶ 43), and instead have claimed that HTI is the one interfering with *SIC's* property

28

(*see* Complaint, defined below, at ¶ 36). The DHHL has already directly informed the SIC Parties that HTI, and not the SIC Parties, is responsible for security on the Paniolo Premises, *see* Yoshida Decl., Ex. Y-29, but the SIC Parties' actions to impede HTI's access have continued unabated.

## I.  SIC and Waimana have initiated the State Court Action seeking, *inter alia,* to permanently evict HTI from the Paniolo Buildings and the Paniolo Premises.

On March 18, 2022, SIC and Waimana (the "Plaintiffs") initiated the State Court Action by filing a complaint against HTI (the "Complaint") in the State of Hawaii Circuit Court of the First Circuit (Case No. 1CCV-22-0000321). A copy of the Complaint has been attached here for the Court's reference at **Appendix H**. The Complaint is premised upon SIC's misinterpretation of this Court's orders and what transpired in proceedings before this Court. The Complaint defines "Licensed Property" broadly, covering the "telecommunications facilities, including Central Offices, warehouses and security fencing . . . and underground conduits throughout [the Hawaiian Home Lands]" developed by SIC under License 372, which definition clearly covers the Paniolo Premises and may also be construed to cover the Paniolo Buildings. *See* Complaint ¶ 9. The Plaintiffs have alleged that the Trustee "did not acquire any interest in License[d] Property" as a result of the Marshal Sale, and "knew that he could not obtain rights to the Licensed Property." *Id.* ¶¶ 13, 16. Accordingly, the Trustee "could not, and did not, sell to [HTI] any rights to occupy

29

the Licensed Property." *Id.* ¶ 19.

The Plaintiffs have also alleged that HTI "is a trespasser on the Licensed Property" and "has no license nor any other right to use the Licensed Property under and surrounding its facilities on HHL." *Id.* ¶¶ 25-27; *see also id.* ¶¶ 16-23.  The Complaint also twists the underlying facts, asserting that HTI has "changed the locks on **SIC warehouses**, continues to damage **SIC's security fencing** . . . cutting SIC's locking mechanisms, and has caused SIC to cut Hawaiian Tel's locks to gain access to **Waimana and SIC's facilities** located on Waimana and SIC's licensed lands." *Id.* ¶ 36 (emphasis added).  The Complaint thus seeks "an injunction barring Hawaiian Tel from access to the Licensed Property" (*id.* ¶ 43), damages for HTI's alleged use of the Licensed Property (*id.*), "disgorgement of HTI profits" (*id.* ¶¶ 43, 46), punitive and other damages and other relief (*id.*).

The Complaint cites to DHHL's initial pleading filed in connection with the 363 Sale, *id.* ¶ 18, but notably leaves out any mention of DHHL's later pleading filed with this Court, which expressed the DHHL's understanding that "any interest of SIC in the Paniolo assets being acquired by Buyer, including that portion of License 372 which comprises part of the Paniolo assets, has been extinguished by the bankruptcy proceedings," and that SIC's claim of exclusivity under License 372 was patently incorrect. *See Department of Hawaiian Home Lands' Response Regarding Michael Katzenstein, Chapter 11 Trustee's Status Report and Request for Status*

*Conference, Filed Herein on August 16, 2021* [Dkt. 432].

## IV.   ARGUMENT

This Motion seeks enforcement of this Court's 363 Sale Order through multiple forms of interim and final relief.

Given the SIC Parties' recent conduct, which has become increasingly belligerent and harmful over time, HTI seeks interim relief on an expedited basis to enforce the injunction in the 363 Sale Order and prevent SIC from engaging in misconduct on the ground – the cutting of locks, the blocking of access, calling the police – until the Court issues a final ruling on the merits of this Motion.[14]

The final relief, as sought in this Motion, seeks a determination by the Court of SIC and HTI's respective rights in connection with (a) the use, ownership and control of the Paniolo Buildings, (b) access over the Paniolo Premises, and (c) security control over the Paniolo Premises.  In particular, HTI seeks a confirmation from the Court that HTI holds control and ownership over the entirety of the Paniolo Buildings through its 363 Sale purchase; a confirmation from the Court that HTI purchased the Access and Easement Rights to the Paniolo Premises (and accordingly, enjoining the SIC Parties from obstructing HTI's access to the Paniolo Buildings and Paniolo Premises, or from attempting to charge HTI any fees for

---

[14] During this interim period, the SIC Parties would still have reasonable access to the Paniolo Buildings and Paniolo Premises, subject to HTI's existing security protocols that are currently applicable to all parties entering the Paniolo Buildings and Paniolo Premises.

access to or use of the Paniolo Buildings and Paniolo Premises); a confirmation from the Court that HTI assumed the obligation of maintaining the security of the Paniolo Buildings and Paniolo Premises (and accordingly, enjoining SIC from interfering with HTI's fulfillment of those obligations). HTI also seeks a finding that SIC and Waimana have violated the 363 Sale Order through the filing of the State Court Action.

### A.   HTI acquired, and now possesses control and ownership over, the entirety of the Paniolo Buildings, including the perimeter fences.

#### 1.   *HTI acquired the Paniolo Buildings.*

While SIC may have owned and controlled certain Paniolo Buildings in the past, the Trustee acquired that ownership and control through the Marshal Sale, and sold each of the Paniolo Buildings to HTI through the 363 Sale. The SIC Parties no longer have any entitlement to use or occupancy of any portion of the Paniolo Buildings.[15] In spite of this, the SIC Parties today are continuing to occupy certain rooms, which they have misleadingly characterized as "warehouses," within the Paniolo Buildings at Anahola and Hilo. Yoshida Decl. ¶¶ 3, 5, 48; *see* Complaint

---

[15] Even though SIC's occupancy was terminated by the Trustee for SIC's default under previous contractual arrangements, and SIC thus has no current contractual rights of occupancy governing its use of the Paniolo assets, on October 1, 2021, HTI notified the SIC Parties, DHHL, and numerous other state and federal agencies of HTI's intent to allow the SIC Parties to remain until March 31, 2022. *See* Masutomi Decl., Exs. M-21, M-22. This date was provided to give the SIC Parties reasonable notice and sufficient time to negotiate with HTI for a new occupancy agreement, and to provide SIC's customers (whose connectivity may be at risk due to SIC's defaults and actions) with reasonable notice and sufficient time to obtain alternate connectivity arrangements. *Id.* HTI has now extended this date to April 30, 2022. *Id.*, Ex. M-23.

¶ 14 (alleging that the Trustee did not want to purchase "the warehouses" through the Marshal Sale).  The SIC Parties have recently gone so far as to barricade the internal doors to those rooms, and have also changed the locks to the external doors to the same, prohibiting entry by HTI, on the grounds that this Court's prior orders did not expressly list the "warehouse" rooms as part of the 363 Sale.  Yoshida Decl. ¶¶ 3, 5, 18, 31.

Such conduct by the SIC Parties is a violation of the Court's 363 Sale Order. The Schedule A.2 Marshal Sale Assets included the "Anahola Central Office" described as "Central Office located in Anahola, Hawaii, including access rights to the land on which the central office resides" and the "Hilo Central Office" described as "Central Office located in Hilo, Hawaii, including access rights to the land on which the central office resides."  Certificate of Execution at 6, 13.  None of the Marshal Sale documents reflect any sort of carveouts ever made as to warehouse rooms or any other portions of these Paniolo Buildings to be reserved for SIC's use. *Id.*  While SIC has characterized certain rooms in these buildings as "warehouses," in an attempt to make them sound as external structures, SIC's building plans for the Paniolo Buildings in Anahola and Hilo show that what SIC calls a "warehouse" is just another room within the central office buildings acquired by HTI.  *See* Masutomi Decl., Ex. M-17 (Anahola); Ex. M-15 (Hilo).  There is no separate portion of the building referred to as "central office" or a "warehouse."  To the contrary, the plans

refer to the entire Paniolo Premise on which the buildings are located as the "Anahola Central Office" and "Hilo Central Office," respectively – the same terms that are used on Schedule A.2. *Id.*

SIC holds no basis for continuing to use any "warehouse" rooms within these buildings for storage; Schedule A.2 clearly evidences that the Trustee acquired the entirety of the Paniolo Buildings in Anahola and Hilo from SIC, along with other related assets. Certificate of Execution at 6, 13. The scope of the assets listed on Schedule A.2 includes not only the building but related assets such as power infrastructure for the building, air conditioning systems, fiber distribution panels, support structures, manholes and entrance conduits, and other equipment and infrastructure. *Id.* The inclusion of all of these related assets further supports the conclusion that the Trustee, and subsequently HTI, acquired the buildings in their entirety. The same is true for the other Paniolo Buildings acquired through the Marshal Sale – specifically, the Paniolo Buildings at Laiopua, Waiehu, Kalamaula, Waimanalo, and Nanakuli. *See id.* at 6-13.

This conclusion is further supported by the fact that Schedule A.2 also included **all of** the Paniolo Keys, being "[a]ll keys for access to the 10 terminal buildings and central offices identified in Schedule A.1 and Schedule A.2 including keys to any fences on the perimeter of the terminal buildings and central offices." *Id.* at 15. It would be illogical and commercially unreasonable to provide that the

Trustee acquired all the keys to all of Paniolo Buildings and the perimeter fences, but that SIC retained some ownership of and ability to control certain rooms within these Paniolo Buildings.[16]

The Trustee later conveyed the Marshal Sale Assets to HTI through the 363 Sale. This is made clear by the description of the A.2 Assets as the "Transferred [Assets] and Property Rights . . . transferred by SIC in conjunction with the US Marshal Sale . . . ." APA, Schedule 2.1(a)(ii). All of the contents of Schedule A.2, as included in the Marshal Sale, is also included in the APA. *Compare* Certificate of Execution at 6 *et seq., with* APA at 238 *et seq.* Additionally, like the Trustee in the Marshal Sale, HTI in the 363 Sale acquired the Paniolo Keys. APA at 245. The right of HTI to control the entirety of the A.2 Assets, which covered the Paniolo Buildings and all rooms contained within them, was thus properly transferred to HTI through the 363 Sale. To the extent SIC had any lingering or residual interest in the A.2 Assets, pursuant to the 363 Sale Order and section 363(f) of the Bankruptcy Code, HTI acquired the Paniolo Buildings and their related rights free and clear of all interests, claims and encumbrances. 363 Sale Order ¶ S; 11 U.S.C. § 363(f). To the extent the SIC Parties attempt to claim that the use and/or occupancy is by a party other than SIC, for the same reasons noted above, the 363 Sale Order extinguished

---

[16] HTI has also been paying for all of the electric utility bills associated with all of the Paniolo Buildings, notwithstanding that the SIC Parties are continuing to occupy portions of the Paniolo Buildings and have incurred utility costs in connection therewith. Masutomi Decl. ¶ 30.

any such claim by any SIC Party.

SIC's refusal to surrender certain rooms within the Paniolo Buildings in Anahola and Hilo is thus a clear violation of both the Marshal Sale Order and the 363 Sale Order.  *See* Sale Order ¶ 39.  HTI respectfully requests that the Court confirm, pursuant to the terms of the 363 Sale Order, that HTI owns the entirety of the Paniolo Buildings, and requests that the Court impose upon SIC an obligation to cease occupancy of any "warehouse" rooms.  HTI further requests that the Court enjoin the SIC Parties from blocking HTI's access to any portion of the Paniolo Buildings.

> 2. *HTI also acquired the perimeter fences surrounding the Paniolo Buildings.*

Each of the Paniolo Premises is surrounded by a perimeter fence which provides security for each of the Paniolo Buildings.  The perimeter fences are shown on nine of the ten construction plans[17] approved by the DHHL.  *See* Masutomi Decl., Exs. M-12 to M-20.  Under Hawaii law, a structure affixed to the real estate is a fixture, and not personal property.  *Conner v. Aila*, Case No. 19-00233 JMS-KJM, 2019 WL 4047609, at *4 (D. Haw. Aug. 27, 2019) (concluding that the plaintiffs' assertion that their house on Hawaiian Home Lands was personal property separate from the land, contradicted Hawaii law) (*citing Ahoi v. Pacheco*, 22 Haw. 257, 258

---

[17] The perimeter fence is not shown on the construction plans for the Laiopua Central Office. *See* Masutomi Decl., Ex. M-11.

(1914)). *See also Armstrong v. Kapohaku*, 5 Haw. 185, 189 (1884).

In this instance, the perimeter fences were constructed pursuant to rights derived from SIC's interest in the 372 License and are an integral and necessary part of the operation of the Paniolo Buildings and the Paniolo Network.  The Marshal Sale specifically transferred all such rights, including the entirety of SIC's interest in the 372 License necessary to operate the Schedule A.2 assets, to the Trustee. Certificate of Execution at 15.  As noted above, the Marshal Sale also included the keys to all locks, specifically "including keys to any fences on the perimeter of the [Paniolo Buildings]," *id.*, and all ancillary "Security" equipment necessary to operate the Paniolo Network in each of the Paniolo Buildings.  *Id.* at 6-13.

The Trustee then conveyed both the A.1 Assets and A.2 Assets to HTI through the 363 Sale.  The assets acquired by HTI include all improvements and fixtures constructed by SIC and/or Paniolo within the Paniolo Premises from the perimeter fence line in, and the SIC Parties have no legal basis to inhibit access, change locks, or affix new boxes to HTI's fences.  Furthermore, SIC's actions, including cutting locks on the fences and otherwise impeding HTI's access to the Paniolo Buildings through the fences, violates the injunctive provisions of the 363 Sale Order, as such actions constitute clear attempts by the SIC Parties to maintain control over the property purchased (the fences) through the 363 Sale.

**B.** **HTI acquired Access and Easement Rights associated with the Paniolo Premises, and the SIC Parties should be prohibited from interfering with HTI's Access and Easement Rights in any manner.**

The SIC Parties have wrongfully taken the position that this Court "confirm[ed HTI's] purchase of the Paniolo assets did not include the access rights across [SIC's or its affiliates'] property surrounding and under the Paniolo assets." *See* Yoshida Decl., Exs. Y-33 to Y-37. *See also, e.g.,* Complaint ¶ 27 (HTI "has no license nor any other right to use the Licensed Property under and surrounding its facilities on [the Hawaiian Home Lands].")   This assertion is not only a misrepresentation of the Court's First Enforcement Order, but is also inconsistent with the 363 Sale Order.  When it purchased the Paniolo Buildings, HTI acquired Access and Easement Rights for the Paniolo Premises, as well as the right to cross adjoining DHHL-controlled land to access the Paniolo Premises, as such rights are necessary to maintain and operate the Paniolo Network and the Paniolo Buildings.

The Access and Easement Rights applicable to the Paniolo Premises, which were obtained by the Trustee in the Marshal Sale and acquired by HTI in the 363 Sale, originated from easements granted to SIC under a license issued by the DHHL to Waimana.  HTI necessarily acquired the Access and Easement Rights when it acquired the Paniolo Buildings, because these rights are necessary to use and operate not only the buildings themselves, but the entire Paniolo Network.  In order to provide the Court with background details and context, HTI describes below the

38

origin of the Access and Easement Rights and their eventual transfer to HTI in the

363 Sale, and is supplementing the record with copies of all documents referenced

herein.

      1.     *Waimana obtained the 372 License, and partially assigned different portions of the 372 License to SIC, Pa Makani, and Clearcom.*

On May 9, 1995, the DHHL issued to Waimana a certain license agreement,

numbered 372 (the "372 License").  *See* Masutomi Decl., Ex. M-1.  Per the license,

DHHL granted to Waimana the "right and privilege to build, construct, repair,

maintain and operate a broad band telecommunications network . . . over, across and

throughout all lands under the administration and jurisdiction of [DHHL] . . . and . .

.  the **right of entry** upon the **easement area and adjoining land** of [DHHL] for

the **construction, maintenance, operation and removal of LICENSEE'S line** and

appurtenances over, **across and under the LICENSE area**."  *Id.* at 2  (capitalization

in original, emphases added).

On January 15, 1996, pursuant to a written assignment ("SIC Assignment"),

Waimana "assign[ed], transfer[red], and set[] over to [SIC] those certain rights, title

and interest necessary to provide **IntraLata and Intrastate telecommunication**

**services**[18] in and to the [372 License]."  Masutomi Decl., Ex. M-2 (emphasis

---

[18] "Telecommunications" "means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  47 U.S.C. § 153(50).  LATAs are "Local Access and Transport Areas" and

added).   Approximately sixteen years later, on December 30, 2011, Waimana assigned to Pa Makani LLC dba Sandwich Isles Wireless ("Pa Makani") "those certain rights, title and interest necessary to provide **wireless communications services** of all types . . . in and to the [372 License]." *Id.*, Ex. M-3 (emphasis added). Separately, on May 29, 2014, Waimana assigned to Clearcom, Inc. dba Sandwich Isles Broadband ("Clearcom") "those certain rights, title and interest necessary to provide **broadband services**[19] of all types, . . . in and to the [372 License]." *Id.*, Ex. M-4 (emphasis added).

> 2.   *DHHL separately granted to SIC certain access and easement rights for the construction and operation of Paniolo Buildings.*

Subsequent to the SIC Assignment, SIC needed to construct central offices and terminal buildings.   DHHL thus identified specific portions of its land and granted Access and Easement Rights to SIC for the location of SIC's central offices and associated appurtenances, in the form of written addenda (collectively, "SIC Addenda" and each an "SIC Addendum").   *See* Masutomi Decl., Exs. M-5 to

---

"IntraLATA service is what consumers generally know as local service[.]" *SBC Commc'ns Inc v. F.C.C.*, 407 F.3d 1223, 1226-27 (D.C. Cir. 2005).  As Hawaii has only one LATA, *see In re GTE Mobilenet of Haw., Inc.*, Dkt. 7687; 1994 WL 570365 (Haw. Pub. Utils. Comm'n Sept. 6, 1994), IntraLATA and Intrastate telecommunications services includes all telecommunications within the State, but excludes state to state or international communication services.

[19] Broadband is an information service and is regulated under Title I of the Communications Act of 1996.  *See N.Y. State Telecommunications Ass'n, Inc. v. James*, 2021 WL 2401338, at *6 (E.D.N.Y. Jun. 11, 2021).  "Information service" and "telecommunications service" are mutually exclusive. *See id.* (citing 47 U.S.C. §§ 153(24), (53)).

M-10.[20]  Importantly, these SIC Addenda (and their delineated Access and Easement

Rights) were granted under the portion of the 372 License that had been assigned to

SIC; none of Waimana, Pa Makani or Clearcom were parties to any of the SIC

Addenda.  *See*, *e.g., id.,* Ex. M-5 at 2.   In each SIC Addendum, the DHHL

demarcated each specific Paniolo Premise, *i.e.*, the specific metes and bounds of the

Access and Easement Rights granted to SIC for the identified Paniolo Building.  *Id.*

at 6-10.  Each SIC Addendum was recorded in the Bureau of Conveyances of the

State of Hawaii ("Bureau of Conveyances").  *Id.* at 1.  Each SIC Addendum notes

that in partially assigning to SIC portions of the 372 License, Waimana "assign[ed],

transfer[red], and set[] over to [SIC] those certain rights, title and interest necessary

to provide IntraLata and Intrastate telecommunications services in and to License

Agreement No. 372."  *Id.* at 2.  Each SIC Addendum runs to the benefit of SIC's

successors in interest (i.e., the Trustee and then HTI), as each "grants and issues to

[SIC], and its **legal successors and assigns**" the easements described therein.  *Id.*

(emphasis added).  The SIC Addenda also noted that SIC required the easements

identified therein "for [SIC's] Central Telephone office, including, but not limited

to, a building and telephone switching equipment." *Id.* at 3.  Pursuant to the Access

and Easement Rights granted under the respective SIC Addenda, SIC thereafter

constructed, within the metes and bounds of the grant, the Paniolo Buildings in

---

[20] A summary of all of the SIC Addenda is attached hereto as **Appendix B**.

41

Laiopua, Kalamaula, Waimanalo, Waiehu, Hilo, Anahola and Nanakuli.  Masutomi

Decl., Exs. M-11 to M-15, M-17 to M-18 (building plans).

3.  *HTI purchased, along with the Paniolo Buildings, the necessary Access and Easement Rights on each corresponding Paniolo Premise.*

Through the 363 Sale, HTI purchased ten specific Paniolo Buildings.  Each

Paniolo Building is located within a Paniolo Premise, and each of the ten Paniolo

Buildings and Paniolo Premises are necessary to operate, and integral parts of, the

whole Paniolo Network.  Masutomi Decl. ¶¶ 25-26.  Three of the Paniolo Buildings

originally belonged to Paniolo, and are identified as A.1 Assets: Kekaha, Puunene,

and Puukapu.[21]  *See* APA, Schedule 2.1(a)(i) (describing "assets owned by Paniolo

free and clear").  The remaining seven Paniolo Buildings, identified as A.2 Assets,

originally belonged to SIC but were transferred to the Trustee through the Marshal

Sale: Laiopua, Waiehu, Hilo, Anahola, Kalamaula, Waimanalo, and Nanakuli.  *See*

*id.,* Schedule 2.1(a)(ii) (describing "assets and rights obtained by the Trustee from

SIC in the Marshal Sale . . . free and clear.").

For the latter seven Paniolo Buildings and corresponding Paniolo Premises

(the A.2 Assets – Laiopua, Waiehu, Hilo, Anahola, Kalamaula, Waimanalo,

Nanakuli), the Access and Easement Rights for these seven sites were originally

---

[21] For the avoidance of doubt, there currently exists two buildings at Puukapu – one SIC building, and one Paniolo Building.  The Paniolo Building, not the SIC building, was an A.1 Asset acquired by HTI through the 363 Sale.

42

embodied within the SIC Addenda.  Masutomi Decl., Exs. M-5 to M-10.  Each addendum described, via metes and bounds particularity, the easement area applicable to the specific Paniolo Premise, as shown in the construction plans for those premises.  *See id.  See also* Masutomi Decl., Exs. M-11 to M-15, M-17 to M-18.

The Access and Easement Rights in connection with the remaining three Paniolo Buildings and Paniolo Premises (the A.1 Assets – Kekaha, Puunene, and Puukapu) arose in a slightly different manner.  Similar to the A.2 Assets, there existed a SIC Addendum addressing Puukapu.  *See* Masutomi Decl., Ex. M-8.  For Kekaha and Puunene, while HTI has been unable to locate similar recorded easements with the Bureau of Conveyances, the pattern and practice established between SIC and DHHL at that time for easements of this type is clear, including, specifically, the approval of construction plans for the applicable Paniolo Buildings, allowing one to conclude that similar easements were granted (either formally or by some other means) by DHHL for these two locations as well.  Accordingly, these two Paniolo Buildings were also constructed, maintained and operated pursuant to SIC's interest in the 372 License, as shown in that certain *Joint Use Agreement,* dated as of July 19, 2007, between Paniolo and SIC.  *See* Dkt. 299-5 (Joint Use Agreement, filed by the Trustee) at ¶ 10 (stating that Paniolo was to construct demarcation buildings in Kekaha, Puunene and Puukapu); § I.A (stating that SIC

43

permits Paniolo to have the benefit and use of SIC's interest in the 372 License "in connection with the construction, installation, ownership and continuing existence of the Paniolo Cable Network System").  Moreover, as shown in the construction plans for these two sites, Paniolo, DHHL and SIC consistently treated the Paniolo Premises for these two Paniolo Buildings sites in a manner consistent with the access and occupancy easements contained within the SIC Addenda for the other Paniolo Premises.  *See* Masutomi Decl., Exs. M-19 and M-20.  This was confirmed by the DHHL in its recently issued ROE, which granted access to the same properties that were identified in the SIC Addenda for the eight sites and on the construction drawings for Kekaha and Puunene.  *See* Exhibit A to *First Amendment to Right of Entry No. 704*, Masutomi Decl., Ex. M-25.

All of these Access and Easement Rights, for each of the ten premises, were thereafter acquired by the Trustee.  As noted above, as listed in Schedule A.2, the Trustee acquired through the Marshal Sale the seven Paniolo Buildings formerly owned by SIC, along with the "access rights to the land on which [each building] resides."  Certificate of Execution at 6-9 and 11-13.  The Schedule A.2 assets also specifically included "[a]ll licenses necessary to build, construct, repair, maintain and operate the Schedule A.2 assets, including without limitation[,] **SIC's interest in [the 372 License]**" and "[a]ll **existing and pending entitlements** . . . necessary to build, construct, repair, maintain and operate the Schedule A.2 assets."

44

Certificate of Execution at 15 (emphases added). In particular, the "existing and pending entitlements" included "**SIC's interest** in memoranda of agreement**, easements,** leases, license agreements, letters of approval, special area management permits**, rights of way or rights of interest**." Certificate of Execution at 15 (emphasis added). The SIC Addenda, as evidence of easements and rights of way granted to SIC, are undoubtedly covered by this language describing the scope of the Marshal Sale Assets. Further, as both Kekaha and Puunene are integral sites within the integrated Paniolo Network, the easement arrangements for these sites, whether originally possessed by either SIC or Paniolo, must also be logically and fairly contained within those "easements" and "rights" acquired by the Trustee as "necessary to build, construct, repair, maintain and operate the Schedule A.2 assets," even if no written SIC Addenda had been finalized for these two sites. SIC's Access and Easement Rights thus plainly transferred to the Trustee through the Marshal Sale. *See* Certificate of Execution at 15.

The Access and Easement Rights in all ten of the Paniolo Premises were then included as part of the 363 Sale and properly transferred to HTI. The description of the Paniolo Buildings as A.2 Assets sold to HTI specifically included "access rights to land on which the central office[s and terminal buildings] reside[]," which is the same language adopted from the description of Marshal Sale Assets. APA at 232, 235, 236. The APA goes so far as to state that the Transferred Assets, for the

45

avoidance of doubt, included but was not limited to "all buildings currently performing as cable landing stations, central offices, real estate (including easements, rights of way, licenses, the Licenses and Entitlements and the like, as are required for ingress, egress and access) conduits, manholes, handholes, rights of way, easements, fiber optic and telecommunication cables . . . ." *Id.,* Schedule 2.1(a)(ii).  Similarly, the description of the Paniolo Buildings as A.1 Assets sold to HTI specifically included "access rights to the land on which the terminal building resides." *Id.*, Schedule 2.1(a)(i).  The documentation for the 363 Sale leaves no doubt that the necessary Access and Easement Rights for each of the Paniolo Premises were properly transferred to HTI, as a necessary component of the 363 Sale and of HTI's purchase of the Paniolo Buildings.[22]

4.    *In violation of the 363 Sale Order, the SIC Parties have blocked and impeded HTI's access to the Paniolo Premises.*

The 363 Sale Order directed "SIC and SIC's Affiliates or any person or entity claiming by or through SIC or SIC's Affiliates . . . to surrender possession of the Transferred Assets," 363 Sale Order ¶ 39, which included the Access and Easement

---

[22] With respect to seven of the eight Paniolo Premises subject to a SIC addenda, the DHHL's grant Access and Easement Rights are solely for the corresponding central office.  *See* Masutomi Decl., Ex. M-5 to M-10.  With respect to the Laiopua central office on the big Island of Hawaii, the SIC Addendum for this central office also included an additional grant of access for a site on Oahu that is unrelated to the Paniolo Network.  *See id.,* Ex. M-5 at 2.  Despite this Oahu grant being within the SIC Addendum whereby HTI obtained the Access and Easement Rights for the Paniolo Premises at Laiopua, upon request of the DHHL, HTI is prepared to execute documentation necessary to disclaim any interest in any grant of access for the unrelated Oahu site.

Rights to the Paniolo Premises.  However, in clear violation of the 363 Sale Order, the SIC Parties have recently installed SIC locks and devices on various Paniolo Premises (barring HTI's access), have called the police on HTI personnel attempting to enter various Paniolo Premises, have physically blocked HTI personnel from accessing and entering various Paniolo Premises, have welded shut access gates and erected concrete barriers, and more.  *See generally* Appendix C (summary of incidents).  The SIC Parties have also alleged that "Waimana holds the land rights from Hawaiian Homes Commission for the land surrounding and under those assets purchased by [HTI]."  Yoshida Decl., Ex. Y-30; *see also* Complaint ¶ 27 ("The rights to the land are held by Waimana and SIC pursuant to License 372.")  If HTI wants access to the Paniolo Premises, the SIC Parties have insisted that HTI "must negotiate it with Waimana" for a contractual right of access in exchange for a fee. Yoshida Decl., Ex. Y-30; *see also* Complaint ¶ 33.

This position held by the SIC Parties is unreasonable, and does not have a basis in law or fact.  Waimana assigned to each of SIC, Pa Makani and Clearcom different slices of the 372 License.  *See* Masutomi Decl., Ex. M-2 to M-4.  As partial assignees of separate portions of Waimana's interest in the 372 License, Waimana, SIC, Pa Makani and Clearcom did not hold joint interests, but rather each individually held distinct interests in separate portions of the 372 License. *See, e.g., Griswold v. Income Props. II*, 1995 WL 256756, at *5 (Tenn. Ct. App. May 4, 1995)

47

(where the holder of a leasehold interest partially assigns separate portions of the same interest to different assignees, "the assignees do not hold their interest jointly, rather each assignee holds an undivided interest in a separate portion of the [interest].") (citing 3A George W. Thompson, *Commentaries on the Modern Law of Real Property* § 1219 (1981)).  HTI's Access and Easement Rights derive solely from its purchase of **SIC's interest** in the 372 License (not Waimana, Pa Makani, or Clearcom's interests), which included the SIC Addenda.  *See* Certificate of Execution at 15.  SIC's standalone interests in the 372 License or in the SIC Addenda have never been dependent upon any arrangement with or payment to Waimana, Pa Makani, or Clearcom, and thus HTI's rights – derived from its purchase of SIC interests – now similarly stands alone.

In any event, the 372 License has never granted to Waimana the right to control DHHL lands.  The 372 License granted to Waimana the right and privilege to build, construct, repair, maintain and operate a broadband telecommunications network, and issued to Waimana a "right of entry upon the easement area and adjoining land of [DHHL]" for the construction, maintenance, operation, and removal of "LICENSEE'S line and appurtenances over, across and under the LICENSE area."  Masutomi Decl., Ex. M-1 at 2 (capitalization in original).  The DHHL has recently confirmed its position, in no uncertain terms, that "[t]he existence of License 372, standing alone, does not give Waimana or [SIC] any rights

48

to limit or restrict [HTI's] access to and use of the Paniolo Assets which are located on DHHL lands."  Yoshida Decl., Ex. Y-29.

None of the remaining portions of the 372 License – the portions held by Pa Makani, Clearcom, or Waimana[23] – give any SIC Party the ability to exclude HTI from accessing the Paniolo Premises.  Nor do the SIC Parties have any basis on which to charge HTI for any usage of the Paniolo Premises.  The existence of any such ability or basis is facially unreasonable; such would render all of the Transferred Assets effectively valueless, as HTI would not be able to access the Paniolo Premises to get to the Paniolo Buildings to operate the Paniolo Network. HTI thus respectfully requests that the Court confirm: in light of HTI's acquisition of the Access and Easement Rights through the 363 Sale, that HTI is not obligated to pay any fee or otherwise obtain any further consent from the SIC Parties in order to access or use the Paniolo Premises or operate the Transferred Assets therein, that the SIC Parties are not permitted to obstruct or impede HTI's access to the Paniolo Premises in any way, and that the SIC Parties (including their employees, contractors, consultants, and other agents) must immediately cease all such conduct which has the effect of excluding or impeding HTI's access on any Paniolo Premise.

---

[23] To the extent Waimana retains any remaining interest in the 372 License, given its assignments to SIC, Pa Makani and Clearcom.

**C.    HTI assumed the obligation of maintaining security over the Paniolo Premises.**

Under the terms of the Court's 363 Sale Order, the obligation of maintaining the security of the Paniolo Buildings and Paniolo Premises was assumed by HTI.[24] The SIC Parties' recent misconduct, however, has made it extremely difficult for HTI to fulfill such obligations.  The recent actions taken by the SIC Parties to impede access to the Paniolo Premises – cutting and replacing HTI's locks, accusing HTI of trespassing, wrongfully contacting the local police on HTI, and more (*see* a summary of incidents in Appendix C) – have not only jeopardized HTI's ability to operate the Paniolo Network, but place HTI at risk of breaching its obligations to the Compliance Monitoring Agencies with respect to the Security Mandates.

HTI's obligation to control and manage security arose from its purchase of the SCL License through the 363 Sale.  This SCL License is a Transferred Asset under the 363 Sale Order – it is specifically identified in Schedule 1.1(b) of the APA as an "Assigned Permit", and thus qualifies as an "Incidental Right" purchased by HTI under Section 2.1 of the APA.  *See* APA at 5-6, 10, 225.  The Court's 363 Sale Order acknowledged, however, that the transfer of the SCL License would require consent of the FCC, and the FCC would potentially need to impose additional obligations on the ownership of the SCL License as a condition to granting their

---

[24] This obligation also arises independently, from the DHHL's ROE recently issued directly to HTI.  *See* Ex. M-23, § 5.

consent.  *See* 363 Sale Order ¶ 49 ("The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on such sales, transfers and assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.").

The FCC did exactly that.  As a condition to approving the transfer of the SCL License to HTI, the FCC and Team Telecom required that HTI assume responsibility for implementing and maintaining security over the Paniolo Network, in compliance with and subject to the LOA and the Security Mandates therein.  *See* FCC Public Notice Report No. SCL-00329, dated August 13, 2021,[25] at 3 (granting the application for the assignment of the SCL License from Paniolo to HTI, conditioned "on compliance by [HTI] with the commitments and undertakings set forth in the Letter of Agreement . . . dated July 23, 2021.").  Because the FCC's consent was conditioned on compliance with the LOA, the requirements of the LOA then became "Assumed Liabilities" under the APA.  *See* APA, Section 2.1(c)(i) ("<u>Assumed Liabilities</u>" include all "liabilities and obligations under the Incidental Rights accruing from and after Closing."); 363 Sale Order ¶ 7.

_____

[25] This document is publicly available at https://fcc.report/IBFS/Public-Notices/12561321.pdf, but for the Court's convenience, a copy is attached hereto at **Appendix F**.

Further, HTI's assumption of the Security Mandates under the LOA neatly aligns with the purchase of other Transferred Assets under both the Marshal Sale and the 363 Sale.  Not only did the Marshal Order transfer all keys for access to the Paniolo Buildings, and the keys to the perimeter fences thereto, it also transferred, for each Paniolo Building, "any equipment that is necessary for the performance or monitoring of . . . Security" needed for the operation of the Paniolo Network. Certificate of Execution at 6-15; *see also* APA at 238-245 (subsequently transferring those assets to HTI through the 363 Sale).  The APA further provides that the A.2 Assets included all "security systems . . . for a stand-alone commercial operation and use of the Paniolo Cable System."  APA at 238.  It would be unreasonable and illogical for all of the relevant keys, security equipment, and security systems to be transferred to HTI if the responsibility and obligation to maintain security over the Paniolo Buildings and Paniolo Premises were held by, or shared with, any other party.

Notwithstanding HTI's obligation to control and maintain security on the Paniolo Premises in compliance with the Security Mandates, HTI fully recognizes that the SIC Parties may continue to require access to certain remaining infrastructure (the "Remaining Infrastructure") that remains on certain Paniolo Premises.  This Remaining Infrastructure had previously been commingled with certain Transferred Assets.  Specifically, at Puunene, the SIC Parties retain a

microwave tower on the Paniolo Premises; at Puukapu, SIC retains a network outbuilding; and at Anahola, the SIC Parties retain a wireless macrotower.[26]  The SIC Parties (and all other parties in interest), however, remain subject to the terms of the 363 Sale Order, including the Court's implicit incorporation of the FCC's requirements – both the Security Mandates themselves and the FCC's assignment of security responsibility to HTI.  *See* 363 Sale Order ¶ 6.

The current situation on the ground has become nearly unmanageable.  HTI's employees have not only been interrupted, delayed, or entirely prevented from performing their tasks in operating and managing the Paniolo Network due to SIC obstructing HTI's access to the Paniolo Premises, but have also faced personal danger in light of SIC's attempts to involve the police on alleged "trespassing" by HTI employees on the Paniolo Premises.  *See* Appendix C; *see also* Yoshida Decl. ¶¶ 26, 27 and Exs. Y-34 to Y-37.  The ability of first responders to effectively respond to any emergency incidents on the Paniolo Premises has also been placed in jeopardy, in light of the permanent welding shut and concrete barriers placed at the Paniolo Premises access points.  *Id.* ¶ 44.  All such misconduct by the SIC Parties goes directly against the terms of the 363 Sale Order, and has made it extremely difficult for HTI to properly secure the premises in compliance with Security

---

[26] In respect of the other seven Paniolo Premises, HTI does not believe that the SIC Parties have any need for access or occupancy, as HTI purchased all the improvements and infrastructure on those Paniolo Premises.

Mandates, despite HTI's best efforts. *Id*. Accordingly, HTI respectfully requests that the Court confirm that, through the 363 Sale Order, the obligation to control and maintain security for the Paniolo Premises in compliance with and subject to the requirements of the FCC was assumed by HTI, and further requests that this Court enjoin the SIC Parties from interfering with HTI's efforts to provide such security.

### D. Through the filing of the State Court Action, SIC and Waimana have breached the 363 Sale Order and the Marshal Sale Order.

The Plaintiffs' act of filing the State Court Action directly contravenes the terms of this Court's prior-issued orders. The Bankruptcy Court supervised and approved the Marshal Sale and the 363 Sale (together, the "Sales"), and has addressed disputes relating to the Sales and the parties' rights thereunder in its First Enforcement Order and in the 2021 AP proceeding. Instead of approaching this Court to resolve any potential disputes it had with HTI, however, the Plaintiffs filed the State Court Action in an attempt to seek a more favorable forum.

While the Complaint attaches the Marshal Sale Order, it slyly leaves out the 363 Sale Order and instead only attaches the APA (without its exhibits). *See id.* ¶¶ 15, 17. The 363 Sale Order contains this Court's exclusive jurisdiction provision:

> 52. This Court shall retain exclusive jurisdiction over **any matters related to or arising from** the Settlement Agreement and **the implementation of the Sale Order**, including without limitation, the **enforcement of the US Marshal Sale**, and Settlement Agreement Representations and Settlement Agreement Covenants.

363 Sale Order at ¶ 52 (emphasis added). See *also* Marshal Sale Order ¶ 8 ("This

Court maintains jurisdiction for of [sic] the purposes of interpretation, implementation and enforcement of this Order.")

The factual and legal issues in the State Court Action – chiefly, HTI's rights to use the "Licensed Property" – would unquestionably require the state court to interpret the 363 Sale Order and the Marshal Sale Order, to determine what assets were acquired by the Trustee and thereafter by HTI. *See, e.g.,* Complaint ¶ 19 (whether the Trustee sold to HTI "any rights to occupy the Licensed Property"). That is a task that properly belongs to this Court, and is a task that falls squarely under the provisions of the Court's orders retaining jurisdiction. *See, e.g., In re Petrie Retail, Inc.*, 304 F.3d 223, 228 (2d Cir. 2002) (finding that the bankruptcy court properly retained subject matter jurisdiction over a post-sale dispute between two non-debtors); *Mendoza v. Gen. Motors, LLC*, Case No. 10-2683, 2010 WL 5224136, at *1 (C.D. Cal. Dec. 15, 2010) (enforcing a bankruptcy court's retention-of-exclusive-jurisdiction clause contained within a sale order, in connection with a class action lawsuit which would have required a determination of whether certain liabilities were assumed through the sale). *See also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (holding that bankruptcy courts "plainly" have jurisdiction "to interpret and enforce [their] own prior orders"). By filing and attempting to prosecute the State Court Action in state court, the Plaintiffs have directly defied this Court's retention of exclusive jurisdiction with respect to the Transferred Assets.

55

The SIC Parties have shown, time and time again, that they hold little regard for this Court's authority and jurisdiction, and the State Court Action is an attempt at subverting this Court's prior rulings.  At a minimum, this Court should issue a finding that the SIC Parties have breached this Court's exclusive jurisdiction provision, as set forth in the 363 Sale Order, by filing and prosecuting the State Court Action.

III.   **CONCLUSION**

For the foregoing reasons, HTI thus respectfully requests that the Motion be granted in its entirety, and the Court enters the Interim Order and Final Order enforcing the 363 Sale Order.

DATED:     Honolulu, Hawaii, <u>March 29, 2022</u>.

CASE LOMBARDI & PETTIT

*/s/ Ted N. Pettit*
TED N. PETTIT
DAVID G. BRITTIN
And
MORGAN, LEWIS & BOCKIUS LLP
ANDREW J. GALLO
MELISSA Y. BOEY

Attorneys for HAWAIIAN TELCOM, INC.

56

## <u>Exhibit 1</u>

**Proposed Interim Order**

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>Chapter 11<br><br>**MOTION BY HAWAIIAN TELCOM, INC. FOR INTERIM AND FINAL RELIEF ENFORCING THE COURT'S SALE ORDER**<br><br><br>Hearing:<br>Date:   _____<br>Time:   _____<br>Judge:   Honorable Robert J. Faris___ |

## ORDER GRANTING INTERIM RELIEF IN CONNECTION WITH MOTION BY HAWAIIAN TELCOM, INC. ENFORCING THE COURT'S SALE ORDER

Upon the motion (the "Motion")[1] of Hawaiian Telcom, Inc. ("HTI") seeking,

pursuant to Sections 105 and 363(f) of title 11 of the United States Code (the

"Bankruptcy Code"), Rule 9013 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 9013-1 of the Local Bankruptcy Rules for the

District of Hawaii (the "Local Rules"), entry of an interim order (this "Interim

Order") enforcing the Court's prior sale order; and consideration of the Motion and

---

[1] Any capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion.

the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due, sufficient, and proper notice of the Motion having been provided under the circumstances and in accordance with the Bankruptcy Rules and the Local Rules, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and the record of the Hearing; and upon consideration of the declarations filed in support of the Motion; and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED on an interim basis as set forth herein.   All capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion.

2.     Sandwich Isles Communications, Inc. ("SIC") and its affiliates (including for avoidance of doubt but without limitation Waimana Enterprises, Inc., Pa Makani LLC, Clearcom, Inc., and members of the Hee family), including all of their employees, contractors, personnel, agents, and representatives, are hereby compelled to:

Interim Order

a.    Immediately cease removing, destroying, altering, or otherwise tampering with any of HTI's locks on and within, including on the perimeter fences of, the following Paniolo Buildings and Paniolo Premises:

| | |
|---|---|
| 1. | Anahola [Kauai] Central Office |
| 2. | Kekaha [Kauai] Terminal Building |
| 3. | Nanakuli [Oahu] Terminal Building |
| 4. | Waimanalo [Oahu] Terminal Building |
| 5. | Kalamaula [Molokai] Terminal Building |
| 6. | Puunene [Maui] Terminal Building |
| 7. | Waiehu [Maui] Central Office |
| 8. | Puukapu [Hawaii] Terminal Building |
| 9. | Laiopua [Hawaii] Central Office |
| 10. | Hilo [Hawaii] Central Office |

b.    Immediately cease barricading the internal doors, drilling or tampering with locks and doors for any portion of the Paniolo Buildings, including but not limited to the Paniolo Buildings at Anahola and Hilo;

c.    Immediately cease preventing or impeding HTI's access to the Paniolo Buildings and Paniolo Premises in any way, including without limitation, by physically blocking entrances to or within the Paniolo Premises, disabling or replacing locks or hardware, installing any locks or devices on the perimeter fence of or within the Paniolo Buildings and Paniolo Premises, welding shut any access gates, installing any bollards or barriers, or any other action that prevents or impedes access to or within the buildings and premises by HTI or any first responders;

3

Interim Order

d.      Immediate cease making false police reports alleging that HTI has been trespassing on the Paniolo Buildings and Paniolo Premises, or otherwise contacting the police with respect to HTI personnel accessing the Paniolo Buildings and Paniolo Premises.

e.      Fully adhere to, and refrain from interfering with, any and all of HTI's security protocols in, on, or within the Paniolo Buildings and Paniolo Premises.

3.      This Interim Order shall be immediately effective and enforceable upon its entry.  Any applicable stay is hereby waived and shall not apply to this Final Order.

4.      This Court shall retain jurisdiction with respect to all matters arising from or related to the enforcement, implementation and/or interpretation of this Interim Order.

5.      A final hearing to consider the relief requested in the Motion shall be held on **May 2, 2022** at **2:00 p.m.** (prevailing Hawaii time) and any objections or responses to the Motion shall be filed and served so as to be actually received on or prior to _____, 2022 at _____ (prevailing Hawaii time).

**END OF ORDER**

## <u>EXHIBIT 2</u>

**Proposed Final Order**

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PANIOLO CABLE COMPANY, LLC,<br><br>Debtor. | Case No. 18-01319 (RJF)<br>Chapter 11<br><br>**MOTION BY HAWAIIAN TELCOM, INC. FOR INTERIM AND FINAL RELIEF ENFORCING THE COURT'S SALE ORDER**<br><br><br>Hearing:<br>Date: _____<br>Time: _____<br>Judge:   Honorable Robert J. Faris |

## ORDER GRANTING FINAL RELIEF IN CONNECTION WITH MOTION BY HAWAIIAN TELCOM, INC. ENFORCING THE COURT'S SALE ORDER

Upon the motion (the "Motion")[1] of Hawaiian Telcom, Inc. ("HTI") seeking,

pursuant to Sections 105 and 363(f) of title 11 of the United States Code (the

"Bankruptcy Code"), Rule 9013 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 9013-1 of the Local Bankruptcy Rules for the

District of Hawaii (the "Local Rules"), entry of a final order (this "Final Order")

enforcing the Court's prior sale order; and consideration of the Motion and the relief

---

[1] Any capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion.

Final Order

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due, sufficient, and proper notice of the Motion having been provided under the circumstances and in accordance with the Bankruptcy Rules and the Local Rules, and it appearing that no other or further notice need be provided; and a final hearing having been held to consider the relief requested in the Motion (the "Final Hearing"); and the record of the Final Hearing; and upon consideration of the declarations filed in support of the Motion; and the Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and good and sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

A.    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this Chapter 11 Case pursuant to Bankruptcy Rule 9014.

B.    This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding.  Venue

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2

Final Order

is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     This Final Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  This Court expressly finds that there is no just reason for delay in the implementation of this Final Order and expressly directs entry of this Final Order as set forth herein which shall not be subject to any stay.

D.     The notice provided in connection with the Motion and the Final Hearing provided all interested parties with timely and proper notice of the relief requested in the Motion.  Further, a reasonable opportunity to object to and to be heard regarding the relief granted by this Final Order has been afforded to all parties entitled to notice.  No further or other notice is or shall be required in connection with the relief granted in this Final Order.

E.     The relief granted in this Final Order is necessary to ensure compliance with this Court's 363 Sale Order and other related previous orders.

F.     Through the Marshal Sale and the 363 Sale, HTI has properly acquired the entirety of the Paniolo Buildings, and thus now holds control and ownership over the entirety of the Paniolo Buildings.

G.     Through the Marshal Sale and the 363 Sale, HTI has properly acquired full rights of access to the Paniolo Buildings and the Paniolo Premises in order to operate the Paniolo Network.  The SIC Parties are prohibited from charging HTI any

3

Final Order

fees for accessing or using the Paniolo Buildings and Paniolo Premises, and HTI is not required to pay any such fees.

H.   The obligation to control and maintain security for the Paniolo Premises, subject to the requirements of the Federal Communications Commission and the LOA, was assumed by HTI through the 363 Sale.

I.   Sandwich Isles Communications, Inc. and Waimana Enterprises, Inc. have violated this Court's exclusive jurisdiction provision by filing the State Court Action, which is currently pending at Case No. 1CCV-22-0000321 in the State of Hawaii Circuit Court of the First Circuit.  This Court retains exclusive jurisdiction to adjudicate the issues raised by SIC in the State Court Action with respect to the 363 Sale, the Marshal Sale, and/or the Transferred Assets.

IT IS THUS HEREBY ORDERED THAT:

1.   The Motion is GRANTED on a final basis as set forth herein.   All capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion.

2.   Any and all objections and responses to the Motion that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.   Sandwich Isles Communications, Inc. ("SIC") and its affiliates (including for avoidance of doubt but without limitation Waimana Enterprises, Inc.,

4

Final Order

Pa Makani LLC, Clearcom, Inc., and members of the Hee family), including all of their employees, contractors, personnel, agents, and representatives, are hereby compelled to:

a.      Immediately cease removing, destroying, altering, or otherwise tampering with any of HTI's locks on and within, including on the perimeter fences of, the following Paniolo Buildings and Paniolo Premises:

| | |
|---|---|
| 1. | Anahola [Kauai] Central Office |
| 2. | Kekaha [Kauai] Terminal Building |
| 3. | Nanakuli [Oahu] Terminal Building |
| 4. | Waimanalo [Oahu] Terminal Building |
| 5. | Kalamaula [Molokai] Terminal Building |
| 6. | Puunene [Maui] Terminal Building |
| 7. | Waiehu [Maui] Central Office |
| 8. | Puukapu [Hawaii] Terminal Building |
| 9. | Laiopua [Hawaii] Central Office |
| 10. | Hilo [Hawaii] Central Office |

b.      Immediately cease barricading the internal doors, drilling or tampering with locks and doors for any portion of the Paniolo Buildings, including but not limited to the Paniolo Buildings at Anahola and Hilo;

c.      Immediately cease preventing or impeding HTI's access to the Paniolo Buildings and Paniolo Premises in any way, including without limitation, by physically blocking entrances to or within the Paniolo Premises, disabling or replacing locks or hardware, installing any locks or devices on the perimeter fences of or within the Paniolo Buildings and Paniolo Premises, welding shut any access

5

Final Order

gates, installing any bollards or barriers, or any other action that prevents or impedes access to or within the buildings and premises by HTI or any first responders;

        d.    Immediate cease making false police reports alleging that HTI has been trespassing on the Paniolo Buildings and Paniolo Premises, or otherwise contacting the police with respect to HTI personnel accessing the Paniolo Buildings and Paniolo Premises.

        e.    Fully adhere to, and refrain from interfering with, any and all of HTI's security protocols in, on, or within the Paniolo Buildings and Paniolo Premises.

        f.    Remove their property from the "warehouse" rooms within the Paniolo Buildings in Anahola and Hilo.

    4.    This Final Order shall be binding in all respects upon all affected parties, including the SIC Parties.

    5.    This Final Order shall be immediately effective and enforceable upon its entry.  Any applicable stay is hereby waived and shall not apply to this Final Order.

    6.    This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the enforcement, implementation and/or interpretation of this Final Order.

**END OF ORDER**

Final Order

SUMMARY OF APPENDICES AND EXHIBITS

filed in connection with
*Motion by Hawaiian Telcom, Inc. for Interim and Final Relief
Enforcing the Court's Sale Order*

## Exhibits and Appendices to Motion

| Exhibit/Appendix | Description |
|---|---|
| Exhibit 1 | Proposed Interim Order |
| Exhibit 2 | Proposed Final Order |
|  |  |
| Appendix A | Summary of Paniolo Premises |
| Appendix B | Summary of SIC Addenda |
| Appendix C | Summary of Incidents |
| Appendix D | FCC Public Notice Report No. SCL-00303, dated February 18, 2021 |
| Appendix E | FCC File No. SCL-ASG-20210122-0006<br>(Petition to Adopt Conditions to Authorization and License) |
| Appendix F | FCC Public Notice Report No. SCL-00329, dated August 13, 2021 |
| Appendix G | Hawaii Public Utilities Commission, Order No. 38269, at Docket No. 2022-0037 |

## Exhibits to *Declaration of Daniel Masutomi*

| Exhibit | Description |
|---|---|
| M-1 | Department of Hawaiian Homelands License Agreement No. 372 |
| M-2 | Partial Assignment of 372 License from Waimana to SIC |
| M-3 | Partial Assignment of 372 License from Waimana to Pa Makani LLC |
| M-4 | Partial Assignment of 372 License from Waimana to Clearcom, Inc. |
| M-5 | SIC Addendum No. 1 to License Agreement No. 372 (Laiopua) |
| M-6 | SIC Addendum No. 2 to License Agreement No. 372 (Kalamaula & Waimanalo) |
| M-7 | SIC Addendum No. 5 to License Agreement No. 372 (Waiehu) |
| M-8 | SIC Addendum No. 6 to License Agreement No. 372 (Hilo & Puukapu) |
| M-9 | SIC Addendum No. 8 to License Agreement No. 372 (Anahola) |
| M-10 | SIC Addendum No. 11 to License Agreement No. 372 (Nanakuli) |
| M-11 | Laiopua Building Plans      **[filed under seal]** |
| M-12 | Kalamaula Building Plans      **[filed under seal]** |
| M-13 | Waimanalo Building Plans      **[filed under seal]** |
| M-14 | Waiehu Building Plans      **[filed under seal]** |

1

| M-15 | Hilo Building Plans | **[filed under seal]** |
|------|---------------------|------------------------|
| M-16 | Puukapu Building Plans | **[filed under seal]** |
| M-17 | Anahola Building Plans | **[filed under seal]** |
| M-18 | Nanakuli Building Plans | **[filed under seal]** |
| M-19 | Kekaha Building Plans | **[filed under seal]** |
| M-20 | Puunene Building Plans | **[filed under seal]** |
| M-21 | Letter from HTI to the SIC Parties, dated October 1, 2021 | |
| M-22 | Letter from HTI to SIC and Waimana, dated December 23, 2021 | |
| M-23 | Letter from HTI to various regulatory agencies, dated March 21, 2022 | |
| M-24 | Right of Entry No. 704 Agreement (ROE) | |
| M-25 | First Amendment to ROE | |
| M-26 | Letter from HTI to SIC, dated September 16, 2021 | |
| M-27 | Email from HTI to SIC, dated September 17, 2021 | |

## Exhibits to *Declaration of Lynette Yoshida*

| Exhibit | Description |
|---------|-------------|
| Y-1 | Email chain between HTI and SIC, dated between December 10-13, 2021 |
| Y-2 | Email from HTI to SIC, dated December 22, 2021 |
| Y-3 | Photo of by-passed lock, taken on January 5, 2022 at Laiopua |
| Y-4 | Photo of second by-passed lock, taken January 7, 2022 at Laiopua |
| Y-5 | Photo of re-established daisy-chain lockset, taken January 7, 2022 at Laiopua |
| Y-6 | Photo of by-passed lock and re-established daisy-chain, taken January 7, 2022 at Waiehu |
| Y-7 | Email from SIC to HTI, dated January 11, 2022 |
| Y-8 | Photo of removed disc lock, taken on or around January 11, 2022 at Waimanalo |
| Y-9 | Photo of by-passed lock, taken on January 12, 2022 at Kalamaula |
| Y-10 | Email from SIC to HTI, dated January 12, 2022 |
| Y-11 | Photo of by-passed lock, taken on January 14, 2022 at Hilo |
| Y-12 | Photo of re-established daisy-chain lockset, taken on January 14, 2022 at Hilo |
| Y-13 | Photos of warehouse with newly established lockset, taken on January 14, 2022 at Hilo |
| Y-14 | Photos of SIC lock on driveway gate, taken on January 14, 2022 at Laiopua |
| Y-15 | Photos of SIC lock on pedestrian gate, taken on January 14, 2022 at Laiopua |
| Y-16 | Photo of SIC lock on gate, taken on January 20, 2022 at Laiopua |
| Y-17 | Photo of SIC lock on gate, taken on January 21, 2022 at Nanakuli |
| Y-18 | Photo of SIC lock on gate, taken on January 26, 2022 at Kalamaula |
| Y-19 | Photos of metal bar/pipe with metal enclosure on gate, taken on January 28, 2022 at Waimanalo |

| Y-20 | Photos of SIC lock on gate, taken on February 2, 2022 at Puunene |
| Y-21 | Photos of SIC's welded lock box and padlock at gate, taken on February 8, 2022 at Waimanalo |
| Y-22 | Photo of re-secured gate (with HTI chain and padlock), taken on February 8, 2022 at Waimanalo |
| Y-23 | Photo of SIC lock on gate, taken on February 9, 2022 at Kalamaula |
| Y-24 | Photos of SIC's installed metal box on gate, taken on February 10, 2022 at Kekaha |
| Y-25 | Photos of SIC lock on gate, taken on February 11, 2022 at Nanakuli |
| Y-26 | Photos of SIC's installed metal box on gate, taken on February 11, 2022 at Anahola |
| Y-27 | Photos of SIC's installed permanent barrier on gate, taken on February 11, 2022 at Waimanalo |
| Y-28 | Photo of SIC lock on gate, taken on February 16, 2022 at Laiopua |
| Y-29 | Letter from DHHL's counsel (K. Herring) to SIC's counsel (L. Smith), dated January 5, 2022 |
| Y-30 | Letter from SIC's counsel (L. Smith) to DHHL's counsel (K. Herring), dated January 17, 2022 |
| Y-31 | Email from SIC to HTI, dated January 6, 2022 |
| Y-32 | Email from SIC to HTI, dated February 2, 2022 |
| Y-33 | Letter from SIC's counsel (L. Smith) to HTI's former counsel (T. Young), dated January 20, 2022 |
| Y-34 | Letter from SIC's counsel (L. Smith) to Chief of Police, Honolulu, dated January 24, 2022 |
| Y-35 | Letter from SIC's counsel (L. Smith) to Chief of Police, Hawaii, dated January 24, 2022 |
| Y-36 | Letter from SIC's counsel (L. Smith) to Chief of Police, Kauai, dated January 24, 2022 |
| Y-37 | Letter from SIC's counsel (L. Smith) to Chief of Police, Maui, dated January 24, 2022 |

**APPENDIX A**

## Summary of Paniolo Premises

| | **Paniolo Premise** | | **Addendum No.** | **Building Plans** | **Incidents[1]** |
|---|---|---|---|---|---|
| 1. | Anahola [Kauai] | A1 | No. 8 (Ex. M-9) | Ex. M-17 | Warehouse: 12/10/2021; 1/31/2022<br>Gate locks: 1/13/2022; 1/31/2022; 2/11/2022; 3/2/2022<br>Cabinet: 1/18/2022 |
| 2. | Kekaha [Kauai] | A2 | None | Ex. M-19 | Gate locks: 12/10/2021; 2/10/2022 |
| 3. | Nanakuli [Oahu] | A1 | No. 11 (Ex. M-10) | Ex. M-18 | Gate locks: 1/21/2022; 2/11/2022 |
| 4. | Waimanalo [Oahu] | A1 | No. 2 (Ex. M-6) | Ex. M-13 | Gate locks: 1/11/2022; 1/28/2022; 2/8/2022; 2/11/2022<br>Physical barricade: 1/27/2022 |
| 5. | Kalamaula [Molokai] | A1 | No. 2 (Ex. M-6) | Ex. M-12 | Gate locks: 1/12/2022; 1/26/2022; 2/9/2022 |
| 6. | Puunene [Maui] | A2 | None | Ex. M-20 | Gate locks: 1/10/2022; 2/2/2022 |
| 7. | Waiehu [Maui] | A1 | No. 5 (Ex. M-7) | Ex. M-14 | Gate locks: 1/7/2022 |
| 8. | Puukapu [Hawaii] | A2 | No. 6 (Ex. M-8) | Ex. M-16 | Gate locks: 1/14/2022; 1/26/2022 |
| 9. | Laiopua [Hawaii] | A1 | No. 1 (Ex. M-5) | Ex. M-11 | Gate locks: 1/5/2022; 1/12/2022; 1/14/2022; 1/20/2022; 2/16/2022 |
| 10. | Hilo [Hawaii] | A1 | No. 6 (Ex. M-8) | Ex. M-15 | Warehouse: 1/14/2022<br>Gate locks: 1/14/2022; 1/26/2022; 1/28/2022; 2/18/2022<br>Police: 1/27/2022; 3/10/2022 |

---

[1] *See* Appendix C and the *Declaration of Lynette Yoshida* for further details about each incident.

# APPENDIX B

## SUMMARY OF ADDENDA TO 372 LICENSE

| Add. No. | Paniolo Premise | Easement Description | Recordation Information | Ex. No. |
|---|---|---|---|---|
| 1 | Laiopua [Hawaii] | Easement to Lot 227 in The Villages of La'i'opua – Village 3; Kealakehe, North Kona, Island of Hawaii[1] | 9/3/1998 as Document No. 98-131443 | M-5 |
| 2 | Kalamaula [Molokai] | Easement to portions of Lots 65 and 65-A, Kalanianaole Beach Lots situated at Kalamaula, Molokai, Maui, Hawaii. Tax Map Key: 2nd Div. 5-2-09: portion 22 and 14 | 10/7/1998 as Document No. 98-151060 | M-6 |
| | Waimanalo [Oahu] | an Easement to a portion of Lot 55, Waimanalo Residence Lots, Unit (File Plan 2216) situated as Waimanalo, Koolaupoko, Oahu, Hawaii.  Tax Map Key: Div. 4-1-08: portion 3 | 10/7/1998 as Document No. 98-151060 | M-6 |
| 5 | Waiehu [Maui] | an Easement to a portion of Lot 14, Waiehu Kou Subdivision; Tax Map Key: 2nd Div. 3-2-21:14 (por). | 3/10/1999 as Document No. 99-036050 | M-7 |
| 6 | Hilo [Hawaii] | an Easement to a portion of Lot 89 of Panaewa House and Farm Lots, Section 1; Tax Map Key: 2-1-025-090 portion | 3/15/2000 as Document No. 2000-034722 | M-8 |
| | Puukapu [Hawaii] | an Easement to a portion of Lot 23, File Plan 1769, Puukapu Pasture Lots – Section I, situated at Puukapu, Waimea, South Kohala, Hawaii; Tax Map Key: 3rd 6-4-04:009 portion[;] and an Easement to a portion of Government Land between Puukapu Pasture Lots – Section I and Kuhio Village, situated at Puukapu, Waimea, South Kohala, Hawaii | 3/15/2000 as Document No. 2000-034722 | M-8 |

[1] Addendum 1 also granted an easement to a portion of Lot 9263-A which is not part of the Paniolo Network.

1

## SUMMARY OF ADDENDA TO 372 LICENSE

| Add. No. | Paniolo Premise | Easement Description | Recordation Information | Ex. No. |
|---|---|---|---|---|
| 8 | Anahola [Kauai] | Easement to Parcel 22 (Tax Map Key No. (4) 4-8-15) situated at Anahola, Kawaiahu, Kauai, Hawaii, beginning at the northwest corner of this parcel of land, on the southwest corner of Kalalea Road, and on the east side of Parcel 23 (Tax Map Key No. (4) 4-8-03) portion of Anahola Residence Lots, Hawaiian Home Lands, the coordinates of said point of beginning referred to Government Triangulation Station "KIKOO" being 4,735.02 South and 6,192.85 East, thence running azimuths measured clockwise from True South | 8/25/2000 as Document No. 2000-118582 | M-9 |
| 11 | Nanakuli [Oahu] | Easement to all of that certain parcel of land known as Lot "A," land situated Northeasterly of lot 54 of File Plan 1492 at the Northeasterly end of Nanakuli Avenue | 12/26/2002 as Document No. 2002-231257 | M-10 |

2

**APPENDIX C**

## Summary of Incidents at Paniolo Premises

| Date | Location | Summary | Support |
|------|----------|---------|---------|
| 12/10/2021 | Kekaha | HTI lock bypassed. | Yoshida Decl. ¶ 5 |
| 12/10/2021 | Anahola | HTI unable to access "warehouse" portion of building. | Yoshida Decl. ¶ 5; Ex. Y-1 |
| 1/5/2022 | Laiopua | HTI lock bypassed on two gates. On 1/7/2022, HTI had to cut the SIC bypassed lock and re-establish daisy chain locks. | Yoshida Decl. ¶¶ 8-9; Exs. Y-3, Y-4 |
| 1/7/2022 | Waiehu | HTI lock bypassed. | Yoshida Decl. ¶ 10; Ex. Y-6 |
| 1/10/2022 | Puunene | HTI lock bypassed. | Yoshida Decl. ¶ 11 |
| 1/11/2022 | Waimanalo | HTI lock and daisy chain bypassed and replaced with SIC lock. | Yoshida Decl. ¶ 12; Ex. Y-7 |
| 1/12/2022 | Kalamaula | HTI lock bypassed. | Yoshida Decl. ¶ 13; Ex. Y-9 |
| 1/12/2022 | Laiopua | Daisy chain locksets removed and replaced with single SIC lock. | Yoshida Decl. ¶ 14; Ex. Y-10 |
| 1/13/2022 | Anahola | HTI lock bypassed. | Yoshida Decl. ¶ 15 |
| 1/14/2022 | Puukapu | HTI lock bypassed. | Yoshida Decl. ¶ 16 |
| 1/14/2022 | Hilo | Daisy chain on pedestrian gate removed and replaced with SIC lock; daisy chain on driveway gate bypassed. | Yoshida Decl. ¶ 17; Ex. Y-11 |
| 1/14/2022 | Hilo | Lock for exterior door of "warehouse" room of building drilled out.  Interior door of "warehouse" room blocked. | Yoshida Decl. ¶ 18; Ex. Y-13 |
| 1/14/2022 | Laiopua | HTI locks on driveway gate and pedestrian gate removed and replaced with SIC locks. | Yoshida Decl. ¶ 19; Exs. Y-14, Y-15 |
| 1/18/2022 | Anahola | Keys to cabinet removed denying access to terminal circuit. | Yoshida Decl. ¶ 20 |
| 1/20/2022 | Laiopua | HTI lock removed and replaced with SIC lock. | Yoshida Decl. ¶ 21; Ex. Y-16 |
| 1/21/2022 | Nanakuli | Daisy chain interlocking HTI-SIC padlocks and heavy duty chain on | Yoshida Decl. ¶ 22; Ex. Y-17 |

1

Appendix C

| Date | Location | Summary | Support |
|------|----------|---------|---------|
|  |  | driveway gate removed and replaced with SIC lock. |  |
| 1/26/2022 | Puukapu | Fence had been tampered and was thus no longer secure. | Yoshida Decl. ¶ 24 |
| 1/26/2022 | Hilo | HTI lock bypassed. | Yoshida Decl. ¶ 25 |
| 1/26/2022 | Kalamaula | HTI lock bypassed. | Yoshida Decl. ¶ 26; Ex. Y-18 |
| 1/27/2022 | Hilo | SIC personnel called police on HTI personnel for entering the premises. | Yoshida Decl. ¶ 27 |
| 1/27/2022 | Waimanalo | SIC personnel blocked gate and would not allow HTI personnel into the premises, and then informed HTI personnel that they could stay on property only in the presence of SIC personnel. | Yoshida Decl. ¶ 28 |
| 1/28/2022 | Hilo | HTI lock removed. | Yoshida Decl. ¶ 29 |
| 1/28/2022 | Waimanalo | SIC cut HTI's lock and placed metal bar/pipe with enclosure on gate to prevent access. | Yoshida Decl. ¶ 30; Ex. Y-19 |
| 1/31/2022 | Anahola | HTI gate lock bypassed, and SIC personnel blocked access to "warehouse" room. | Yoshida Decl. ¶ 31 |
| 2/2/2022 | Puunene | HTI lock removed and replaced with SIC lock. | Yoshida Decl. ¶ 32; Ex. Y-20 |
| 2/8/2022 | Waimanalo | HTI's combination lock and heavy duty lock to secure driveway gate removed and replaced with padlock encased in metal box. | Yoshida Decl. ¶ 33; Ex. Y-21 |
| 2/9/2022 | Kalamaula | HTI lock removed and replaced with SIC lock. | Yoshida Decl. ¶ 34; Ex. Y-23 |
| 2/10/2022 | Kekaha | HTI lock bypassed and SIC installed metal box over its own lock. | Yoshida Decl. ¶ 35; Ex. Y-24 |
| 2/11/2022 | Nanakuli | SIC lock installed. | Yoshida Decl. ¶ 36; Ex. Y-25 |
| 2/11/2022 | Anahola | HTI lock bypassed and SIC installed metal box over its own lock. | Yoshida Decl. ¶ 37; Ex. Y-26 |

2

| Date | Location | Summary | Support |
|---|---|---|---|
| 2/11/2022 | Waimanalo | Permanent barrier placed in driveway, and driveway gate welded shut, to prevent access. | Yoshida Decl. ¶ 38; Ex. Y-27 |
| 2/16/2022 | Laiopua | HTI lock replaced by SIC lock. | Yoshida Decl. ¶ 39; Ex. Y-28 |
| 2/18/2022 | Hilo | HTI's lock cut. | Yoshida Decl. ¶ 40. |
| 3/3/2022 | Anahola | HTI's padlock and chain removed and replaced with SIC lock. | Yoshida Decl. ¶ 41 |
| 3/10/2022 | Hilo | SIC personnel called police and informed HTI that he had been instructed to cut HTI's lock. | Yoshida Decl. ¶ 42 |

3

Appendix C

# APPENDIX D

Appendix D



# PUBLIC NOTICE

**FEDERAL COMMUNICATIONS COMMISSION**
**445 12th STREET S.W.**
**WASHINGTON  D.C.  20554**

News media information 202-418-0500
Internet: http://www.fcc.gov (or ftp.fcc.gov)
TTY (202) 418-2555

**Report No.  SCL-00303NS**                              **Thursday  February 18, 2021**

**Non-Streamlined Submarine Cable Landing License Applications**
**Accepted For Filing**

Unless otherwise specified, the following procedures apply to the applications listed below:

The applications listed below have been found, upon initial review, to be acceptable for filing.  Pursuant to the Submarine Cable Landing License Act, 47 U.S.C. §§ 34-39, and Executive Order No. 10530, reprinted as amended in 3 U.S.C. § 301, each applicant seeks: (a) the grant of a cable landing licensee; (b) the modification of a cable landing license; and/or (c) the assignment or transfer of control of an interest in a submarine cable landing license.  These applications are not subject to the streamlined processing procedures set forth in Section 1.767 of the Commission's rules, 47 CFR § 1.767.

Filings relating to this application must be received within 14 days of this notice.  Ex parte communications between outside parties and Commission staff concerning these applications are permitted subject to the Commission's rules for "permit-but-disclose proceedings." See 47 C.F.R. § 1.1206.

These applications are being coordinated with the Department of State and other Executive Branch agencies pursuant to section 1.767(b) of the Commission's rules, 47 C.F.R. §1.767(b), and consistent with procedures established with the Department of State. See Review of Commission Consideration of Applications under the Cable Landing License Act, IB Docket No. 00-106, Report and Order, 16 FCC Rcd 22167, 22192-93, paras. 51-52 (2001) (Submarine Cable Landing License Report and Order); Streamlined Procedures for Executive Branch Review of Submarine Cable Landing License Requests, State Department Media Note (Revised) (rel. Dec. 20, 2001) available at http://2001-2009.state.gov/r/pa/prs/ps/2001/6951.htm.

Pursuant to its decision in Review of Commission Consideration of Applications under the Cable Landing License Act, IB Docket No. 00-106, FCC 01-332, 16 FCC Rcd 22167 (2001), and section 1.767 of the rules, the Commission will take action upon these applications within ninety (90) days after release of this public notice, unless it determines that additional time is needed.

People with Disabilities: To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 1-888-835-5322 (tty). All applications listed are subject to further consideration and review, and may be returned and/or dismissed if not found to be in accordance with the Commission's rules, regulations, and other requirements.

SCL-ASG-20210122-00006     E          Hawaiian Telcom, Inc.

Assignment

**Current Licensee:**   Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11

**FROM:** Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11

**TO:**   Hawaiian Telcom, Inc.

Application for consent to the assignment of the cable landing license for the Paniolo Cable System, SCL-LIC-20070223-00003, from the Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11 Trustee) to Hawaiian Telcom, Inc. (HTI). The Paniolo Cable System is a non-common carrier, domestic fiber optic system consisting of 48 fiber pairs and serving the Hawaiian islands. The Paniolo Cable system connects the Hawaiian Islands of Kauai, Oahu, Molokai, Maui, and Hawaii. It has four interisland subsea segments with a total of seven landings: (1) Kekaha, Kaua'i to Makaha, Oahu; (2) Hawai'i Kai, Oahu, to Kaunakakai, Moloka'i; (3) Kaunakakai, Moloka'i, to Lahaina, Maui; and (4) Makena, Maui, to Kawaihae, Hawai'i. The cable went into service in 2009. Applicants state that HTI intends to operate this cable on a common carrier basis.

On November 13, 2018, HSBC Securities (USA) Inc., Sunrise Partners Limited Partnership, and Deutsche Bank Trust Company Americas (Petitioning Creditors) jointly filed an involuntary petition for bankruptcy protection of the Paniolo Cable Company, LLC under chapter 11 of the U.S. Bankruptcy Code with the United States Bankruptcy Court for the District of Hawaii (Bankruptcy Court). On November 29, 2018, the Petitioning Creditors filed a motion with the bankruptcy court seeking the appointment of a Chapter 11 trustee for Paniolo Cable Company, LLC. On February 11, 2019 the Bankruptcy Court entered an Order appointing the Chapter 11 Trustee. On March 8, 2019, Michael Katzenstein, as Chapter 11 Trustee of the Bankruptcy Estate of Paniolo Cable Company, LLC (the Chapter 11 Trustee) notified the Commission of the pro forma assignment of the Paniolo Cable System license from Paniolo Cable Company, LLC to Paniolo Cable Company, LLC, as debtor under the control of the Chapter 11 Trustee. See Public Notice, Report No. SCL-00235, SCL-ASG-20190308-00008, Actions Taken Under Cable Landing License Act, DA 19-200 (IB rel. Mar. 21, 2019).

On November 30, 2020, the Chapter 11 Trustee and HTI entered into an asset purchase agreement pursuant to which HTI will acquire the Paniolo Cable System assets and other unregulated assets. On December 28, 2020, the Bankruptcy Court entered a sale order that, among other things: (1) authorized and approved the sale of Paniolo Cable Company's assets free and clear of all liens, claims, interests, and encumbrances; and (2) approved the asset purchase agreement. Upon consummation of the proposed transaction, HTI will be the owner and operator of the Paniolo Cable System.

HTI is a Delaware corporation that is 100% owned by Hawaiian Telcom Communications, Inc., a Delaware holding company, which 100% owned by Hawaiian Telcom Holdco, Inc., a Delaware holding company, which is 100% owned by Cincinnati Bell, Inc. (Cincinnati Bell), an Ohio holding company. Applicants state that Cincinnati Bell is publicly traded and that its shares are widely held, and that the only entity with a 10% or greater interest is BlackRock, Inc., a Delaware investment management company that owns 14.68% of Cincinnati Bell.

Cincinnati Bell and HTI have pending applications regarding the proposed transfer of control of Cincinnati Bell to Red Fiber Parent LLC (Red Fiber Parent). Red Fiber Parent, a Delaware limited liability company, will acquire 100% of the stock of Cincinnati Bell. See Applications Filed for the Transfer of Control of Cincinnati Bell Inc. and Hawaiian Telcom, Inc. to Red Fiber Parent LLC, WC Docket No. 20-146, Public Notice, 35 FCC Rcd 11320 (WCB/IB/WTB 2020).

The sole member of Red Fiber Parent is RF Topco LLC (TopCo), a Delaware limited liability company formed at the direction of MIP V (FCC) AIV, L.P. (MIP V), a Delaware limited partnership. The sole member of TopCo is Red Fiber Holdings LLC (RF Holdings), a Delaware limited liability company. At the time of closing, RF Holdings would be majority owned (61.5% equity) and controlled by MIP V RF Partners, L.P. (MIP V Member), a Delaware limited partnership, which, in turn, would be majority owned (73.15% equity) and controlled by MIP V. Both MIP V and MIP V Member are funds managed by Macquarie Infrastructure Partners Inc. pursuant to agreement with the funds' general partner, Macquarie Infrastructure Partners V GP, LLC (MIP V GP), which is controlled by Macquarie Infrastructure and Real Assets Inc. (MIRA). MIRA is ultimately wholly owned and controlled by Macquarie Group Limited (MGL), a publicly traded Australian company that provides banking and investment services. RF Holdings would be indirectly minority owned by (i) certain U.S.-organized alternative investment vehicles (Ares AIVs) managed by the Private Equity Group of Ares Management Corporation (Ares Management), a Delaware entity (an aggregate 21.2% equity interest); and (ii) Retail Employees Superannuation Trust (REST), a widely held Australian public offer pension fund managed by Retail Employees Superannuation Pty Limited (Rest Trustee), as trustee of the fund (17.3% equity). REST's indirect interest in Red Fiber Parent will be held by Rest Nominees No. 2 Pty Ltd as trustee for REST US Infrastructure No. 2 Trust (Rest Immediate Entity). MIP V Member, the Ares AIVs, and Rest Immediate Entity would have the right to appoint directors of RF Holdings and Cincinnati Bell based on their equity interests in RF Holdings. According to the Applicants, passive investors will hold indirect equity interests in Red Fiber Parent, through RF Holdings, in the form of limited partnership interests in MIP V or MIP V Member (or an affiliate entity), or the Ares AIVs, or membership interests in REST. These passive investors would each hold indirect interests of less than 10% in Red Fiber Parent.

HTI certifies that it accepts and will abide by the routine conditions specified in 47 CFR § 1.767(g).

Pursuant to Commission practice, the application is being referred to the relevant Executive Branch agencies for their views on any national security, law enforcement, foreign policy or trade policy concerns related to the proposed foreign ownership of Cincinnati Bell and HTI.

Page 2 of 3

REMINDER:

Applicants must certify that neither the applicant nor any party to the application is subject to a denial of federal benefits by federal and/or state courts under authority granted in 21 U.S.C. § 862.  See 47 C.F.R. §§ 1.2001–.2003.

By this notice, we inform the public that submarine cable landing license applications that are part of larger transactions involving multiple Commission licenses or authorizations may involve "extraordinary circumstances" as referenced in Review of Commission Consideration of Applications under the Cable Landing License Act, Report and Order, 16 FCC Rcd 22167 (2001) and Rules and Policies on Foreign Participation in the U.S. Telecommunications Market, Report and Order and Order on Reconsideration, 12 FCC Rcd 23891 (1997), paras. 327-28, Order on Reconsideration, 15 FCC Rcd 18158 (2000).  Additionally, extraordinary circumstances result where Executive Branch agencies petition the Commission to defer action on an application pending the resolution of potential national security, law enforcement, foreign policy and trade policy issues. Accordingly, these applications may not be acted on within the 90-day review period that the Commission has established as the period of time normally required to reach a decision on non-streamlined cable landing licenses. This notice shall serve as public notice to applicants that, in these circumstances, additional time may be required for Commission review and final action. No additional formal public notice will be provided routinely with respect to specific applications in the event that the applicable review period extends beyond 90 days.

Appendix D

**APPENDIX E**

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC  20554**

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Paniolo Cable Company, LLC, ) | File No. SCL-ASG-20210122-00006 |
| and Hawaiian Telcom, Inc. ) | |
| ) | |
| Application for Consent to Assign ) | |
| A Cable Landing License Held by Paniolo ) | |
| Cable Company, LLC, Connecting the ) | |
| Islands of Kauai, Oahu, Molokai, Maui, ) | |
| And Hawai'i in the State of Hawaii, to ) | |
| Hawaiian Telcom Inc. ) | |
| ) | |
| The Paniolo Cable System ) | |

**PETITION TO ADOPT CONDITIONS TO AUTHORIZATION AND LICENSE**

Pursuant to Executive Order 13913, the National Telecommunications and Information

Administration (NTIA) submits this Petition to Adopt Conditions to Authorization and License

(Petition) on behalf of the Committee for the Assessment of Foreign Participation in the United

States Telecommunications Services Sector (Committee).[1]  Through this Petition, and pursuant

to section 1.41 of the Commission's Rules, the Committee advises the Commission that it has no

objection to the Commission approving the above-captioned application, provided that the

Commission conditions its approval on the assurances of Hawaiian Telcom, Inc., ("HTI") to

abide by the commitments and undertakings set forth in the July 23, 2021, Letter of Agreement

(LOA), a copy of which is attached hereto.[2]

Section 2 of the Cable Landing License Act authorizes the President to withhold, revoke,

or condition a submarine cable landing license if the President determines that such action

---

[1] Exec. Order No. 13913, § 9(h), 85 Fed. Reg. 19643, 19647-48 (2020). The Executive Order
directs the Committee to "assist the [Commission] in its public interest review of national
security and law enforcement concerns that may be raised by foreign participation in the United
States telecommunications services sector." Id. § 3(a), 85 Fed. Reg. at 19643.
[2] 47 C.F.R. § 1.41.

would, among other things, "promote the security of the United States."[3] In 1954, the President

delegated that authority to the Commission, subject to a requirement that it not act on an

application without first obtaining "such advice from any executive department or establishment

of the Government as the Commission deems necessary."[4] The Commission has long sought the

expertise of the relevant Executive Branch agencies and has routinely granted agencies' requests

to impose conditions on cable landing licenses to address national security, law enforcement, and

other concerns raised by particular applications.[5]

     After discussions with representatives of the parties in connection with the above-

captioned application, the Committee has concluded that the additional commitments and

undertakings set forth in the LOA will help ensure that those agencies with responsibility for

protecting national security, enforcing the law, and preserving public safety can proceed

appropriately to satisfy those responsibilities.

     Accordingly, NTIA on behalf of the Committee advises the Commission that the

Committee has no objection to the Commission granting the above-captioned application,

provided that the Commission conditions its consent on compliance with the July 23, 2021, LOA

attached to this filing.

Respectfully submitted,

Kathy Smith
Chief Counsel

National Telecommunications and
Information Administration
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230
(202) 482-1816

August 3, 2021

---

[3] 47 U.S.C. § 35.
[4] Exec. Order No. 10530, § 5(a), 19 Fed. Reg. 2709, 2711 (1954). See also 47 C.F.R. § 1.767(b).
[5] See, e.g., Actions Taken Under Cable Landing License Act, 34 FCC Rcd 8628 (2019), 32 FCC Rcd 3791, 3792-93 (2017), 28 FCC Rcd 1323, 1324 (2013), 24 FCC Rcd 2219, 2220 (2009), 23 FCC Rcd 13149, 13420 (2008).

2



July 23, 2021

Assistant Secretary for Trade and Economic Security
Office of Strategy, Policy, and Plans
Mail Stop 0445
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528-0445
IP-FCC@hq.dhs.gov

Chief, Foreign Investment Review Section (FIRS)
Deputy Chief, Compliance and Enforcement (FIRS)
On Behalf of the Assistant Attorney General for National Security
United States Department of Justice
National Security Division
175 N Street, NE
Washington, DC 20530
Compliance.Telecom@usdoj.gov

Andrew Pahutski
U.S. Department of Defense
1400 Defense Pentagon
Washington, DC 20301
osd.pentagon.dod-cio.list.team-telecom@mail.mil

Dear Madam/Sir:

This Letter of Agreement ("LOA") outlines the commitments made by Hawaiian Telcom, Inc. ("HT" or "Licensee") to the U.S. Department of Homeland Security, the U.S. Department of Justice, and the U.S. Department of Defense (collectively, the "Compliance Monitoring Agencies" or "CMAs") to address national security and law enforcement risks raised with regard to an application filed by Paniolo Cable Company ("PCC") and HT with the Federal Communications Commission ("FCC") requesting consent to assign the cable landing license for the Paniolo Cable System ("Paniolo") from PCC to HT.[1]  Paniolo is a submarine cable system that connects five of the Hawaiian Islands: Kauai, Oahu, Molokai, Maui, and Hawai'i.

HT certifies as true and correct, under penalties outlined in 18 U.S.C. § 1001, all statements HT or its representatives have made to the CMAs and the FCC in the course of the review of the above-referenced application that the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector ("Committee") conducted pursuant to Executive Order 13913.  HT hereby adopts those statements as the basis for this LOA.

---

[1] FCC File No. SCL-ASG-20210122-00006.

HT has agreed to provide this LOA to the CMAs, and understands that upon execution of this LOA, the FCC will be petitioned to condition the cable landing license for Paniolo on compliance with this LOA.

For purposes of this LOA:

A.   "Access" means the ability to physically or logically undertake any of the following actions: (a) read, divert, or otherwise obtain non-public information or technology from or about software, hardware, a system or a network; (b) add, edit or alter information or technology stored on or by software, hardware, a system or a network; and (c) alter the physical or logical state of software, hardware, a system or a network (*e.g.*, turning it on or off, changing configuration, removing or adding components or connections).

B.   "Cybersecurity Incident Response Plan" means a plan or processes put in place to develop and implement the appropriate activities to take action regarding a detected cybersecurity event that has been determined to have an impact on HT prompting the need for response and recovery.

C.   "Domestic Communications" means: (a) Wire Communications or Electronic Communications (whether stored or not) between one location within in the United States, including its territories, to another location within the United States, including its territories; or (b) the U.S. portion of a Wire Communication or Electronic Communication (whether stored or not) that originates or terminates in the United States or its territories.

D.   "Domestic Communications Infrastructure" or "DCI" means: (a) any portion of Paniolo that physically is located in the United States, up to and including the submarine line terminating equipment, including (if any) transmission, switching, bridging, and routing equipment, and any associated software (with the exception of commercial-off-the-shelf ("COTS") software used for common business functions, *e.g.*, Microsoft Office) used by or on behalf of HT for Paniolo to provide, process, direct, control, supervise, or manage Domestic Communications; and (b) Network Operations Center ("NOC") facilities, as defined in Section F below.

E.   "Electronic Communication" has the meaning given it in 18 U.S.C. § 2510(12).

F.   "Network Operations Center" or "NOC" means the locations and facilities designated as such by HT for purposes of performing network management, monitoring, maintenance, or other operational functions for Paniolo.

G.   "Principal Equipment" means the primary electronic components of Paniolo, which comprises the DCI and Wet Infrastructure.  Principal Equipment consists of: network element servers; routers; switches; repeaters; submarine line terminal equipment ("SLTE"); system supervisory equipment ("SSE"); signal modulators and amplifiers; power feed equipment ("PFE"); tilt and shape equalizer units ("TEQ/SEQ"); optical distribution frames ("ODF"); branching units ("BU"); synchronous optical network ("SONET"); synchronous digital hierarchy ("SDH"); interface equipment; wavelength selective switch ("WSS") technology; wave division multiplexing ("WDM"); dense wave division multiplexing ("DWDM"); coarse wave division

multiplexing ("CWDM"); optical carrier network ("OCx") equipment, as applicable; all embedded software for the equipment; any non-embedded software used for monitoring, administration, or provisioning Paniolo (with the exception of COTS software used for common business functions, *e.g.*, Microsoft Office); and any other such equipment, whether physical or logical, that performs the functions of the equipment described in this definition that HT may use in the normal course of business.

H.  "Screened Personnel" has the meaning given it in Section 10 below.

I.  "Security" means a condition that results from the establishment and maintenance of protective measures that enable an organization to perform its mission or critical functions despite risks posed by threats to its use of systems.  Protective measures may involve a combination of deterrence, avoidance, prevention, detection, recovery, and correction that should form part of the organization's risk management approach.

J.  "Wet Infrastructure" means hardware components installed and residing on the undersea portion of Paniolo, including fiber optic cables, repeaters, branching units, and routers (if any).  Wet Infrastructure includes all the components used to define the topology of the undersea portion of Paniolo.

K.  "Wire Communication" has the meaning given it in 18 U.S.C. § 2510(1).


HT undertakes to comply with the following commitments:

**1.  Security Point of Contact**

HT agrees to maintain a Security Point of Contact ("POC") for purposes of this LOA.  The POC will possess the appropriate authority, reporting lines, independence, skills and resources to ensure compliance with the terms of this LOA.  The POC will be a U.S. citizen and, to the knowledge of HT, will be eligible to hold an active U.S. Government security clearance at the "Secret" level or higher.  HT agrees to nominate its proposed POC within **30 days** of the execution of this LOA.  HT understands that the POC nomination will be subject to CMA review and approval and may be subject to a background check at the sole discretion of the CMAs.  In order to facilitate this, HT will provide the name, date of birth, place of birth, social security number, and passport number of the nominee, and will subsequently provide any other information requested by the CMAs.

The POC will be available twenty-four (24) hours per day, seven (7) days per week, regarding any national security or law enforcement risks that the CMAs may identify with respect to Paniolo.  Upon CMA request, the POC will make himself/herself available in person within the United States within **72 hours** at a date and location as deemed necessary by the CMAs.  The POC will be responsible for receiving and promptly effectuating any lawful inquiries or requests for information, and HT will ensure that the POC has sufficient authority to effectuate compliance with obligations set forth in this LOA.

HT agrees to notify the CMAs of any proposed change to the POC at least **15 days** in advance (except in the case of the unexpected firing, resignation or death of a POC in which case such written notice must be provided within **5 days** of such event) of such proposed change.  HT understands that any proposed POC will be subject to CMA review and approval pursuant to this Section as outlined above.

2. **Cable System Information**

Within **90 days** of the execution of this LOA, and, thereafter, within **30 days** upon CMA request, HT agrees to make available the following Paniolo information:

(a)     network management information, including:  (1) a network map that includes physical and logical topology, including any terrestrial backhaul from the cable landing stations to SLTE locations or other facilities housing Paniolo Principal Equipment; (2) network and telecommunications architecture descriptions and associated descriptions of interconnection points and controlled gateways to the DCI and Wet Infrastructure; (3) network operational plans, processes, and procedures; (4) locations and functions of any NOCs, data centers, and main distribution facilities; (5) an organizational chart, to include specific reference to the names and positions of senior HT officials responsible for operations of Paniolo, and/or senior officials of any third parties performing such duties on behalf of HT; and (6) descriptions of interfaces and connections to Paniolo for service offload, disaster recovery, or administrative functions;

(b)     a complete and current list of all contracts held by HT or its designee(s) for the maintenance, repair and security of Paniolo; and

(c)     a restoration plan for the Principal Equipment and the Wet Infrastructure for Paniolo.

Within **45 days** of the execution of this LOA, HT agrees to confirm to the CMAs in writing the location of the Paniolo NOC(s), and other facilities with NOC functionality, and the controller, operator, or manager for, the Paniolo NOC(s).  HT understands the CMAs will approve or disapprove the locations within **45 days** of acknowledgement of receipt or as otherwise agreed to by HT and the CMAs, with the right of approval not waived unless provided in writing by the CMAs.  HT agrees to notify the CMAs of any proposed change to the NOC locations, or operators, to include the addition of new NOC locations, at least **45 days** in advance of such proposed change.  HT understands the CMAs will approve or disapprove the new operator, location or locations within **45 days** of acknowledgement of receipt or as otherwise agreed to by HT and the CMAs, with the right of approval not waived unless provided in writing by the CMAs.

3.   **Principal Equipment List**

Within **90 days** of the execution of this LOA, HT agrees to provide the CMAs with a list to include:

(a)     a complete and current list of all Principal Equipment, including:

(1) a description of each item and the functions supported;

(2) each item's manufacturer; and

(3) the model and/or version number of any hardware or software; and

(b)     any vendors, contractors, or subcontractors involved in providing, installing, operating, managing, repairing, or maintaining the Principal Equipment.

Objections to the Principal Equipment List will be handled pursuant to Section 7.

At the sole discretion of the CMAs, HT agrees to supplement in writing the foregoing definition of Principal Equipment to address subsequent technological developments with submarine systems.

4.   **Modifications to Existing Principal Equipment**

HT agrees to provide the CMAs at least **30 days'** advance notice prior to any maintenance, repair, or replacement that would result in any modification to the quantum, function, configuration, operation, or location of existing Principal Equipment for Paniolo.  With any such notice, HT may request that the CMAs waive the notice obligation of this Paragraph 5 for substantially similar modifications in the future.  For the avoidance of doubt, modifications requiring notice to the CMAs do not include routine software updates pushed through by approved vendors.

The 30 days' advance notice requirement is waived for any maintenance, repair, or replacement that is undertaken in response to an unforeseen or uncontrollable event and that is necessary to ensure the continued operability of Paniolo; however, in such circumstances, HT agrees to provide advance notice to the CMAs of the modification, if practicable, and, if impracticable, HT agrees to provide notice within **10 days** after the maintenance, repair, or replacement.  This notice will include a detailed description of the equipment replaced and the circumstances surrounding the need to replace the Principal Equipment without 30 days' advance notice.

HT may continue to utilize any Principal Equipment maintained, repaired, or replaced pursuant to the process outlined in this Section, provided that the CMAs do not object pursuant to Section 7.  In the event of such an objection, HT will not begin reliance upon, expand existing deployment, or enhance the capabilities of any Principal Equipment to which the CMAs have

objected, and HT agrees to meet, confer, and otherwise attempt in good faith to resolve the CMAs' objection.  Until the objection is resolved, HT will not upgrade, install, replace, or service any objectionable Principal Equipment without written authorization from the CMAs.

**5.  Change in Vendors, Contractors, or Subcontractors for Principal Equipment**

HT agrees to provide at least **30 days'** advance notice prior to any change to the list of vendors, contractors, or subcontractors involved in providing, installing, operating, managing, repairing, or maintaining the Principal Equipment.

In addition, HT agrees to provide at least **30 days'** advance notice prior to changing the service offerings or support from a previously-listed vendor, contractor, or subcontractor (*i.e.*, where a previously-listed provider will be offering support in a previously unidentified way).

Objections to any new vendor, contractor, or subcontractor for the Principal Equipment or the proposed service offerings thereof will be handled pursuant to Section 7.

**6.  Equipment Testing**

HT agrees to provide at least **30 days'** advance notice prior to initiating the testing of any new Principal Equipment connected to Paniolo by any vendor not already on the approved Principal Equipment List.  Objections to any testing proposed pursuant to this Section will be handled pursuant to Section 7.

Prior to deployment of any distributed acoustic sensing technology onto the marine portion of this cable, HT agrees to receive the approval of the United States Navy.
HT will provide notice to osd.pentagon.ousd-a-s.list.team-telecom@mail.mil  prior to the deployment, with a courtesy copy to the CMAs.

**7.  Objection Resolution**

Within **90 days** of receipt of any notice provided by HT pursuant to Sections 3, 4, 5, or 6, the CMAs shall either provide written approval or disapproval to HT of the action described in such notice.  If within the 90-days approval/disapproval period the CMAs seek additional information from HT, the approval/disapproval period shall be extended by the number of days the CMAs awaited the requested information.  In the event of a disapproval, HT will not expand the existing deployment or enhance the capabilities of any Principal Equipment of which the CMAs have disapproved, and HT agrees to meet, confer and resolve the CMAs' objection.  Until the CMAs' disapproval is resolved, HT will not upgrade, install, replace, or service any disapproved Principal Equipment without written authorization from the CMAs.

-6-

8. **Measures to Prevent Improper Use and Unauthorized Logical Access**

HT agrees to take practicable measures to prevent unauthorized logical Access to Paniolo and to prevent any unlawful use or disclosure of information carried on the same, and HT will include these measures in the policies that HT will develop and implement pursuant to this LOA.  For purposes of this Section, such "practicable measures," at a minimum, include effectuating compliance with all applicable U.S. laws and regulations governing cybersecurity, information security, and privacy and will be measures consistent with best practices and guidelines, such as but not limited to the Cybersecurity Framework of the National Institute of Standards and Technology and 27001 Series standards of the International Organization for Standardization. These measures should also include items such as configuration management, security audits, and system interconnection documentation, as well as contractual safeguards and screening procedures for personnel with logical access to the DCI.

HT agrees that its policies will also include, among other things, policies or plans relating to its information security, supply chain security, cybersecurity incident response, remote access, cybersecurity, third-party contractors, outsourcing and offshoring, maintenance and retention of system logs, protection of lawful U.S. process, protection of U.S. Records obtained by HT in the ordinary course of business, and HT's plans regarding new contracts or amendments to existing contracts with third-party providers requiring those third parties to notify HT in the event of a breach or loss of U.S. Records within a specified time period after discovery, not to exceed 48 hours from the time of discovery, unless the CMAs grant a waiver.

HT agrees to take appropriate measures to protect and promote resiliency of Paniolo, including measures to ensure that security patches for systems and applications are up to date.

HT agrees to maintain or exceed security standards and best practices utilized within the U.S. telecommunications industry for maintenance of password systems and firewalls, monitoring and oversight of logical Access to Paniolo, maintenance of non-destructive logical Access logs, and periodic internal audits of network security and associated network devices.

HT agrees to submit a policy regarding logical security measures for Paniolo adopted in accordance with the requirements of this Section to the CMAs within **90 days** of the date of execution of this LOA.  HT agrees that the policy will be updated when appropriate to conform with evolving information security standards, and that HT will make additional modifications to the policy, if requested by the USG Parties, and to work with the USG Parties to implement such modifications.  The CMAs will approve or disapprove the policy within **90 days** of receipt.

9. **Physical Security Measures**

HT agrees to take practicable measures to physically secure Paniolo, including the DCI and Wet Infrastructure.  HT will screen appropriate personnel in accordance with Section 10 below, and HT will require that all persons who physically access the DCI are escorted at all times by Screened Personnel, as defined herein.

HT agrees to submit a policy setting forth its physical security measures for Paniolo to the CMAs within **90 days** of the date of execution of this LOA.  The CMAs will approve or disapprove the policy within **90 days** of receipt.

## 10. Screening of Personnel

HT agrees to implement, either directly (including through an affiliate) or through a vendor or service provider, a process to screen any existing or newly hired HT personnel (or any personnel performing under an agreement or arrangement with HT) in, at minimum, the following circumstances:

(a)  any person whose position could involve logical Access to the DCI; and

(b)  any person charged with securing the DCI.

HT's personnel screening process will be reflected in a written policy and will include background investigations, public criminal records checks, or other analogous means to ascertain a person's trustworthiness.  Upon satisfactory completion of the requirements set forth in the screening policy, such persons will be considered "Screened Personnel."

HT agrees to submit the screening policy to the CMAs within **90 days** of the execution of this LOA.  The CMAs will approve or disapprove the policy within **90 days** of receipt.  HT agrees to cooperate with any request by the CMAs to provide additional identifying information regarding Screened Personnel.

## 11. Reporting Incidents and Breaches

HT agrees to report to the CMAs within **48 hours** if it learns of information that reasonably indicates:

(a)  unauthorized third-party Access to, or disruption or corruption of, Paniolo or any information being carried on Paniolo.

(b)  any other unauthorized Access to or disclosure of Domestic Communications on Paniolo in violation of federal, state, or local law; or

(c)  any material breach of the commitments made in this LOA, including a violation of any approved plan, policy, or procedure under this LOA.

(d)  Any unauthorized Access to, or disclosure of, information obtained from or relating to Government entities; or

(e)     Any one or more of the following which affect HT's computer network(s) or associated information systems:

    i.     Unauthorized disruptions to a service or denial of a service;

    ii.    Unauthorized processing or storage of data;

    iii.   Unauthorized modifications to system hardware, firmware, or software, including the identification of vulnerabilities introduced through a cyber supply chain compromise;

    iv.    Unplanned incidents that cause activation of HT's Cybersecurity Incident Response Plan; or

    v.     Attempts from unauthorized sources to Access systems or data if these attempts to Access systems or data may materially affect HT's ability to comply with the terms of this LOA; or

    vi.    An unauthorized occurrence that (A) actually or imminently jeopardizes the integrity, confidentiality, or availability of information or an information system; or (B) constitutes a violation or imminent threat of violation of law, security policies, security procedures, or acceptable use policies.

HT agrees to require any third-party service provider to disclose to HT any security breach, whether from data breach or other cause, within 48 hours of the third party discovering the breach, unless the CMAs grant a waiver.  HT agrees further to require any third-party service provider to disclose to HT, within 48 hours of discovery, unless the CMAs grant a waiver, any critical exposure, threat, and vulnerabilities activating its Cybersecurity Incident Response Plan, associated with the products or services provided to HT, including as a result of tainted software, introduction of malware, insertion of counterfeits, unauthorized production, tampering, theft, or insertion of malicious software and hardware, as well as poor development and manufacturing practices in the cyber supply chain.

Upon CMA request, HT agrees to submit in writing a follow-up report describing in greater detail the incident or breach and HT's steps to remediate the incident or breach to the CMAs within **15 days** of discovery of the relevant conduct.  HT also agrees to submit in writing supplementary information regarding any follow-up report until such evaluation is complete.  HT agrees to remediate any incidents or breaches reported pursuant to this provision to the satisfaction of the CMAs.

HT further agrees to take timely and appropriate remedial measures, as recommended by the US-Computer Emergency Readiness Team/Cybersecurity and Infrastructure Security Agency ("US-CERT"/"CISA"), an Information Sharing and Analysis Center ("ISAC"), or other authority, to respond and recover from any cyber or supply chain incident and mitigate vulnerabilities.

**12. Instruction of Obligations**

HT agrees to instruct appropriate officers, employees, contractors, and agents as to HT's obligations under this LOA, including the individuals' duty to report any violation, and to issue periodic reminders of such obligations.

HT agrees to issue initial instructions in writing and provide appropriate live training within **90 days** of the execution of this LOA, and HT agrees to submit a copy of such instructions to the CMAs at the same time.  HT agrees to issue updated instructions or training annually thereafter.

**13. Change in Services or Cable Operations**

HT agrees to notify the CMAs in writing at least **30 days** prior to implementing any changes to the communications services or operations of Paniolo, including notice if HT's proposed change would impact any services provided to U.S. government customers pursuant to a contract with the U.S. government.  HT agrees to provide a detailed description of the proposed change including the terms, conditions, individuals and/or entities involved in making the change to the communications services or operations.

**14. Change in Control**

If HT learns of any information that reasonably indicates that any single foreign entity or individual, other than those already identified, has or likely will obtain an ownership interest, whether direct or indirect, in HT or Paniolo above ten (10) percent, or if any foreign entity or individual, singly or in combination with other foreign entities or individuals, has or likely otherwise will gain either: (i) control, as determined in accordance with 47 C.F.R. § 63.09(b); or (ii) *de facto* or *de jure* control of HT or Paniolo,  HT agrees to provide notice in writing to the CMAs within **15 days**.  Notice under this Section will, at a minimum:

(a)     identify the entity or individual(s) acquiring control (specifying the name, addresses, and telephone numbers of the entity or individual(s));

(b)     identify the beneficial owners of any such increased or prospective increased ownership interest in HT or Paniolo by the entity or individual(s) (specifying the name, addresses, and telephone numbers of each beneficial owner); and

(c)     quantify the amount of ownership interest that the entity or individual(s) has or likely will obtain in HT or Paniolo and, if applicable, the basis for their prospective control of HT or Paniolo.

15.   **Annual Report**

On March 12, 2022 and each subsequent anniversary, HT agrees to submit to the CMAs a report assessing HT's compliance with the terms of this LOA for the preceding year.  The report shall include:

(a)   a certification, under penalties outlined in 18 U.S.C. § 1001, that all statements contained within the report are true and correct;

(b)   the names and contact information of the then-current POC(s);

(c)   Cable System Information, as described in Section 2 above, noting any changes during the reporting period;

(d)   an updated Principal Equipment List containing all information described in Section 3 above, identifying any modifications during the reporting period;

(e)   a copy of the then-current policies adopted in accordance with this LOA, including policies for logical security (Section 8), physical security (Section 9), screening (Section 10), incident reporting (Section 11), and employee training (Section 12), and a summary of any changes during the reporting period and the reasons therefor;

(f)   a summary of any events that occurred during the reporting period that will or reasonably could impact the effectiveness of or compliance with this LOA;

(g)   a summary of any known acts of noncompliance with the terms of this LOA that occurred during the reporting period, whether inadvertent or intentional, with a discussion of what steps have been or will be taken to prevent such acts from occurring in the future;

16.   **Third-Party Audit**

At their sole discretion, but no more frequently than once every calendar year, unless the original audit is found by the CMAs to have been unsatisfactory, the CMAs may request a third-party audit of HT's compliance with the terms of this LOA.

(a)   Within **60 days** of the CMAs requesting a third-party audit, HT will nominate two third-party auditors, subject to the approval of the CMAs.  Within **60 days** of the nominations, the CMAs will approve or disapprove the nominated third-party auditor firms.

(b)   If the CMAs disapprove of either of the nominated third-party auditors, HT agrees to nominate, within **30 days** of such objection, another third-party auditor.  If the CMAs disapprove the nomination of a supplemental third-party auditor, HT will provide to the

-11-

CMAs three (3) additional candidates to be considered for third-party auditor from which the CMAs may choose at their discretion.

(c)     As part of the auditor nomination and approval process, the CMAs may condition approval of a nominated auditor on HT providing information regarding HT's and the nominated auditor's pre-existing relationship (if any).

(d)     HT will be solely responsible for any costs associated with any third-party audit carried out pursuant to this Section.  The CMAs, however, will consider avoidance of unreasonable costs as a factor when exercising their rights under this Section.

(e)     HT will ensure the selected third-party auditor submits, prior to commencing the audit, a methodology and proposed scope of audit, both of which will be subject to CMA approval.

(f)     HT will ensure that the executed engagement agreement with the third-party auditor is provided to the CMAs within **5 days** of execution.

(g)     The third-party auditor will promptly deliver to the CMAs and HT all reports and related information generated or gathered during its review that relate directly to HT's compliance with the terms of this LOA and agrees to meet independently with the CMAs upon request.


**17. Consultation and Visitation**

HT agrees to meet and confer with the CMAs and to resolve to the satisfaction of the CMAs any concerns the CMAs may raise regarding compliance with this LOA.

HT agrees to negotiate in good faith to resolve to the satisfaction of the CMAs any national security or law enforcement risks the CMAs may identify with respect to any matters set forth in this LOA.

HT agrees that, upon **48 hours** advance notice, except when due to exigent circumstances such advance notice is not practicable, the CMAs may visit HT or Paniolo facilities to conduct on-site reviews to verify the implementation of and compliance with the terms of this LOA.  Subject to applicable law, HT will provide unimpeded access to any documents, information, facilities, and personnel necessary to verify compliance with the terms of this LOA on the understanding that when advance notice of a visit is not provided, HT will provide the CMAs with access to documents, information, facilities, and personnel within **24 hours** of such an access request.


**18. Computing Time**

In computing any time period pursuant to this LOA, the below rules apply.

-12-

(a)     For any period stated in days:

    i.   the day of the event that triggers the period is excluded;

    ii.  every day thereafter is counted, including intermediate Saturdays, Sundays, and federal holidays, except for those days that are tolled pursuant to Section 18(c); and

    iii. the last day of the period is included, but if the last day is a Saturday, Sunday, or federal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or federal holiday.

(b)     For any period stated in hours:

    i.   begin counting immediately on the occurrence of the event that triggers the period;

    ii.  count every hour, including hours during intermediate Saturdays, Sundays, and federal holidays, except for those hours that are tolled pursuant to Section 18(c).; and

    iii. if the period would end on a Saturday, Sunday, or federal holiday, the period continues to run until the same time on the next day that is not a Saturday, Sunday, or federal holiday.

(c)     Any approval provision applicable to the CMAs pursuant to this LOA shall be tolled during a lapse in appropriations or any time when the Federal government in the greater Washington, D.C. area is closed.

This LOA shall inure to the benefit of, and shall be binding upon, HT and its successors, assigns, subsidiaries, and affiliates.

HT agrees that, in the event that HT breaches the commitments set forth in this LOA, to include conduct contrary to the CMAs' timely objection to any notice submitted pursuant to this LOA, under subsection 10(f) of Executive Order 13913 ("the Executive Order"), a recommendation may be made that the FCC modify, condition, revoke, cancel, terminate, enter other declaratory relief, or render null and void any relevant license, permit, or other authorization granted by the FCC to HT or any successors-in-interest, in addition to any other remedy available at law or equity.

If, after this LOA takes effect, the CMAs or HT believe that changed circumstances warrant modifying or terminating this LOA (including if the CMAs determine that the terms of this LOA are inadequate or no longer necessary to address national security or law enforcement risks), HT and the CMAs agree to negotiate in good faith to modify this LOA. Rejection of a proposed modification alone shall not constitute evidence of a failure to negotiate in good faith.

-13-

Nothing in this LOA excuses HT from its obligations to comply with all applicable legal requirements and obligations, including all applicable statutes, regulations, requirements, or orders.  More specifically, HT understands that all statements HT and/or its representatives make to the CMAs are and will remain subject to the penalties set forth in 18 U.S.C. § 1001, should any such statements violate that statute.

HT agrees to permit disclosure of confidential and highly confidential information submitted to the FCC pursuant to 47 C.F.R. § 0.442 to Federal government departments, agencies, and offices whose principals are listed in Section 3 of Executive Order 13913.

HT understands that, upon execution of this LOA by an authorized representative or attorney, or shortly thereafter, the FCC will be notified that there is no objection to grant of the application.

For and on behalf of Hawaiian Telcom Inc.

Christopher J. Wilson
Vice President and General Counsel
Hawaiian Telcom Inc.
221 East Fourth Street
Cincinnati, OH 45202
Tel: 513-397-0750
christopher.wilson@cinbell.com

**APPENDIX F**



# PUBLIC NOTICE

**FEDERAL COMMUNICATIONS COMMISSION**
**45 L STREET NE**
**WASHINGTON D.C.  20554**

News media information 202-418-0500
Internet: http://www.fcc.gov (or ftp.fcc.gov)
TTY (202) 418-2555

**DA No.        21-993**

**Report No.  SCL-00329**                                                    **Friday  August 13, 2021**

**Actions Taken Under Cable Landing License Act**

**Section 1.767(a) Cable Landing Licenses, Modifications, and Assignments or Transfers of Control of Interests in Cable Landing Licenses (47 C.F.R. § 1.767(a))**

By the Chief, Telecommunications and Analysis Division, International Bureau:

Pursuant to An Act Relating to the Landing and Operation of Submarine Cables in the United States, 47 U.S.C. §§ 34-39 (Cable Landing License Act), Executive Order No. 10530, Exec. Ord. No. 10530 reprinted as amended in 3 U.S.C. § 301, and section 1.767 of the Commission's rules, 47 C.F.R. § 1.767, the following applications ARE GRANTED.  These grants of authority are taken under section 0.261 of the Commission's rules, 47 C.F.R. § 0.261. Petitions for reconsideration under section 1.106 or applications for review under section 1.115 of the Commission's rules, 47 C.F.R. §§ 1.106, 1.115, may be filed within 30 days of the date of this public notice.

These applications have been coordinated with the Department of State and other Executive Branch agencies pursuant to section 1.767(b) of the Commission's rules, 47 C.F.R. §1.767(b), and consistent with procedures established with the Department of State. See Review of Commission Consideration of Applications under the Cable Landing License Act, IB Docket No. 00-106, Report and Order, 16 FCC Rcd 22167, 22192-93, paras. 51-52 (2001) (Submarine Cable Landing License Report and Order); Streamlined Procedures for Executive Branch Review of Submarine Cable Landing License Requests, State Department Media Note (Revised) (rel. Dec. 20, 2001) available at http://2001-2009.state.gov/r/pa/prs/ps/2001/6951.htm.

This public notice serves as each cable landing licensee's Cable Landing License, or modification thereto, pursuant to the Cable Landing License Act and sections 1.767 and 1.768 of the Commission's rules.  Cable landing licensees should review carefully the terms and conditions of their licenses.   Failure to comply with these terms and conditions or relevant Commission rules and policies could result in fines or forfeitures.

U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-10   Filed  03/29/22    Page 2 of 4

Appendix F

```
SCL-ASG-20210122-00006      E        Hawaiian Telcom, Inc.
```

Assignment

Grant of Authority                                                        Date of Action:    08/11/2021

**Current Licensee:**   Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11

**FROM:**   Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11

**TO:**      Hawaiian Telcom, Inc.

Application for consent to the assignment of the cable landing license for the Paniolo Cable System, SCL-LIC-20070223-00003, from the Bankruptcy Estate of Paniolo Cable Company, LLC (Michael Katzenstein, Chapter 11 Trustee) to Hawaiian Telcom, Inc (HTI). The Paniolo Cable System is a non-common carrier, domestic fiber optic system consisting of 48 fiber pairs and serving the Hawaiian islands. The Paniolo Cable system connects the Hawaiian Islands of Kauai, Oahu, Molokai, Maui, and Hawaii. It has four interisland subsea segments with a total of seven landings: (1) Kekaha, Kaua'i to Makaha, Oahu; (2) Hawai'i Kai, Oahu, to Kaunakakai, Moloka'i; (3) Kaunakakai, Moloka'i, to Lahaina, Maui; and (4) Makena, Maui, to Kawaihae, Hawai'i. The cable went into service in 2009. Applicants state that HTI intends to operate the cable on a common carrier basis.

On November 13, 2018, HSBC Securities (USA) Inc., Sunrise Partners Limited Partnership, and Deutsche Bank Trust Company Americas (Petitioning Creditors) jointly filed an involuntary petition for bankruptcy protection of the Paniolo Cable Company, LLC under Chapter 11 of the U.S. Bankruptcy Code with the United States Bankruptcy Court for the District of Hawaii (Bankruptcy Court). On November 29, 2018, the Petitioning Creditors filed a motion with the bankruptcy court seeking the appointment of a Chapter 11 trustee for Paniolo Cable Company, LLC. On February 11, 2019 the Bankruptcy Court entered an Order appointing the Chapter 11 Trustee. On March 8, 2019, Michael Katzenstein, as Chapter 11 Trustee of the Bankruptcy Estate of Paniolo Cable Company, LLC (the Chapter 11 Trustee) notified the Commission of the pro forma assignment of the Paniolo Cable System license from Paniolo Cable Company, LLC to Paniolo Cable Company, LLC, as debtor under the control of the Chapter 11 Trustee. See Public Notice, Report No. SCL-00235, SCL-ASG-20190308-00008, Actions Taken Under Cable Landing License Act, DA 19-200 (IB rel. Mar. 21, 2019).

On November 30, 2020, the Chapter 11 Trustee and HTI entered into an asset purchase agreement pursuant to which HTI will acquire the Paniolo Cable System assets and other unregulated assets. On December 28, 2020, the Bankruptcy Court entered a sale order that, among other things: (1) authorized and approved the sale of Paniolo Cable Company's assets free and clear of all liens, claims, interests, and encumbrances; and (2) approved the asset purchase agreement. Upon consummation of the proposed transaction, HTI will be the owner and operator of the Paniolo Cable System.

HTI is a Delaware corporation that is 100% owned by Hawaiian Telcom Communications, Inc., a Delaware holding company, which is 100% owned by Hawaiian Telcom Holdco, Inc., a Delaware holding company, which is 100% owned by Cincinnati Bell, Inc. (Cincinnati Bell), an Ohio holding company. Applicants state that at this time Cincinnati Bell is publicly traded and that its shares are widely held, and that the only entity with a 10% or greater interest is BlackRock, Inc., a Delaware investment management company that owns 14.68% of Cincinnati Bell.

The Commission has granted applications regarding the proposed transfer of control of Cincinnati Bell to Red Fiber Parent LLC (Red Fiber Parent). Red Fiber Parent, a Delaware limited liability company, will acquire 100% of the stock of Cincinnati Bell. See Applications Granted For The Transfer Of Control Of Cincinnati Bell Inc. And Hawaiian Telcom, Inc. To Red Fiber Parent LLC, WC Docket No. 20-146, AU Docket No. 20-34, Public Notice, DA 21-615 (WCB/IB/WTB rel. May 26, 2021). According to the Applicants that transaction has not yet been consummated. On August 11, 2021, Applicants provided updated ownership information for Red Fiber Parent.

Upon consummation, Red Fiber Parent would directly acquire at closing 100% of the stock of Cincinnati Bell. The sole member of Red Fiber Parent is RF Topco LLC (TopCo), a Delaware limited liability company formed at the direction of MIP V (FCC) AIV, L.P. (MIP V), a Delaware limited partnership. The sole member of TopCo is Red Fiber Holdings LLC (RF Holdings), a Delaware limited liability company. At the time of closing, RF Holdings would be majority owned (65.8% equity) and controlled by MIP V RF Partners, L.P. (MIP V Member), a Delaware limited partnership, which, in turn, would be majority owned (64.77% equity) and controlled by MIP V. Both MIP V and MIP V Member are funds managed by Macquarie Infrastructure Partners Inc. pursuant to agreement with the funds' general partner, Macquarie Infrastructure Partners V GP, LLC (MIP V GP), which is controlled by Macquarie Infrastructure and Real Assets Inc. (MIRA). MIRA is ultimately wholly owned and controlled by Macquarie Group Limited (MGL), a publicly traded Australian company that provides banking and investment services.

RF Holdings would be indirectly minority owned by (i) certain U.S.-organized alternative investment vehicles (Ares AIVs) and certain U.S.-organized co-invest entities, all managed by the Private Equity Group of Ares Management Corporation (Ares Management), a Delaware entity (an aggregate 17.6% equity interest); and (ii) Retail Employees Superannuation Trust (REST), a widely held Australian public offer pension fund managed by Retail Employees Superannuation Pty Limited (Rest Trustee), as trustee of the fund (16.6% equity). REST's indirect interest in Red Fiber Parent will be held by Rest Nominees No. 2 Pty Ltd as trustee for REST US Infrastructure No. 2 Trust (Rest Immediate Entity). The sole beneficiary of Rest Immediate Entity is REST Nominees No. 1 Pty Ltd, as trustee for the Rest International Infrastructure Investments Holding Trust (Rest Intermediate Entity). The sole beneficiary of Rest Intermediate Entity is REST. The ultimate beneficial owners of Rest Trustee are Shop, Distributive and Allied Employees' Association (SDA), an Australian entity, with 50% of the beneficial interest, and the following foreign individuals, each with 12.5% of the legal and beneficial interest, as nominees of employer sponsors: Steven John Priestly (Australia and United Kingdom), Catriona Noble (Australia), Vaughn Nigel Richtor (Australia and United Kingdom), and Sally Louise Evans (Australia and New Zealand). MIP V Member, the Ares AIVs, and Rest Immediate Entity would have the right to appoint directors of RF Holdings and Cincinnati Bell based on their equity interests in RF Holdings. As of the effective time of the merger, MIP V Member will have five votes, Ares Management will have two votes, and REST will have one vote on the boards of RF Holdings and Cincinnati Bell. Additionally, there will be two independent and/or non-member appointed directors of each of RF Holdings and Cincinnati Bell.

Page 2 of 3

We grant the Petition to Adopt Conditions to Authorizations and Licenses filed in this proceeding on August 3, 2021, by the National Telecommunications and Information Administration on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector.  Accordingly, we condition grant of the application on compliance by Hawaiian Telcom Inc. with the commitments and undertakings set forth in the Letter of Agreement from Christopher J. Wilson, Vice President and General Counsel, Hawaiian Telcom Inc. to the Chief, Foreign Investment Review Section, Deputy Chief, Compliance and Enforcement, on behalf of the Assistant Attorney General for National Security, United States Department of Justice, National Security Division, dated July 23, 2021 (LOA).  A failure to comply and/or remain in compliance with any of these commitments and undertakings shall constitute a failure to meet a condition of this authorization and the underlying cable landing license and thus grounds for declaring the cable landing license terminated without further action on the part of the Commission.  Failure to meet a condition of the authorization may also result in monetary sanctions or other enforcement action by the Commission.  The Petition and the LOA may be viewed on the FCC's website through the International Bureau Filing System by searching for SCL-ASG-20210122-00006 and accessing the "Other Filings related to this application" from the Document Viewing Area.

HTI certifies that it accepts and will abide by the routine conditions specified in 47 CFR § 1.767(g).

This authorization is without prejudice to the Commission's action in any other related pending proceedings.

# <u>Appendix G</u>

BEFORE THE PUBLIC UTILITIES COMMISSION

OF THE STATE OF HAWAII

-------- In the Matter of -------- )
                                   )
    PUBLIC UTILITIES COMMISSION    )    DOCKET NO. 2022-0037
                                   )
Instituting an Emergency           )
Investigative Proceeding Regarding )
Sandwich Isles Communications, Inc.'s )
Fitness, Willingness, and Ability to )
Continue Providing Telecommunications )
Services to Its Customers on Lands )
Administered by the Department of  )
Hawaiian Home Lands.               )
_____)

ORDER NO. <u>    38269    </u>

INSTITUTING AN EMERGENCY INVESTIGATIVE PROCEEDING
REGARDING SANDWICH ISLES COMMUNICATIONS, INC.'S
FITNESS, WILLINGNESS, AND ABILITY TO CONTINUE PROVIDING
TELECOMMUNICATIONS SERVICES TO ITS CUSTOMERS ON LANDS
<u>ADMINISTERED BY THE DEPARTMENT OF HAWAIIAN HOME LANDS</u>

BEFORE THE PUBLIC UTILITIES COMMISSION

OF THE STATE OF HAWAII

```
-------- In the Matter of --------    )
                                      )
     PUBLIC UTILITIES COMMISSION      )     DOCKET NO. 2022-0037
                                      )
Instituting an Emergency              )     ORDER NO. 38269
Investigative Proceeding Regarding    )
Sandwich Isles Communications, Inc.'s )
Fitness, Willingness, and Ability to  )
Continue Providing Telecommunications )
Services to Its Customers on Lands    )
Administered by the Department of     )
Hawaiian Home Lands.                  )
_____)
```

INSTITUTING AN EMERGENCY INVESTIGATIVE PROCEEDING
REGARDING SANDWICH ISLES COMMUNICATIONS, INC.'S
FITNESS, WILLINGNESS, AND ABILITY TO CONTINUE PROVIDING
TELECOMMUNICATIONS SERVICES TO ITS CUSTOMERS ON LANDS
ADMINISTERED BY THE DEPARTMENT OF HAWAIIAN HOME LANDS

By this Order, the Commission: (1) opens this proceeding to investigate SANDWICH ISLES COMMUNICATIONS, INC.'s ("SIC") fitness, willingness, and ability to continue providing telecommunications services to its customers on lands administered by the Department of Hawaiian Home Lands ("DHHL"); (2) names as Parties to this docket SIC, the DIVISION OF CONSUMER ADVOCACY ("Consumer Advocate"), an ex officio party pursuant to Hawaii Revised Statutes ("HRS") § 269-51 and Hawaii Administrative Rules ("HAR") § 16-601-62(a), HAWAIIAN TELECOM, INC. ("HTI"), and DHHL; and (3) invites any interested individual or

organization to file a motion to intervene or participate without intervention in this docket within twenty (20) days of the filing of this Order in accordance with HAR Chapter 16-601.

The Commission cannot overstate the paramount importance of maintaining affordable and reliable telecommunications services to the State as a whole, and in particular, to customers on Hawaiian Home Lands.   To that end, it is critical that SIC demonstrate its continued ability to provide affordable and reliable telecommunications services to its customers in light of the practical and legal realities resulting from recent bankruptcy and federal district court proceedings, and for the involved and affected entities to develop a plan to move forward effectively given the current circumstances.

The purpose of this proceeding is to determine whether SIC is fit, willing, and able to continue providing telecommunications services to its customers on Hawaiian Home Lands, and, if so, to allow SIC and other parties to present solutions, with Commission assistance, that will allow SIC to continue providing reliable and affordable telecommunications services to the Hawaiian Home Lands moving forward, or will allow such services to continue in the absence of SIC.

I.

BACKGROUND AND PROCEDURAL HISTORY

A.

SIC's History of Service to the Hawaiian Home Lands

SIC is a rural telephone company that was founded in 1995.[1] SIC has a Commission-issued Certificate of Authority ("COA") to provide intraLATA and intrastate telecommunications services in the State of Hawaii, restricted to providing services on lands administered by DHHL.[2] SIC established an infrastructure of inter-island undersea fiber cables and middle-mile terrestrial fiber on Hawaiian Home Lands, called the "Paniolo Network," that it used to provide telecommunications services to, among other things, Hawaiian Home Lands.[3] The middle-mile telecommunications

---

[1]See HAWAII DEPARTMENT OF COMMERCE & CONSUMER AFFAIRS, BUSINESS REGISTRATION DIVISION, https://hbe.ehawaii.gov/documents/business.html?fileNumber=98388D1 (last visited March 1, 2022); http://www.sandwichisles.com/SIC.html (last visited March 1, 2022). SIC is a wholly-owned subsidiary of Waimana Enterprises, Inc., a Hawaii corporation. See U.S. v. Sandwich Isles Commc'ns, Inc., 398 F.Supp.3d 757, 763 (D.Haw. 2019); see also Docket No. 96-0026, Order No. 16078, filed on November 14, 1997 ("Order No. 16078"), at 2 (hereinafter U.S. v. SIC).

[2]Order No. 16078 4-5 (also stating that "[a]s a holder of a COA, [SIC] is subject to all applicable provisions of HRS chapter 269, HAR chapter 6-80 and chapter 6-81, any other applicable state law and commission rules, and any orders that the commission may issue from time to time.")

[3]See DHHL's Memorandum in Support of Motion of Hawaiian Telcom, Inc. to Enforce Sale Order (Dkt No. 472) at *3, In re Paniolo Cable Company, LLC, Case No. 18-01319 RJF (Bankr. D. Haw. October 8, 2021) ("DHHL Memorandum 472").

2022-0037                           3

services link up to "last mile" infrastructure operated by SIC.[4]
This middle and last mile infrastructure provides critical
telecommunications services to DHHL, DHHL's beneficiaries,
and DHHL's lessees throughout the State.

Between 1997 and 2001, the Rural Utilities Service
("RUS") of the U.S. Department of Agriculture ("USDA") loaned SIC
an aggregate principal amount exceeding $160 million to assist
with a build out of its telecommunications infrastructure in
exchange for a broad security interest covering all of SIC's real,
personal, and intangible property and all of SIC's relationships,
privileges, permits, and contracts, which RUS subsequently perfected.[5]
From 2002 through 2015, SIC also received over $27 million from
the Federal Communications Commission ("FCC") via the Universal
Service Fund ("USF") for various telecommunications-related
costs.[6]  In 2015, following the criminal tax fraud conviction of

---

[4]DHHL Memorandum 472.

[5]See DHHL Memorandum 472 at *3; see also U.S. v. SIC, 398 F.Supp.
at 762.  The loans were initially made by the Rural Telephone Bank
("RTB"), an agency of the USDA, pursuant to the Rural Electrification
Act of 1936.  The RTB was subsequently succeeded by the RUS in 2006.
Id.

[6]FCC 20-131, In the Matter of Sandwich Isles Communications, Inc.,
Waimana Enterprises, Inc., Albert S.N. Hee, Forfeiture Order,
File No. EB-IHD-15-00019603, released October 1, 2020 ("FCC Forfeiture
Order"), at 2.  The USF is a federal funding mechanism for
subsidizing telephone service to low-income households and high-cost
areas.  See Universal Service Fund, FEDERAL COMMUNICATIONS COMMISSION,
https://www.fcc.gov/general/universal-service-fund.

2022-0037                          4

Albert Hee,[7] the FCC opened an investigation into "whether SIC received any improper payments from the federal high-cost support mechanism from 2002 to June 2015, the period during which much of Hee's criminal conduct occurred."[8]   Thereafter, in 2015, the Commission declined to certify to the FCC and the Universal Services Administrative Company ("USAC")[9] that all federal high-cost support provided to SIC was used in the preceding calendar year and would be used in the coming calendar year only for its intended purpose (i.e., only for the provision, maintenance, and upgrading of facilities and services for which the support is intended), consistent with Title 47 of the Code of Federal Regulations § 54.314(a).[10]   The FCC subsequently

---

[7]Albert S.N. Hee was "Waimana's sole shareholder for most relevant times and held numerous positions within SIC, Waimana, and other affiliated companies he controlled . . . ." FCC Forfeiture Order at 2.  See also U.S. v. Albert S.N. Hee, No. 14-cr-00826-SOM (D. Haw. June 23, 2015).

[8]FCC Forfeiture Order at 8 (noting the FCC's "ongoing obligation to protect the [USF] from waste, fraud, and abuse, and to ensure that universal service support is used for its intended purposes." Id. at 2).

[9]The USF consists of four separate funds, one being the high-cost support fund, which, as noted above, is designed to support rural providers serving high-cost areas. See Program Overview, UNIVERSAL SERVICE ADMINISTRATIVE CO., https://www.usac.org/high-cost/program-overview/ (last visited March 1, 2022); Universal Service Fund, FEDERAL COMMUNICATIONS COMMISSION https://www.fcc.gov/general/universal-service-fund (last visited March 1, 2022).

[10]See Docket No. 2015-0083, Decision and Order No. 33167, filed on September 28, 2015.

found SIC to have received over $27 million in unearned payments due to falsified cost reporting, resulting in an FCC-imposed forfeiture penalty of $49,598,448.[11]

B.

SIC's Default and Bankruptcy Proceedings

SIC defaulted on the loans from RUS and RUS obtained a judgment against SIC in the amount of $138,557,635.82 in the U.S. District Court for the District of Hawaii in February of 2020 ("RUS Judgment").[12]  As a part of RUS' levy on

_____

[11]See FCC Forfeiture Order ("[W]e impose a forfeiture penalty of $49,598,448 against SIC, jointly and severally with Waimana and [Albert] Hee. The forfeiture we impose here reflects the extraordinary gravity and extent of SIC's willful and fraudulent violations and furthers the [FCC's] goals of ensuring accountability for past conduct, deterring future violations, promoting compliance with our rules, and protecting the integrity of the Universal Service Fund." Id. at 2-3).

[12]See Amended Partial Judgment in a Civil Case, U.S. v. SIC (Dkt. No. 226) (D. Haw. Feb. 18, 2020), Civ. No. 18-00145 JMS-RT, ECF # 226 (D. Haw. Feb. 18, 2020); see also U.S. v. SIC (Dkt. No. 265) (D. Haw. June 29, 2020) (Order Overruling Objection to Writ of Execution), Civ. No. 18-00145 JMS-RT, ECF # 265 (D. Haw. June 29, 2020) (Order Overruling Objection to Writ of Execution) and Katzenstein v. Sandwich Isles Commc'ns (In re Paniolo Cable Co.), Civ. No. 21-00499 JMS-WRP (D. Haw. Mar. 3, 2022) (Order Granting the United States' Motion to Quash Pau Loa Ventures, Inc.'s Writ of Execution ("Order Granting U.S. Motion to Quash")).  Despite the ongoing complexity of the Paniolo Cable bankruptcy proceeding, it is the Commission's understanding that prior to RUS obtaining its $138,557,635.82 judgment against SIC in February 2020, Michael Katzenstein, the Paniolo Cable bankruptcy trustee obtained an Order and Judgment against SIC in the amount of $256,552,854 in January 2020 ("Katzenstein Judgment"), which was recorded prior to entry of the RUS Judgment.  The Katzenstein Judgment

2022-0037                                6

SIC's assets to satisfy its judgment, the Paniolo Network was sold to HTI via federal bankruptcy court proceedings.[13]  As of August 31, 2021, the transaction effectuating HTI's purchase of the Paniolo Network had closed, and HTI's position is that it owns the Paniolo Network free and clear of other claims and liens.[14]  Upon review of the bankruptcy proceedings, it appears that the bankruptcy court case terminated SIC's rights to occupancy and use of the Paniolo Network.[15]

---

was assigned to an entity called "Pau Loa Ventures" in June 2020, and on October 25, 2021, the bankruptcy court issued a Writ of Execution in favor of Pau Loa Ventures, directing the U.S. Marshal to levy SIC's property to satisfy the Katzenstein Judgment ("Pau Loa Writ of Execution").  Order Granting U.S. Motion to Quash at 4-6.  RUS subsequently filed a Motion to Quash the Pau Loa Writ of Execution, arguing that "the property identified in Pau Loa's Writ of Execution is fully encumbered by the [U.S.'s] senior lien and that [SIC] has no remaining equity in the property." Id. at 6. On March 3, 2022, the Court granted RUS' Motion to Quash.  Order Granting U.S. Motion to Quash at 12-13.

[13]See HTI's Motion to Enforce Sale Order (Dkt No. 459) at *4-5, In re Paniolo Cable Company, LLC, Case No. 18-01319 RJF (Bankr. D. Haw. October 2, 2021) ("HTI Motion 459") (noting that the bankruptcy court entered into a sale order (Dkt. No. 366) approving the sale of certain Paniolo assets to HTI, pursuant to an asset purchase agreement); see also In re Paniolo Cable Company, LLC, Case No. 18-01319 RJF (Bankr. D. Haw. Nov. 19, 2021) (Order Granting in Part and Denying in Part Hawaiian Telcom's Motion to Enforce Sale Order).

[14]See HTI Motion 459 at *4-5; Letter From: HTI To: SIC, Clearcom, Inc., Waimana Enterprises, Inc., and Pa Makani, Inc. Re: Notice of disconnection from the Paniolo Network, dated October 1, 2021 ("HTI October 1, 2021 Letter").

[15]HTI October 1, 2021 Letter.  Per the Commission's review of the proceedings, it appears that that the Trustee did, in fact, sell the Paniolo network to HTI free and clear of any claim, lien, or other encumbrance by SIC.  In an adversary proceeding, SIC claimed that the

2022-0037                                    7

C.

Current Dispute Regarding the Paniolo Network

Following the transfer of the Paniolo Network to HTI, HTI sent SIC a letter noting the change in ownership and expressing an asserted commitment to offering local exchange carriers services on HTI's network.[16]   HTI allowed SIC to temporarily continue uninterrupted use of the Paniolo facilities to avoid disruption of telecommunication and other services, pending the negotiation of a more permanent agreement to govern that relationship.   However, correspondence from HTI to SIC states that it is HTI's position that SIC did not make required

---

sale of the Paniolo Network free and clear of SIC's right to use the Paniolo Network was a violation of a previous settlement agreement entered between SIC and the Trustee, but the Court in the adversary bankruptcy proceeding found as a matter of law that any violation by the Trustee was excused by SIC's earlier breaches of the same settlement agreement, and therefore that SIC's claims against the Trustee and against HTI related to its alleged contracts for use of the Paniolo Network were invalid.  See Order Granting Defendant Michael Katzenstein, as Chapter 11 Trustee's Motion for Summary Judgment on All Claims in Plaintiff's Complaint Filed October 12, 2021 (Dkt No. 57), In re Paniolo Cable Company, LLC, Case No. 18-01319 RJF, Adversary Proc. No. 21-90017 (Bankr. D. Haw. February 1, 2022) (citing and incorporating Oral Ruling, PDF File with Audio File Attachment (Dkt No. 56)), In re Paniolo Cable Company, LLC, Case No. 18-01319 RJF, Adversary Proc. No. 21-90017 (Bankr. D. Haw. January 14, 2022) ("Adversary Proceeding Ruling").

[16]Letter From: HTI To: SIC Re: "Transfer of Ownership of Paniolo Network from the bankruptcy estate of Paniolo Cable Company LLC [] to [HTI], use of Paniolo Network by [SIC]," dated August 31, 2021 ("HTI August 31, 2021 Letter").

payments to HTI related to use of the Paniolo Network.[17]   HTI sent a letter to SIC indicating that, despite SIC's nonpayment, HTI was seeking to negotiate and enter an agreement for SIC's future use of the Paniolo Network but that if no such agreement was reached by March 31, 2022, HTI would revoke SIC's access to and use of the Paniolo Network.[18]   This would also affect SIC's ability to provide telecommunications service to its customers via SIC's "last mile" network.

Other correspondence between HTI and SIC alleges that SIC is obfuscating HTI's access to and ownership of certain elements of the Paniolo Network.[19]   For example, HTI asserts that SIC has barricaded interior doors and changed exterior locks to certain of the Paniolo Network's facilities despite SIC having no legal ownership thereof or other authorization.[20]   HTI further alleges that SIC's interference with HTI's rights as the owner of the Paniolo Network has not ceased despite demand.[21]

---

[17]Letter From: HTI To: Waimana Enterprises, Inc. and SIC Re: Notice of Revised Access Protocols for Hawaiian Telcom Premises, dated December 23, 2021 ("HTI December 23, 2021 Letter").

[18]HTI December 23, 2021 Letter.

[19]See HTI December 23, 2021 Letter.

[20]HTI December 23, 2021 Letter.

[21]HTI December 23, 2021 Letter.

D.

<u>Commission IRs</u>

The Commission had been monitoring the federal District Court and bankruptcy court proceedings, and, on September 21, 2021, issued a set of Information Requests ("IRs") to SIC regarding, among other things, SIC's ability and willingness to continue providing services to its customers.[22]  SIC did not respond to those IRs or otherwise object or request more time to answer.[23]  Accordingly, the Commission issued Order No. 38003 compelling SIC to respond to the IRs on October 5, 2021.[24]  Following the Commission's order compelling a response, SIC did respond to the Commission's first set of IRs and subsequently responded to a second set of IRs, which was issued by the Commission on October 14, 2021.[25]

In SIC's responses to the Commission's IRs, SIC indicates that certain agreements with the Bankruptcy Trustee

---

[22]Letter From: Commission To: Sandwich Isles Communications, Inc. Re: Inquiry Regarding Sandwich Isles' Communications, dated September 21, 2021.

[23]Order No. 38003 (Non-Docketed), "Compelling Sandwich Isles Communications, Inc. to Respond to Information Requests, Filed on September 21, 2021," filed on October 5, 2021 ("Order No. 38003"), at 2.

[24]<u>See</u> Order No. 38003.

[25]Letter From: Commission To: Sandwich Isles Communications, Inc. Re: Follow-Up Inquiries Regarding Sandwich Isles Communications, Inc., dated October 14, 2021.

"insure [sic] SIC will be able to continue to provide service into the future."[26]   SIC further indicates that it remains willing to provide services to the Hawaiian Home Lands, but that it "may be unable to provide service if the [Hawaiian Home Commission] decides to take action that would facilitate negating" the agreements SIC claims will allow it to continue to provide services.[27]   SIC provided a limited response to a Commission IR regarding the effects on SIC's property from the RUS continuing to levy on the RUS Judgment against SIC.[28]

E.

SIC Annual Financial Reports

Pursuant to HAR §§ 6-80-91 and 92, telecommunications carriers are required to file annual financial reports ("AFRs") with the Commission, which must include, among other things, a statement of operations reflecting intrastate revenues by services and intrastate expenses by accounts, and a balance sheet reflecting the carrier's intrastate operations.

---

[26]SIC Response to PUC-SIC-IR-05(a).

[27]SIC Response to PUC-SIC-IR-05(b).

[28]SIC Response to PUC-SIC-IR-6.  The Commission is interested in SIC's position on these same matters now that the Court in the adversarial bankruptcy proceeding has issued its decision regarding the agreements to which SIC may have been referring. See Adversary Proceeding Ruling.

2022-0037                                    11

SIC's AFRs have been filed subject to non-docketed protective orders issued by the Commission, and as such, the Commission will not reveal any specific confidential information contained therein at this time.[29] However, the Commission, based upon its review of SIC's annual reports from 2015 to 2020, observes that SIC appears to be in a dire financial situation. SIC's financial situation will also be a subject of investigation in this docket.

F.

Consumer Advocate's Request for Proceeding

Following SIC's responses to the Commission's first set of IRs, the Consumer Advocate requested that the Commission open a docket "to facilitate transparency and access to information regarding this matter."[30] "The Consumer Advocate believes that establishing a docket will allow interested stakeholders, such as

---

[29]This is not a determination by the Commission that the information was properly redacted, and the Commission reserves the right to order SIC to re-file information unredacted if it is later determined to have been improperly designated as confidential pursuant to the Uniform Information Practices Act.

[30]Letter From: Consumer Advocate To: Commission Re: Sandwich Isles Communications, Inc. and Service to Department of Hawaiian Home Land properties, dated October 15, 2021 ("Consumer Advocate Letter").

SIC's customers, to access and review relevant documents regarding this matter."[31]

II.

<u>DISCUSSION</u>

At this time, the Commission intends to address the uncertainties surrounding SIC's fitness, willingness, and ability to provide services to its customers on Hawaiian Home Lands in the face of the pending March 31, 2022 deadline on which HTI states that it will cut SIC off from the Paniolo Network. The Commission understands that SIC contends that it has the legal right to continue to use the Paniolo Network under certain agreements, which may or may not be enforced by the Bankruptcy Court.[32] But considering that SIC's customers in Hawaiian Home Lands could abruptly lose access to needed telecommunications services depending on a number of potential outcomes, that uncertainty is unacceptable.

The Commission therefore opens this docket to assess whether SIC is fit, willing, and able to continue to provide service to its customers in the Hawaiian Home Lands, and to develop

---

[31]Consumer Advocate Letter.

[32]SIC Response to PUC-SIC-IR-05(a), (b).

2022-0037                                    13

and analyze possible alternatives in the event the Commission finds

that SIC cannot.

A.

Opening the Subject Docket

1.   The Commission opens this emergency investigative proceeding to analyze whether SIC will be fit, willing, and able to continue to provide services to its customers, and, in the event it cannot, to propose and analyze possible solutions for its customers that are being, or would be, deprived of service.

2.   The named parties herein are SIC, the Consumer Advocate pursuant to HRS § 269-51 and HAR § 16-601-62(a), HTI, and DHHL.

3.   The Commission invites any other interested individual or organization to timely file a motion to intervene or participate in this proceeding within twenty (20) days from the filing date of this Order, in accordance with HAR Chapter 16-601.

4.   The Commission invites SIC to file a response to the issues raised in this Order by Monday, March 21, 2022. The Commission will issue an order following SIC's response, that lays out the Statement of Issues for this proceeding, as well as sets forth the procedural schedule.

III.

ORDERS

The Commission ORDERS:

1.    The Commission opens this emergency investigative docket to analyze whether SIC is fit, willing, and able to continue to provide services to its customers, and, in the event it cannot, to propose and analyze possible solutions for its those customers that are being, or will be, deprived of service.

2.    The named parties herein are SIC and the Consumer Advocate pursuant to HRS § 269-51 and HAR § 16-601-62(a), HTI, and DHHL.

3.    The Commission invites any interested individual or organization to timely file a motion to intervene or participate in this proceeding within twenty (20) days from the filing date of this Order, in accordance with HAR Chapter 16-601.



U.S. Bankruptcy Court - Hawaii   #18-01319   Dkt # 637-11   Filed  03/29/22   Page 17 of 20                                                              Appendix G

4.   The Commission invites SIC to file a response to the issues raised in this Order by Monday, March 21, 2022. The Commission will issue an order following the filing of SIC's response that lays out the Statement of Issues for this proceeding, as well as sets forth the procedural schedule.

DONE at Honolulu, Hawaii ___MARCH 11, 2022___.

PUBLIC UTILITIES COMMISSION
OF THE STATE OF HAWAII

By _____
James P. Griffin, Chair

By _____
Jennifer M. Potter, Commissioner

By _____
Leodoloff R. Asuncion, Jr., Commissioner

APPROVED AS TO FORM:

_____
Caroline C. Ishida
Commission Counsel

2022-0037.ljk

2022-0037                    16

<u>CERTIFICATE OF SERVICE</u>

Pursuant to Order No. 37043, the foregoing order was served on the date of filing by electronic mail addressed to the following parties:

DEAN NISHINA
EXECUTIVE DIRECTOR
DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS
DIVISION OF CONSUMER ADVOCACY
dnishina@dcca.hawaii.gov

KEVIN W. HERRING, ESQ.
ASHFORD & WRISTON
A LIMITED LIABILITY LAW PARTNERSHIP LLP
kherring@awlaw.com

WILLIAM J. AILA, JR.
CHAIRMAN, HAWAIIAN HOMES COMMISSION
DEPARTMENT OF HAWAIIAN HOME LANDS
william.j.ailajr@hawaii.gov

FILED

2022 Mar 11 PM 16:00

PUBLIC UTILITIES
COMMISSION

The foregoing document was electronically filed with the State of Hawaii Public Utilities Commission's Document Management System (DMS).

Appendix G

# A̲P̲P̲E̲N̲D̲I̲X̲ ̲H̲

Of Counsel:
SULLIVAN MEHEULA LEE, LLLP

**Electronically Filed**
**FIRST CIRCUIT**
**1CCV-22-0000321**
**18-MAR-2022**
**05:07 PM**
**Dkt. 1 CMPS**

WILLIAM K. MEHEULA III        2277
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 2900
Honolulu, Hawaii 96813
Telephone: (808) 628-7535
Facsimile: (808) 533-2467
Email: meheula@smlhawaii.com
Attorney for Plaintiff
WAIMANA ENTERPRISES INC.


Of Counsel:
KOBAYASHI SUGITA & GODA, LLP

LEX R. SMITH        3485
First Hawaiian Center
999 Bishop Street, Suite 2600
Honolulu, Hawaii 96813
Telephone: (808) 535-5700
Facsimile: (808) 535-5799
Email: lsmith@ksglaw.com

Attorney for Plaintiff
SANDWICH ISLES COMMUNICATIONS INC.


IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| WAIMANA ENTERPRISES INC. and SANDWICH ISLES COMMUNICATIONS INC., | CIVIL NO. _____ (Other Civil Action) |
|---|---|
| Plaintiffs, | COMPLAINT; EXHIBITS "A" – "K"; SUMMONS |
| vs. | |
| HAWAIIAN TELCOM INC., | |
| Defendant. | |

I do hereby certify that the foregoing is a full, true and correct copy of the official court record of the Courts of the State of Hawaiʻi.
Dated at: Honolulu, Hawaiʻi 22-MAR-2022, /s/ Lori Ann Okita, Clerk of the First Judicial Circuit, State of Hawaiʻi



**Appendix H**

COMPLAINT

Waimana Enterprises Incorporated (**"Waimana"**) and Sandwich Isles Communications, Inc. (**"SIC"**) for their complaint against Hawaiian Telcom Inc. (**"Hawaiian Tel"**) alleges and avers as follows.

Waimana and SIC are the owners and holders of License 372 requiring Waimana and SIC to provide all infrastructure necessary to provide modern telecommunications services to every resident of the Hawaiian Home Lands (**"HHL"**), no matter how remote their residence may be. Many of its customers do not have electricity or water and one family lives in a tent.  License 372 mandates that no matter how expensive the infrastructure may be in order to provide such service, Waimana's and SIC's monthly charge to the customer will be no more than is charged for comparable service in urban areas in the state of Hawaii.   The provisions of License 372 are the reason the residents of the HHL have modern telecommunication service today, including in many cases fiber-optic cable to their homes.  It is essential to sustaining, expanding and upgrading modern service to the HHL residents in the future that the requirements of License 372, or equivalent, be continued.   Hawaiian Telcom does not have any license for the Paniolo facilities on Waimana's and SIC's Licensed Property under License 372  that it purchased in 2021 and, even if Hawaiian Tel had a license for the Licensed Property (which it does not), Hawaiian Tel is not meeting the requirements of License 372.  This lawsuit is brought in order to remedy that critical situation which is damaging the residents of the Hawaiian Home Lands.

1.      SIC is a corporation organized and existing under the laws of the State of Hawaii.

2.      Waimana is a corporation organized and existing under the laws of the State of Hawaii.

3.      Hawaiian Tel is a corporation organized under the laws of the State of Hawaii.

2

4.     Section 207(c)(1)(A) of the Hawaiian Homes Commission Act (**"HHCA"**)
authorizes the Hawaiian Homes Commission (**"HHC"**) to grant licenses, for lots, as easements
for public purposes including utility facilities.  Waimana is the owner and holder of License No.
372 issued by the State of Hawaii Department of Hawaiian Home Lands (**"DHHL"**) pursuant to
authorization from the HHC (hereinafter **"License 372"**).

5.     Under HHCA 207(c)(1), License 372 is an interest in real estate issued to
Waimana pursuant to HHCA. 207(c)(1) and Hawaii Administrative Rules 10-4-21 and 22.  A
true copy of License 372 is attached hereto as **Exhibit "A"** and incorporated herein by this
reference.

6.     By instrument dated January 15, 1996, Waimana partially assigned License 372 to
SIC (the **"Partial Assignment"**).  The Partial Assignment is expressly limited to "IntraLata and
Intrastate telecommunication (**"voice"**) services" on the Hawaiian Home Lands (**"HHL"**).  A
true copy of the Partial Assignment is attached hereto as **Exhibit "B."**  By instrument dated
October 6, 2008, the HHC consented to the Partial Assignment.  A true copy of the Consent is
attached hereto as **Exhibit "C"**.  Partial Assignment remains in full force and effect, and SIC is
not in breach of the License 372 and has not abandoned License 372.

7.     The DHHL has confirmed as recently as January 6, 2022 that License 372
remains in full force and effect, is valid and has not been cancelled. Waimana and SIC also are
not in breach of the License 372 and have not abandoned License 372.

8.     License 372 in relevant part provides:

> LICENSOR [DHHL] determines that the LICENSE established herein is essential
> in order to provide broad band telecommunication services of all types (including but not
> limited to local, intrastate, interstate and international telephone; video on demand;
> interactive communication; cable television; medical and educational links; and
> electronic data transmission) to LICENSOR'S lands in a timely manner;

3

NOW THEREFORE, LICENSOR, in consideration of the services to be provided by LICENSEE [Waimana], and the terms, conditions and covenants herein contained on the part of LICENSEE to be kept, observed and performed, hereby grants and issues to LICENSEE, and its legal successors and assigns, the exclusive right and privilege to build, construct, repair, maintain and operate a broad band telecommunications network including poles, overhead and/or underground lines, appliances, microwave and/or other types of equipment over, across, under and throughout all lands under the administration and jurisdiction of LICENSOR, and its legal successors and assigns, including the right to trim and keep trimmed any vegetation, shrubbery, bushes or trees in the way of its lines and appurtenances, and including also the right of entry upon the easement area and adjoining land of LICENSOR for the construction, maintenance, operation and removal of LICENSEE'S line and appurtenances over, across and under the LICENSE area.

TO HAVE AND TO HOLD the same unto LICENSEE, its legal successors and assigns, in perpetuity, commencing on May 1, 1995, unless sooner terminated as hereinafter provided,

5.    LEVEL OF TELECOMMUNICATION SERVICES.  LICENSEE shall provide at a minimum the same level of telecommunication service being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall use its best effort to provide a higher level of telecommunication service than that being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not provide a lower level of service than that level being provided in adjacent areas not subject to the LICENSE unless LICENSOR shall agree in writing.

6.    COST OF TELECOMMUNICATIONS SERVICES.  LICENSEE shall provide to the beneficiaries of LICENSOR living in areas subject to this LICENSE, telecommunications services at a cost less than or equal to the cost for comparable services being provided in adjacent areas not subject to this LICENSE.  LICENSEE shall not charge beneficiaries living in the LICENSE area more for telecommunication services than being charged in adjacent areas not subject to this LICENSE unless LICENSOR consents in writing.

9.    Pursuant to License 372, SIC developed telecommunications facilities, including

Central Offices, warehouses and security fencing ("**Licensee Buildings**")and underground

conduits throughout HHL to beneficiary lessee residences (collectively "**Licensed Property.**")

SIC used those facilities for the provision of voice services.  SIC was granted a Certificate of

Authority from the Hawaii Public Utilities Commission to provide voice services ONLY on

HHL.  Waimana caused other subsidiaries to provide other telecommunications services

(internet, wireless etc.) by using, in part, the excess capacity on SIC's facilities.

4

10.     Paniolo Cable Company Inc. ("**Paniolo**"), which is a third-party mainland undersea cable company not owned or controlled by Waimana, developed and leased to SIC, certain telecommunication facilities (undersea and underground cables and switches) outside of HHL which connected various HHL parcels on each Hawaiian island except Lanai.  Paniolo's facilities were connected to and housed in SIC's existing facilities on the Licensed Property, pursuant to SIC's joint use agreement with Paniolo.  All of Paniolo's facilities were leased to SIC.  Paniolo had no interest in any HHL, as the Licensed Property was licensed to Waimana pursuant to its rights under License 372 and SIC pursuant to its rights under its partial assignment.  The assets owned by Paniolo and leased to SIC including the assets on the Licensed Property are hereinafter referred to as the "**Paniolo Assets**."

11.     In 2018, an involuntary bankruptcy petition was filed against Paniolo and in 2019, the U.S. Bankruptcy Court appointed Michael Katzenstein to serve as the Trustee in Bankruptcy for Paniolo ("**Katzenstein**").

12.     Because SIC was delinquent in its rent payments to Paniolo, in 2019, Katzenstein sued SIC and obtained a money judgment against SIC for the amount of unpaid rent that SIC owed to Paniolo.

13.     With the money judgment, Katzenstein obtained a Writ of Execution and caused the United States Marshal to hold an execution sale of certain specifically identified telecommunications assets of SIC all of which were on the License Property.  Katzenstein, however, did not acquire any interest in License Property as a result of the execution sale.  (The SIC assets acquired by Katzenstein in the execution sale are hereinafter referred to as the "**Katzenstein-Acquired SIC Assets**.")

5

14.     The Katzenstein-Acquired SIC Assets covered only a small specified portion of SIC's facilities on the Licensed Property.  Katzenstein did not want SIC's "last mile" or "local loop" facilities (**"last mile facilities"**) that connect each home on HHL to the local, national and international communication networks or the warehouses and security fencing.  Katzenstein and Hawaiian Tel did not want responsibility to service **ALL** customers on the HHL.  Katzenstein and Hawaiian Tel wanted the assets that could be used to improve service to Hawaiian Tel's customers off of HHL.  These assets continue to be owned by SIC and are essential to sustaining and expanding service to SIC's, Waimana's and/or Waimana's other subsidiaries' customers on the HHL.

15.     By order entered March 16, 2020 the U.S. Bankruptcy Court confirmed the sale of the Katzenstein-Acquired SIC Assets to Trustee Katzenstein.  A true copy of the March 16, 2020 Order is attached hereto as **Exhibit "D."**

16.     Katzenstein knew that he could not obtain rights to the Licensed Property.  He therefore negotiated with SIC and obtained from SIC the right to use the Licensed Property.  In exchange, Katzenstein committed to amongst other conditions not impair telecommunications service to HHL and granted SIC the right to use Paniolo Fiber Pairs on the Paniolo Assets to continue to provide telecommunications services to HHL.  This agreement, entitled  the Master Relationship Agreement dated March 6, 2020 (**"MRA,"**)  attached hereto as **Exhibit "E,"** , which was approved by the Bankruptcy Court by order dated June 4, 2020, allowed Katzenstein to use License 372 for the purposes authorized by SIC:

> For the avoidance of doubt, the Parties acknowledge and agree that DHHL License will not be assigned by SIC to Paniolo, but that SIC shall, and hereby does, grant to Paniolo the full benefit and use of the DHHL License for the IRU Term provided Paniolo does not exercise its rights under such grant to impair service to HHL.

6

Id. at Schedule 2, section 2.3.

17.     Katzenstein then sold the Katzenstein-Acquired SIC Assets (together with

Paniolo's Assets) to defendant Hawaiian Tel.  A copy of the Asset Purchase Agreement dated

November 30, 2020 ("**APA**") is attached hereto as **Exhibit "F."**

18.     On December 16, 2020, Ryan K. P. Kanakaole, Esq., the Deputy Attorney

General representing DHHL filed papers in the Bankruptcy Court confirming that because

Hawaiian Tel did not acquire the right to use License 372, "The Buyer will need to acquire a new

license for the use of DHHL lands."   The same message was confirmed by HHC Chairman

William Aila, in a emails dated January 6, 2021 to alhee@waimana.com that state that License

372 has not been cancelled, and: "The License remains valid.  DHHL informed the Court that

any purchaser of the assets would require a license from DHHL."

19.     Katzenstein never had any rights to any real estate on HHL including the

Licensed Property.  License 372 was never assigned to Katzenstein.  Because Katzenstein never

owned any interest in License 372, he could not, and did not, sell to Hawaiian Tel any rights to

occupy the Licensed Property.

20.     Hawaiian Tel had the opportunity to assume from Katzenstein all of the benefits

of MRA including the use and enjoyment of SIC's rights under License 372.

21.     Hawaiian Tel, however, chose not to assume that agreement that would have

given it the right to use the Licensed Property.    At the time Hawaiian Tel made its choice not to

assume this agreement with SIC, Hawaiian Tel knew that it was buying facilities located on

Waimana's and SIC's Licensed Property.

22.     Hawaiian Tel's failure to assume the right to use the Licensed Property was not

inadvertent.  Hawaiian Tel has repeatedly emphasized that its decision not to assume the

agreement that allowed Katzenstein to use the License Property was deliberate and intentional.

For example, in Hawaiian Tel's motion filed in the U.S. Bankruptcy Court on November 16,

2021, attached hereto as **Exhibit "H,"** Hawaiian Tel boldly asserted that the agreements giving

Paniolo the right to use License 372:

> were solely "Assignable Contracts" which means they were
> contracts that could have been assigned by the Trustee to HTI at
> HTI's sole election. ... **HTI, however, did not elect to designate**
> **any of the SIC Agreements as agreements to be assigned by the**
> **Trustee to HTI**

Id. at 14 (emphasis added).

      23.    Thus, Hawaiian Tel had the opportunity to acquire the right to use the Licensed

Property but chose not to do so.

      24.    On August 31, 2021, the APA sale of Paniolo's Assets from Katzenstein to

Hawaiian Tel closed.

      25.    Hawaiian Tel is a trespasser on the Licensed Property or in the alternative, a "hold

over tenant" from Katenzstein's use rights under the MRA, which is unlikely because Hawaiian

Tel knowingly rejected assignment of those rights.

      26.    On and after August 31, 2021, Hawaiian Tel had no right to locate the assets it

had purchased on the Licensed Property.  Hawaiian Tel does not have a license allowing its

assets to be on Licensed Property.

      27.    Hawaiian Tel purchased from Katzenstein certain facilities located on the

Licensed Property, but has absolutely no interest in the land surrounding and under facilities.

The rights to that land are held by Waimana and SIC pursuant to License 372.  Hawaiian Tel has

no license nor any other right to use the Licensed Property under and surrounding its facilities on

HHL.

8

28.     License 372 places strict and expensive obligations on Waimana and SIC to assure service to every customer on HHL

29.     Hawaiian Tel acknowledges that it needs a license to operate its facilities on HHL, but to date has not obtained one.

30.     In License 372, DHHL granted Waimana the exclusive right to provide telecommunication service on HHL (**"Exclusive Service Right"**).  However, in addition to this Exclusive Service Right, License 372 also granted Waimana the exclusive right to possess the Licensed Property.

31.     Hawaiian Tel may argue that the Federal Communications Commission ("FCC") order dated July 3, 2017 (**"FCC Order"**), attached hereto as **Exhibit "I,"** requires DHHL to provide access to the Licensed Property on the grounds that the FCC Order prohibits DHHL from granting an exclusive license to only one company to provide telecommunications services on HHL, i.e. the Exclusive Service Right.  However, the order does not require Waimana and SIC to share use of the Licensed Property.  The FCC Order only preempts the portion of the License that:

> grants one entity the "exclusive" right "to build, construct, repair, maintain and operate a . . . telecommunications network" for the purpose of providing service to the residents of the Hawaiian home lands and therefore prohibits other entities from doing so.

Id. at Page 7, Paragraph 16

32.     Under the severability provision of the License 372 at section 22, while the Exclusive Service Right may have been invalidated by the FCC Order, the order did not invalidate and FCC does not have jurisdiction to invalidate Waimana's and SIC's right to exclusive possession of the Licensed Property subject to DHHL's rights set forth in License 372. Waimana and SIC require exclusive possession to perform its telecommunications obligations

9

required under License 372.  Thus, Waimana's and SIC's right to exclusive possession of the Licensed Property survived the FCC Order, as did their rights and obligations to provide telecommunications services to HHL.  An internal DHHL memo to the HHC dated January 18, 2022 states "DHHL has informed its lessees, tenants, and permittees that under Federal law they may obtain broadband telecommunications services from any provider of their choice." confirming that the FCC ORDER dealt with License 372 Exclusive Service Right, a copy of which is attached hereto as **Exhibit "G."**

33.     Waimana and SIC are the owners of numerous improvements on the properties licensed under License 372 that were not obtained by Katzenstein and thus were **not** purchased by Hawaiian Tel and are still owned, maintained and used by SIC and/or Waimana and/or Waimana's other subsidiaries to provide service to their HHL customers.  Hawaiian Tel's destructive actions are interfering with Waimana and its subsidiaries' including SIC's ability to continue to provide service to the residents of the HHL.  Hawaiian Telcom are using these Licensed Properties without authorization or paying for such use.

34.     Waimana and SIC have repeatedly urged Hawaiian Tel to negotiate terms on which Hawaiian Tel can be allowed to use the Licensed Property, as Katzenstein did.  Hawaiian Tel has refused to do so.  Hawaiian Tel wants something it and Katzenstein knew was illegal and unfair—Hawaiian Tel wants to use the Licensed Property for free and without committing to not impair telecommunications service to HHL and the obligations of License 372 which DHHL and the HHC granted Waimana and SIC.

35.     Because Hawaiian Tel has no right to locate its facilities on Waimana and SIC's Licensed Property, and Hawaiian Tel has refused to negotiate satisfactory terms for the use of those licensed lands, and Hawaiian Tel continues to damage assets they do not own, Waimana

10

had no choice but to demand that Hawaiian Tel remove its facilities from Waimana and SIC's licensed lands. A true copy of the February 10, 2022, demand letter is attached as **Exhibit "J"**.

36.    Since August 31, 2021, Hawaiian Tel has changed the locks on SIC warehouses, continues to damage SIC's security fencing, including cutting SIC's locking mechanisms, and has caused SIC to cut Hawaiian Tel's locks to gain access to Waimana and SIC's facilities located on Waimana and SIC's licensed lands. Numerous police reports of these incidents have been made.

37.    Despite SIC's and Waimana's demands to follow its security protocols, Hawaiian Tel has failed and refused to stop destroying SIC's property trespassing and remove its facilities from Waimana and SIC's licensed lands.

38.    License 372 grants Waimana and SIC an interest **in land**.

39.    Despite warnings from Waimana and SIC, Hawaiian Tel has repeatedly cut locks and damaged Waimana's and SIC's improvements that Katzenstein has never owned and therefore Hawaiian Tel does not, and could not own. A copy of Hawaiian Tel's letter asserting their alleged "justification" for doing so is attached hereto as **Exhibit "K,"** which only proves that Hawaiian Tel is unfairly competing with Waimana and SIC by usurping Waimana's and SIC's Licensed Property and SIC's "last mile" facilities without compensation, and destroying relations with DHHL and HHL customers.

COUNT I

40.    Waimana and SIC incorporate by reference the allegations contained in paragraphs 1 through 39 hereinabove.

11

41.   Hawaiian Tel is a trespasser or holdover tenant, squatting on land licensed to Waimana and SIC pursuant to License 372 and preventing Waimana and SIC from using the Licensed Property and serving HHL lessees.

42.   Hawaiian Tel has no license, nor any other legal right, to occupy SIC's and Waimana's Licensed Property.

43.   SIC is entitled to: (a) an injunction barring Hawaiian Tel from access to the Licensed Property, and/or a judgment for possession of the Licensed Property under License 372 and an order evicting of Hawaiian Tel from the Licensed Property and an order to remove any property of Hawaiian Tel located thereon, (b) damages for wrongfully using the Licensed Property in violation of Waimana and SIC's rights under License 372 including damages for use of the Licensed Property and disgorgement of Hawaiian Tel profits; and (c) punitive damages.

COUNT II

44.   Waimana and SIC incorporate by reference the allegations contained in paragraphs 1 through 43 hereinabove.

45.   Hawaiian Tel has willfully damaged Waimana's and SIC's property located on Waimana's and SIC's licensed premises, and used without authorization or compensation SIC's "last mile" facilities that constitutes conversion.

46.   Waimana and SIC are entitled to judgment for damages in an amount to be proved at trial for: (a) the property damage caused by Hawaiian Tel's tortious actions in deliberately, repeatedly damaging Waimana's and SIC's property; (b) lost profits and compensation for use of the Licensed Property and disgorgement of Hawaiian Tel profits for use of SIC's "last mile" facilities; and (c) punitive damages.

COUNT III

12

47.    Waimana and SIC incorporate by reference the allegations contained in paragraphs 1 through 46 hereinabove.

48.    Hawaiian Tel is a competitor with Waimana and SIC in the telecommunications business.

49.    Hawaiian Telecom engaged in unfair methods of competition by usurping Waimana and SIC's land rights under the License 372 and SIC's "last mile" facilities without compensation, and destroying relations with DHHL and HHL customers.

50.    Hawaiian Tel's above-described conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

51.    Hawaiian Tel's conduct negatively affects competition and harms fair competition by impeding Waimana and SIC's operation on HHL.

52.    Waimana and SIC have been damaged in its business and property by Hawaiian Tel's unfair methods of competition in an amount to be proven at trial

WHEREFORE, Plaintiffs pray the Court grant the following relief:

1.    Issuance of a judgment for eviction against Hawaiian Tel, evicting Hawaiian Tel from Licensed Areas and to remove its property therefrom;

2.    Issuance of a Writ of Possession in favor of plaintiffs and against defendant Hawaiian Tel directing the sheriff to remove Hawaiian Tel from the lands covered by plaintiffs' License 372;

3.    For a temporary restraining order and preliminary and permanent injunctions enjoining occupying the Licensed Property and prohibiting Hawaiian Tel from damaging Wamana's and SIC's facilities located on the Licensed Property and last mile facilities on HHL.

4.    For damages in an amount to be determined at trial.

13

5.  For treble damages in an amount be determined at trial.

6.  For punitive damages in an amount to be determined at trial.

7.  For plaintiffs' reasonable costs and attorneys' fees incurred herein.

8.  For such other and further relief as the Court deems just.

Dated: Honolulu, Hawaii March 18, 2022.


/s/Lex R. Smith
LEX R. SMITH

Attorney for Plaintiff
SANDWICH ISLES COMMUNICATIONS INC.


/s/ William Meheula
WILLIAM MEHEULA

Attorney for Plaintiff
WAIMANA ENTERPRISES INC.

14

**Date Signed:**
**May 17, 2022**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF HAWAII

In re:

PANIOLO CABLE COMPANY, LLC,

Debtor.

Case No. 18-01319 (RJF)
Chapter 11

**ORDER GRANTING FINAL RELIEF IN CONNECTION WITH
MOTION BY HAWAIIAN TELCOM, INC.
ENFORCING THE COURT'S SALE ORDER**

Upon the motion (ECF No. 637, the "Motion")[1] of Hawaiian Telcom, Inc.

("HTI") seeking entry of a final order (this "Final Order") enforcing the Court's prior

sale order; and an interim hearing having been held on April 18, 2022 to consider

the interim relief requested in the Motion (the "Interim Hearing"); and the order

granting interim relief under the Motion having been entered on April 22, 2022 at

---

[1] Any capitalized terms used but not defined herein hold the meanings ascribed to them in the Motion or its accompanying Memorandum in Support (ECF 637-1).

ECF 696; and a final hearing having been held on May 16, 2022 to consider the final relief requested in the Motion (the "Final Hearing" and together with the Interim Hearing, the "Hearings"); and the Court having considered the Motion, the supporting declarations and other supporting documents filed in connection with the Motion, and the record of both the Hearings, including the appearances of counsel; and the Court having considered all objections or responses to the Motion filed with the Court or asserted at the Hearings; and the Court having found and determined that the legal and factual bases set forth in the Motion and its supporting documents establish just cause for the final relief granted herein; and after due deliberation and good and sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this Chapter 11 Case pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    This Court has jurisdiction over these proceedings through its authority to interpret and enforce its own prior orders. *See Travelers Indem. Co. v. Bailey*, 557

2

U.S. 137, 151 (2009). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      This Final Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). This Court expressly finds that there is no just reason for delay in the implementation of this Final Order and expressly directs entry of this Final Order as set forth herein which shall not be subject to any stay.

D.      The notice provided in connection with the Motion and the Final Hearing provided all interested parties (including, for the avoidance of doubt, each of SIC, Waimana Enterprises, Inc., Pa Makani LLC, Clearcom, Inc., and all affiliates) with timely and proper notice of the relief requested in the Motion. Further, a reasonable opportunity to object to and to be heard regarding the relief granted by this Final Order has been afforded to all parties entitled to notice. No further or other notice is or shall be required in connection with the relief granted in this Final Order.

E.      The relief granted in this Final Order is necessary to ensure compliance with this Court's 363 Sale Order and other related previous orders.

F.      Through the Marshal Sale (defined at ECF No. 637-1 at 4 of 59) and the 363 Sale (*id*.), HTI has properly acquired the entirety of the Paniolo Buildings (defined at ECF No. 637 at 4-5 of 8), and thus now holds exclusive control and ownership over, as well as rights of access to, the entirety of the Paniolo Buildings.

G.     Through the Marshal Sale and the 363 Sale, HTI has properly acquired the assets that permit operation of the Paniolo Network (defined at ECF No. 637-1 at 11 of 59), including, without limitation, full rights of access to the Paniolo Premises, including those certain portions of the 372 License (defined at ECF No. 637-1 at 8-9 of 59) pertaining to the Paniolo Network and/or the Paniolo Premises that were formerly held by SIC.  SIC, Waimana Enterprises, Inc., Pa Makani LLC, Clearcom, Inc., all affiliates thereof, as well as all members of the Hee family and all other individuals who have authority or *de facto* control over any of these entities (collectively, the "SIC Parties")[2] are thus prohibited from charging HTI any fees for accessing or using any assets that permit operation of the Paniolo Network, including, without limitation, the Paniolo Buildings and Paniolo Premises, and HTI is not required to pay any such fees.

H.     Through the Marshal Sale and the 363 Sale, including HTI's acquisition of the perimeter fences surrounding the Paniolo Premises and its the acquisition of all keys relating to the Paniolo Buildings and Paniolo Premises, HTI has acquired the exclusive ability to control and maintain security for and over the entirety of the Paniolo Network, the Paniolo Buildings, and the Paniolo Premises.

---

[2] For the avoidance of doubt, the SIC Parties include, but are not limited to, Albert Hee, Wendy Hee, Adrianne Hee, Breanne Hee-Kahalewai, Jonathan "Mika Kane" Kahalewai, and Charlton Hee.

4

IT IS THUS HEREBY ORDERED THAT:

1.    The Motion is GRANTED on a final basis as set forth herein.

2.    Any and all objections and responses to the Motion that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.    Each of the SIC Parties, including all of their officers, employees, contractors, personnel, agents, and representatives, are hereby compelled to:

a.    Immediately cease removing, destroying, altering, replacing, or otherwise tampering with any of HTI's locks, chains, and other security apparatus pertaining to the Paniolo Network.  For the avoidance of doubt, this includes any of HTI's locks, chains, and other security apparatus on and within the Paniolo Buildings and the Paniolo Premises (including all perimeter fences thereof), including but not limited to the following:

| | |
|------|------------------------------------|
| 1.   | Anahola [Kauai] Central Office     |
| 2.   | Kekaha [Kauai] Terminal Building   |
| 3.   | Nanakuli [Oahu] Terminal Building  |
| 4.   | Waimanalo [Oahu] Terminal Building |
| 5.   | Kalamaula [Molokai] Terminal Building |
| 6.   | Puunene [Maui] Terminal Building   |
| 7.   | Waiehu [Maui] Central Office       |
| 8.   | Puukapu [Hawaii] Terminal Building |
| 9.   | Laiopua [Hawaii] Central Office    |
| 10.  | Hilo [Hawaii] Central Office       |

5

b.     Immediately (i) unlock all doors and locks within the Paniolo Buildings which they still hold keys to, (ii) turn over to HTI all such keys and copies of such keys; (iii) cease barricading or blocking any portion of the Paniolo Buildings, as well as cease drilling or tampering with locks, security apparatus, and doors for any portion of the Paniolo Buildings.

c.     Immediately cease preventing or impeding in any way HTI's access (including access by HTI's contractors and agents) to the Paniolo Network, including on or within any portion of the Paniolo Buildings, the Paniolo Premises, and/or the perimeter fences thereof, including (without limitation) the following conduct:  (i) blocking or shutting any entrances or gates, (ii) disabling or replacing any locks or security apparatus, (iii) installing any locks or security apparatus, and (iv) installing any bollards or barriers.

d.     Immediately cease making police reports alleging that HTI (including HTI's contractors and agents) has been trespassing in or on any portion of the Paniolo Buildings and Paniolo Premises, or otherwise contacting the police with respect to HTI personnel accessing the Paniolo Network, including any portion of the Paniolo Buildings and Paniolo Premises.

e.     Fully adhere to, and immediately cease or refrain from interfering in any way with, any and all of HTI's security measures and protocols

6

relating to the Paniolo Network, including such measures and protocols in, on, or within any portion of the Paniolo Buildings and Paniolo Premises;

        f.    Immediately remove their property from the "warehouse" rooms within the Paniolo Buildings in Anahola and Hilo.

4.    This Final Order shall be binding in all respects upon all parties, including for the avoidance of doubt each of the SIC Parties.

5.    The FCC's rights and powers to take any action pursuant to its regulatory authority, including, but not limited to, imposing any regulatory conditions on sales, transfers and assignments and setting any regulatory fines or forfeitures, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

6.    This Final Order shall be immediately effective and enforceable upon its entry.  Any applicable stay is hereby waived and shall not apply to this Final Order.

7.    This Court retains jurisdiction to enforce, implement, and interpret the 363 Sale Order and this Final Order.

**END OF ORDER**

7

H9022 (12/15)

| | |
|---|---|
| **Information to identify the case:** | |
| Debtor 1 **Paniolo Cable Company, LLC** | **United States Bankruptcy Court District of Hawaii** |
| Name | |
| Debtor 2 (Spouse, if filing) Name | Case number:  **18–01319** Chapter:  **11** |

## NOTICE OF ENTRY OF ORDER OR JUDGMENT

NOTICE IS GIVEN THAT:

The court entered the following order or judgment on the date below,

**Order Granting Final Relief in Connection with Motion by Hawaiian Telcom, Inc. Enforcing the Court's Sale Order (related document(s)637 Motion). Date of Entry: 5/17/2022. (BA)**

The order or judgment may be viewed at the Clerk's Office. It may also be viewed online using PACER, the federal judiciary's electronic records system. Information about obtaining and using a PACER account is available at the court website, www.hib.uscourts.gov.

Date:  May 17, 2022

Clerk's Office:
1132 Bishop Street, Suite 250
Honolulu, Hawaii 96813
(808) 522–8100
www.hib.uscourts.gov

Michael B. Dowling
Clerk